JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

## BEFORE THE JUDICIAL PANEL ON
## MULTIDISTRICT LITIGATION

MAY 23 2008

FILED
CLERK'S OFFICE

IN RE: DIGITEK®    :
**PRODUCT LIABILITY LITIGATION**    :    **MDL DOCKET NO.** 1968
   :
_____ :

## PLAINTIFFS' MOTION FOR TRANSFER AND COORDINATION
## OR CONSOLIDATION UNDER 28 U.S.C. §1407

Arnold Levin, Esquire
Fred S. Longer, Esquire
Michael M. Weinkowitz, Esquire
LEVIN, FISHBEIN, SEDRAN &
BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106-3697
215 592-1500 (phone)
215 592-4663 (fax)
ALevin@lfsblaw.com
FLonger@lfsblaw.com
MWeinkowitz@lfsblaw.com

Joseph DePalma, Esquire
LITE DEPALMA GREENBERG
& RIVAS, LLC
Two Gateway Center,
12th Floor
Newark, NJ 07102
973.623.3000 (phone)
973.623.0858 (fax)
jdepalma@ldgrlaw.com

John R. Malkinson, Esquire
MALKINSON & HALPERN, P.C.
223 W. Jackson Blvd.,
Suite 1010
Chicago, IL 60606
312 427-9600 (phone)
312 427-9629 (fax)
MHPC@aol.com

## ATTORNEYS FOR PLAINTIFFS, KEVIN CLARK AND WILLIE MAE WILBURN, ON
## BEHALF OF THEMSELVES AND OTHERS SIMILARLY SITUATED
*Kevin Clark and Willie Mae Wilburn, individually, and on behalf of all others similarly situated
v. Actavis, Inc. et al., 2:08-cv-2293 (D.NJ 2008)*

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION
MAY 2 . A 10: 1
RECEIVED
CLERK'S OFFICE

# OFFICIAL FILE COPY

IMAGED MAY 2 7 2008

PLEADING NO.

1. Pursuant to 28 U.S.C. §1407 and Rule 7.2 of the Rules of Procedure of the Judicial Panel on MultiDistrict Litigation, Plaintiffs in the action captioned *Kevin Clark and Willie Mae Wilburn, individually, and on behalf of all others similarly situated v. Actavis, Inc. et al.* 2:08-cv-2293 (D.NJ 2008) respectfully move this Panel for an order transferring to the United States District Court for the District of New Jersey the pending actions against Defendants Actavis Group Hf, Actavis Totowa, LLC (formerly known as Amide Pharmaceutical, Inc.), Actavis Inc., Actavis Elizabeth, LLC., Actavis US, Mylan, Inc., Mylan Pharmaceuticals, Inc., Mylan Laboratories, Inc., Mylan Bertek Pharmaceuticals Inc., and, UDL Laboratories, Inc. and any and all additional Related Actions that may be brought to the attention of the Panel against Defendants to the United States District Court for the District of New Jersey. **(Exhibit "1').**[1]

2. As set forth below and in the accompanying *Memorandum*, the actions listed on the accompanying *Schedule of Actions* (hereinafter the "Related Actions")**(Exhibit "2")**[2] satisfy the requirements for consolidation and coordination under 28 U.S.C. §1407 because they concern common questions of fact and consolidation or coordination will serve the interests of efficiency and convenience.

3. In support of this *Motion*, Movants state as follows:

    a) Movants are the named Plaintiffs in the class action filed in the United States District Court for the District of New Jersey, *Kevin Clark and Willie Mae Wilburn, individually, and on behalf of all others similarly situated v. Actavis, Inc. et al.,* 2:08-cv-2293 (D.NJ 2008);

---

[1] The *Class Action Complaint* filed by Movants is attached as Exhibit "1" to *Plaintiffs' Memorandum of Law in Support of Motion for Transfer and Coordination or Consolidation under 28 U.S.C. §1407.*

[2] The *Schedule of Actions* is attached as Exhibit "2" to *Plaintiffs' Memorandum of Law in Support of Motion for Transfer and Coordination or Consolidation under 28 U.S.C. §1407.*

-2-

b)    Counsel for Movants have filed and are aware of two other federal suits asserting class claims and one individual action (the Related Actions) (Exhibit "2"). Each of the other Related Actions have been filed in different federal jurisdictions but contains virtually identical allegations concerning the manufacture and distribution of a prescription medication, Digitek®, containing up to twice the approved of dose on the label of the drug's active ingredient, and seeks similar relief against the Defendants. Pursuant to "CAFA," these separately filed state class and national class actions were appropriately filed in federal court;

c)    The Related Actions were each filed pursuant to 28 U.S.C. §1332 (Diversity). The Related Actions alleging class actions were also filed pursuant to 28 U.S.C. §1332 (d)(2)(A) which incorporates provisions of the *Class Action Fairness Act of 2005* ("CAFA"). 28 U.S.C., §1332 (d)(2)(A) provides that "the district courts shall have original jurisdiction over any civil class action in which the matter in controversy exceeds the sum or value of five million dollars ($5,000,000.00) and any member of the class of Plaintiffs is a citizen of a state different from any defendant." 28 U.S.C. §1332(d)(2)(A);

d)    New Jersey is a geographic focal point of the litigation for each of the Related Cases. The subject medication, Digitek®, in the Related Actions was manufactured in New Jersey and Defendants, Actavis Totowa, LLC, Actavis Elizabeth, LLC, Actavis, Inc., Actavis, U.S., Mylan, Inc., Mylan Laboratories, Inc. and Mylan Pharmaceuticals, Inc. are each citizens of New Jersey with their principal places of business in New Jersey. Any action brought outside of New Jersey asserting a state class action fell under the original jurisdiction of federal court. The Movants' national class action brought in this District of New Jersey falls under the original jurisdiction of federal court. Pursuant to "CAFA," these separately filed state classes and the national class were appropriately filed in federal court;

e)    Pursuant to 28 U.S.C. §1407(a), civil actions involving one or more common questions of fact pending in different districts, may be transferred to any district for coordinated or consolidated pretrial proceedings. 28 U.S.C. §1407(a). The Related Actions involve one or more common questions of fact;

f)    Transfer to New Jersey will "promote the just and efficient conduct of [the Related] Actions." 28 U.S. C. § 1407 Discovery has not yet commenced in any of the Related Actions and transfer will eliminate duplicative discovery and the risk of inconsistent pretrial rulings to the benefit of all

parties. Accordingly, transfer and consolidation or coordination will also conserve judicial resources;

g) Transfer and consolidation or coordination of the Related Actions in New Jersey will further the convenience of the parties and witnesses. The vast majority of the defendants' documents and witnesses are likely in New Jersey where several central defendants are headquartered and the subject medication was manufactured. The New Jersey court is also conveniently situated for those requiring utilizing air or travel;

h) The New Jersey court has the resources and judicial expertise to manage the Digitek® litigation. The New Jersey court is equipped with sufficient modern facilities to accommodate the handling of complex litigation and has been the recipient of numerous MDL transfers. The presiding judge in Movants' New Jersey lawsuit, the Honorable Joseph A. Greenaway, Jr., is a seasoned jurist with experience presiding over complex litigation, including pursuant to MDL transfer; and,

I) These Related Actions if transferred to the District of New Jersey will not result in any prejudice to any plaintiff or putative class members because each of their forum or home state's substantive law including the conflict of law rules will apply. *Van Dusen v. Barrack*, 376 U.S. 612, 84 S.Ct. 805, 821 (U.S. 1964). Under *Van Dusen*, when a diversity action is transferred from one federal district court to another, the transfer does not result in the application of a new choice of law rule. *Id.; Ferrens v. Deere & Co.*, 819 F.2d 423 (3rd Cir. 1987) citing *Van Dusen v. Barrack*, 376 U.S. 612, 84 S.Ct. 805, 821 (U.S. 1964). Rather, the law of the transferor or forum state will be applied when an action is transferred under section 1404(a). *Id.; Gonzalez v. Volvo of America Corp.*, 734 F.2d 1221, 1223-1224 (7th Cir. 1984); *Nelson v. International Pain Co.*, 716 F.2d 640, 643 (9th Cir. 1983); *Martin v. Stokes*, 623 F.2d 469, 471-473 (6th cir. 1982); *Cowan v. Ford Motor Company*, 1713 F.2d 100, 104 (5th Cir. 1983). The transferee district court must apply the state law that would have been applied if there had been no change of venue. *Id.* "A change of venue under § 1404(a) generally should be, with respect to state law, but a change of court rooms." *Van Dusen*, at 821. Once the pretrial proceedings are completed, the actions are then transferred back to the original jurisdiction for trial. *Lexecon, Inc. v. Milberg, Weiss, Bershad, Hynes & Lerach*, 523 U.S. 26, 41 (US 1998). Consolidation under §1407 will only occur for pretrial proceedings. Once pretrial proceedings are completed, these actions will be transferred back to their respective original jurisdictions for trial under that states' substantive law preserving all class members rights and interests.

-4-

4.     For the foregoing reasons and the reasons set forth in the accompanying

*Memorandum*, Movants respectfully move this Panel for an order transferring all pending actions

against Defendants and any other additional related actions that may be brought to the attention

of the Panel, to the United States District Court of New Jersey, in Newark, New Jersey.

Respectfully Submitted,

**LEVIN, FISHBEIN, SEDRAN & BERMAN**

Arnold Levin, Esquire
Fred S. Longer, Esquire
Michael M. Weinkowitz, Esquire
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500 (phone)
(215) 592-4663 (fax)
ALevin@lfsblaw.com
FLonger@lfsblaw.com
MWeinkowitz@lfsblaw.com

Joseph DePalma, Esquire
**LITE DEPALMA GREENBERG & RIVAS, LLC**
Two Gateway Center, 12th Floor
Newark, NJ 07102
(973) 623.3000 (phone)
(973).623.0858 (fax)
jdepalma@ldgrlaw.com

John R. Malkinson, Esquire
**MALKINSON & HALPERN, P.C.**
223 W. Jackson Blvd., Suite 1010
Chicago, IL 60606
(312) 427-9600 (phone)
(312) 427-9629 (fax)
MHPC@aol.com

Date:   May 14, 2008

-5-

## BEFORE THE JUDICIAL PANEL ON
## MULTIDISTRICT LITIGATION

_____

|   |   |
|---|---|
| IN RE: DIGITEK® | : |
| PRODUCT LIABILITY LITIGATION | : |
|   | : |
|   | : |

**MDL DOCKET NO. 1968**

_____

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR TRANSFER AND COORDINATION
## OR CONSOLIDATION UNDER 28 U.S.C. §1407

Arnold Levin, Esquire
Fred S. Longer, Esquire
Michael M. Weinkowitz, Esquire
LEVIN, FISHBEIN, SEDRAN &
BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106-3697
215 592-1500 (phone)
215 592-4663 (fax)
ALevin@lfsblaw.com
FLonger@lfsblaw.com
MWeinkowitz@lfsblaw.com

Joseph DePalma, Esquire
LITE DEPALMA GREENBERG &
RIVAS, LLC
Two Gateway Center,
12th Floor
Newark, NJ 07102
973.623.3000 (phone)
973.623.0858 (fax)
jdepalma@ldgrlaw.com

John R. Malkinson, Esquire
MALKINSON & HALPERN, P.C.
223 W. Jackson Blvd.,
Suite 1010
Chicago, IL 60606
312 427-9600 (phone)
312 427-9629 (fax)
MHPC@aol.com

## ATTORNEYS FOR PLAINTIFFS, KEVIN CLARK AND WILLIE MAE WILBURN, ON
## BEHALF OF THEMSELVES AND OTHERS SIMILARLY SITUATED
_Kevin Clark and Willie Mae Wilburn, individually, and on behalf of all others similarly situated
v. Actavis, Inc. et al., 2:08-cv-2293 (D.NJ 2008)_

RECEIVED
CLERK'S OFFICE
JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION
MAY 2 A

## I. INTRODUCTION

Pursuant to 28 U.S.C. §1407 and Rule 7.2 of the Rules of Procedure of the Judicial Panel

on MultiDistrict Litigation, Plaintiffs in the action captioned *Kevin Clark and Willie Mae*

*Wilburn, individually, and on behalf of all others similarly situated v. Actavis, Inc. et al.* 2:08-cv-

2293 (D.NJ. 2008). Movants respectfully submits this *Memorandum in Support of Plaintiffs'*

*Motion for Transfer and Coordination and Consolidation.*

Movants' lawsuit filed in the District of New Jersey seeks a national class of all persons

residing in the United States who were prescribed and ingested the Recalled Digitek®, during the

time period when the Recalled Digitek® was manufactured, produced, distributed, released, sold

or otherwise supplied, who became responsible for medical expenses, and suffered or may have

suffered personal injuries or assert wrongful death claims arising from the ingestion of the

Recalled Digitek®. Excluded from the Class are the Defendants, including any parent,

subsidiary, affiliate or controlled person of the Defendants and their officers, directors, agents or

employees, any judge or judicial officers assigned to this matter, plaintiffs' counsel and members

of the immediate families of any excluded persons. **(Exhibit "1").**[3] Two other federal product

liability suits involving Digitek® and variously seeking classes for national or individual state

residents have been filed:

> 1. *Ruby I. Thrasher, individually on behalf of all others similarly*
> *situated v. Actavis Group, et al.,* E.D. La. 2008 (2:08-cv-03167)(Judge Helen G.
> Gerrigan/Magistrate Judge Alma L. Chasez) (seeking statewide class); and,
>
> ' 2. *Bobby White, individually on behalf of all others similarly situated*
> *v. Actavis Totowa, LLC, et al.,* W.D. Missouri 2008 4:08-cv-00320)(Judge Dean
> Whipple) (seeking a nationwide class).

---

[3] The *Class Action Complaint* filed by Movants is attached as Exhibit "1".

A product liability suit involving an individual action for injuries from Digitek® has been filed:

> 1.    *Novak v. Mylan Pharmaceuticals, Inc. et al.* N.D. Ohio 1:08cv-01119)(Judge Solomon Oliver, Jr. / Magistrate Judge Perlman).

**(Exhibit "2")(Exhibit "3").**[4] These lawsuits and Movants' lawsuit are collectively referred to as the "Related Cases."

The legal theories and facts asserted in all the Related Actions and related actions are virtually identical and arise from the identical conduct of the Defendants, that occurred in New Jersey, in designing, manufacturing, producing, labeling, testing, inspecting, distributing, selling or otherwise placing into the stream of commerce a defective drug, Digitek®, containing more than the approved level of the active ingredient that is appropriate, and which led to a nationwide Class I recall of the drug announced by the United States Food and Drug Administration (FDA) on April 25, 2008.

The Related Actions were filed in different District Courts pursuant to 28 U.S.C. §1332 and/or 28 U.S.C. §1332(d)(2)(A) which provides: "The district courts shall have original jurisdiction over any civil class action in which the matter in controversy exceeds the sum or value of five million dollars ($5,000,000.00) and any member of the class of plaintiffs is a citizen of a state different from any defendant." 28 U.S.C. §1332(d)(2)(A)(Exhibit "3").

In this case, Defendants, Actavis Totowa, LLC, Actavis Elizabeth, LLC, Actavis, Inc., Actavis, U.S., Mylan, Inc., Mylan Laboratories, Inc. and Mylan Pharmaceuticals, Inc., are all citizens of New Jersey, and have their principal places of business there.

---

[4] Exhibit "2" is a *Schedule of Actions*. The *Complaints* filed in these Related Actions are attached as Exhibit "3."

## II. SUMMARY OF THE CASE

Plaintiffs throughout the nation have brought individual and class action suits against Defendants Actavis Group Hf, Actavis Totowa, LLC (formerly known as Amide Pharmaceutical, Inc.), Actavis Inc., Actavis Elizabeth, LLC., Actavis US, Mylan, Inc., Mylan Pharmaceuticals, Inc., Mylan Laboratories, Inc., Mylan Bertek Pharmaceuticals Inc., and, UDL Laboratories, Inc. for designing, manufacturing, producing, labeling, testing, inspecting, distributing, selling or otherwise placing into the stream of commerce a defective drug, Digitek®, containing more than the approved level of the active ingredient that is appropriate which led to a nationwide Class I recall of the drug announced by the FDA on April 25, 2008.

### A. The Drug - Digitek® (digoxin tablets, USP)

Digitek® is the brand-name of one of the cardiac glycosides, a closely related group of drugs having in common specific effects on the myocardium of the heart. The first commercially available digoxin product approved by the FDA went on the market in 1952. Digitek® is widely prescribed and used by millions of Americans to treat various heart conditions, including atrial fibrillation, atrial flutter and congestive heart failure. It works by increasing the strength and vigor of the heart muscle contractions which is why it is useful in treating congestive heart failure. It also slows the electrical conduction between the atrial and ventricles which is why it is useful for treating abnormal heart rhythms. Digitek® and digoxin are metabolized in the liver but excreted by the kidney. Digitek® is approved only for sale and distribution in the United States in two dosage strengths: Digitek® (digoxin tablets, USP) 0.125 mg, and Digitek® (digoxin tablets, USP) 0.250 mg.

-4-

**B.** **Digoxin Toxicity**

There is very little cushion between a therapeutically beneficial dose level of digoxin and a toxic level of the drug. Digoxin toxicity can cause potentially life-treating heart rhythm disturbances, as well as renal damage, nausea, vomiting, diarrhea, dizziness, confusion, loss of appetite, visual disturbances, low blood pressure, cardiac instability, irregular pulse, heart palpatations, and bradycardia, as well as the serious complications from these injuries. At its most severe, death can occur from excessive digoxin intake.

**C.** **The FDA's Revised Warning Letter and Inspection Revealing "Significant Deviations from the Current Good Manufacturing Practice Regulations" And The Class I-Recall in the United States**

In or around February 1, 2007, the FDA issued a "Revised Warning Letter" to the Actavis Defendants through Actavis Totowa (hereinafter "*Revised Warning Letter*") citing "significant deviations from the current Good Manufacturing Practice regulations." The *Revised Warning letter* is available on the FDA's website at http://www.fda.gov/foi /warning_letters /archive/ g6235d.htm. In the *Revised Warning letter* the FDA noted several deviations from good manufacturing process, resulting in the adulteration of drug products, including Digitek®, that were observed by the FDA during an inspection conducted July 10, 2006 to August 10, 2006. According the FDA's *Revised Warning Letter*:

> Significant deficiencies were found in the operations of your firm's quality control unit, and as a result there **is no assurance that many drug products manufactured and released into interstate commerce by your firm have the identity, strength, quality and purity that they purport to possess**.

The FDA concluded the *Revised Warning* letter by giving the Actavis Defendants through Actavis Totowa 15 working days to provide a written listing of all released lots of finished drug

-5-

products that remain within specification that are associated with any out-of specification test

results during manufacture and to provide description of the actions taken to ensure that lots were

suitable for release.

On or about April 25, 2008, the FDA announced a Class I Recall of all lots of Bertek and

UDL Laboratories Digitek® (hereinafter "Recalled Digitek®"). The FDA announcement,

available at http://www.fda.gov/ medwatch/safety/2008/safety08.htm#Digitek, stated:

---

**DIGITEK (DIGOXIN TABLETS, USP)**

Audience: Cardiologists, family physicians, pharmacists, other healthcare professionals, patients

[Posted 04/28/2008] Actavis Totowa LLC notified healthcare professionals of a Class I nationwide recall of all strengths of Digitek, a drug used to treat heart failure and abnormal heart rhythms. The products are distributed by Mylan Pharmaceuticals Inc., under a "Bertek" label and by UDL Laboratories, Inc. under a "UDL" label. The product is being recalled due to the possibility that tablets with double the appropriate thickness may contain twice the approved level of active ingredient. The existence of double strength tablets poses a risk of digitalis toxicity in patents with renal failure. Digitalis toxicity can cause nausea, vomiting, dizziness, low blood pressure, cardiac instability and bradycardia. Several reports of illnesses and injuries have been reported. Patients should contact their healthcare professional with questions.

[April 25, 2008 - Press Release - Actavis Totowa LLC]

---

Class I Recalls are instituted only when there exists a reasonable probability that use of

the product will cause serious injury or death.

The Defendants are drug companies, engaged in the design, development, manufacture,

production, processing, compounding, formulating, testing, sale, marketing, labeling, packaging,

dosing, advertising, promotion, supply, releasing and/or distribution of Digitek® tablets

containing an amount of digoxin, exceeding the dose on the label. The Recalled Digitek® was

adulterated, misbranded, defective, unreasonably dangerous and unfit for its intended uses.

-6-

Defendants placed tens of thousands of patients unnecessarily at risk of serious injury and/or death and may have caused them to suffer personal injuries and harm, including medical expenses, anxiety and fear induced from ingesting the defective and misbranded drug.

Defendants knew or should have known about the manufacturing and production defects, the misbranding, negligent sale and distribution of the Recalled Digitek®, and had a duty to design, develop, manufacture, produce, process, compound, formulate, test, sell, market, label, package, dose, advertise, promote, supply, release and/or distribute only safe Digitek® with approved, doses of digoxin and doses of digoxin that were consistent with the dose on the label. Furthermore, Defendants knew or should have known that they designed, developed, manufactured, produced, processed, compounded, formulated, tested, sold, marketed, labeled, packaged, dosed, advertised, promoted, supplied, released and/or distributed Digitek® with excessive unapproved amounts of digoxin before any of the Recalled Digitek® was released for distribution and sale; and, before they mislabeled the Recalled Digitek®.

Defendants failed to implement or utilize adequate safeguards, tests, inspections and quality assurance procedures to ensure the accuracy of the strength of Digitek®. Defendants failed to implement or utilize adequate testing, including batch testing, batch dose verification, and other procedures, safeguards, and inspections to confirm, monitor and assess the quality, dose and safety of Digitek®.

As a direct and proximate result of the liability-producing conduct of Defendants and the defective and unreasonably dangerous condition of the Recalled Digitek®, the Plaintiffs and members of the Class have suffered physical injury and damage, become rsponsible for medical expenses to determine their post-recall digoxin blood level, require medical monitoring, seek

reimbursement of the amounts of money spent for the purchase of the defective, misbranded and adulterated Recalled Digitek®, and have suffered serious physical injury, pain and suffering, loss of income, loss of opportunity, loss of family and social relationships, and medical, hospital, surgical expenses and other expenses related to evaluation, diagnosis and/or treatment thereof, for which Defendants are liable.

The recalled Digitek® in all of the Related cases has a single common defect, as described herein. Transfer and consolidation or coordination of these actions, and any other subsequently-filed related cases, will serve the interests of justice by providing a single forum in which the legal rights of potentially thousands of plaintiffs can be adjudicated. Movants request the cases be assigned to the United States District Court for the District of New Jersey in Newark, New Jersey where the litigation is pending As will be demonstrated below, New Jersey is the most appropriate jurisdiction for consolidation.

## III.   **PENDING ACTIONS**

Movants' counsel is aware of numerous actions filed nationally. (Exhibit "2"). There may be other pending federal actions of which Movants are unaware. Pursuant to Panel Rule 7.5(e) regarding notice of "tag-along" actions, these actions should also be transferred. It is anticipated that other Plaintiffs will file additional federal actions against the Defendants based on the same or similar legal theories, facts and request the same relief. After consolidation, these actions will become "tag-along" actions.

## IV. ARGUMENT

### A. TRANSFER TO THE DISTRICT OF NEW JERSEY FOR COORDINATED OR CONSOLIDATED PRETRIAL PROCEEDINGS WILL PROMOTE § 1407'S GOALS OF INSURING THE JUST AND EFFICIENT CONDUCT OF THE ACTIONS AND AVOIDING INCONSISTENT OR CONFLICTING SUBSTANTIVE AND PROCEDURAL DETERMINATIONS

Pursuant to 28 U.S.C. § 1407(a), the above actions should be coordinated and

consolidated. 28 U.S.C. § 1407 (a) provides, in relevant part:

> When civil actions involving one or more common questions of fact are pending in different districts, such actions may be transferred to any district for coordinated or consolidated pretrial proceedings. Such transfers shall be made by the judicial panel on the MultiDistrict litigation authorized by this section upon its determination that transfers for such proceedings will be for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions.

The transfer of actions to a single forum under § 1407 is appropriate where, as here, it

will prevent duplication of discovery and eliminate the possibility of overlapping or inconsistent

pleading determinations by courts of coordinate jurisdictions. *In re Litig. Arising from*

*Termination of Retirement Plan for Employees of Fireman's Fund Ins. Co.*, 422 F.Supp. 287,

290 (J.P.M.L. 1976); *In re LTV Corp. Sec. Litig.*, 470 F.Supp. 859, 862 (J.P.M.L. 1979).

The litmus test of transferability and coordination under § 1407 is the presence of

common questions of fact. *In re Fed. Election Campaign Act Litig.*, 511 F.Supp. 821, 823

(J.P.M.L. 1979). Common questions are presumed "where two or more complaints assert

comparable allegations against identical defendants based on similar transactions and events."

*In re Air West, Inc. Securities Litig.*, 384 F.Supp. 609, 611 (J.P.M.L. 1974); *See also In re*

*Cuisinart Food Processor Antitrust Litig.*, 506 F.Supp. 651, 654-655 (J.P.M.L. 1981).

-9-

There are currently four (4) cases pending across several districts in the federal judiciary.[5] *See* Schedule of Actions (attached as Exhibit "3"). All of these actions present common core questions of fact and law regarding the appropriateness and legality of Defendants' actions. In *Humana Managed Care Litigation* this Court stated:

> Indeed, we point out that transfer to a single district under Section 1407 has the salutary effect of placing all the Related Actions before a single judge who can formulate a pretrial program that: 1) allows pretrial proceedings with respect to any non-common issues to proceed concurrently with pretrial proceedings on common issues, *In re Multi-Piece Rim Products Liability Litigation,* 464 F.Supp. 969, 974 (J.P.M.L. 1979); and 2) ensures that pretrial proceedings will be conducted in a manner leading to the just and expeditious resolution of all actions to the overall benefit of the parties.

*Humana Managed Care Litigation v. Cigna Corp., et al.*, 2000 WL 1925080, \*3 (JPML 2000).

Movants have brought a national class in the District of New Jersey. Cases brought in other jurisdictions variously involve a nationwide class, a statewide class and an individual action. These cases if transferred to the District of New Jersey will not result in any prejudice to the class members, or any individual plaintiff, because each of their forum or home state's substantive law including the conflict of law rules will apply. *Van Dusen v. Barrack*, 376 U.S.C. 612, 84 S.Ct. 805, 821 (U.S. 1964). Under *Van Dusen*, when a diversity action is transferred from one federal district court to another, the transfer does not result in the application of a new choice of law rule. *Id.; Ferrens v. Deere & Co.*, 819 F.2d 423 (3rd Cir. 1987) citing *Van Dusen v. Barrack*, 376 U.S. 612, 84 S.Ct. 805, 821 (U.S. 1964). Rather, the law of the transferor or forum state will be applied when an action is transferred under section 1404(a). *Id.; Gonzalez v.*

---

[5] It is anticipated that there will be additional cases filed as in other complex product liability cases involving drugs such as Vioxx, Diet Drugs, Baycol etc.

-10-

*Volvo of America Corp.,* 734 F.2d 1221, 1223-1224 (7th Cir. 1984); *Nelson v. International Pain Co.*, 716 F.2d 640, 643 (9th Cir. 1983); *Martin v. Stokes*, 623 F.2d 469, 471-473 (6th Cir. 1980); *Cowan v. Ford Motor Company*, 1713 F.2d 100, 104 (5th Cir. 1983). The transferee district court must apply the state law that would have been applied if there had been no change of venue. *Id.* "A change of venue under s 1404(a) generally should be, with respect to state law, but a change of court rooms." *Van Dusen,* at 821.

Consolidation in the District of New Jersey will ensure that the Defendants, individual Plaintiffs and all class members are afforded similar and consistent rulings for pretrial discovery and ancillary issues. Thus, centralization of all actions has the ultimate effect of promoting judicial economy, efficient discovery and pretrial proceedings, and an expeditious resolution of the action to the benefit of all parties. As such, the transfer of actions to a single forum under §1407 is appropriate where, as here, it will prevent duplication of discovery and eliminate the possibility of overlapping or inconsistent pleading determinations by courts of coordinate jurisdictions.

## B. THE DISTRICT OF NEW JERSEY IS THE MOST APPROPRIATE FORUM TO HEAR COMPLEX LITIGATION

The MDL Panel has concluded on twenty-two occasions that the United States District Court for District of New Jersey is the most appropriate forum to hear complex product liability and other litigation because of its expertise in handling these matters, including one transfer order to Judge Greenaway (bolded):

> 1. MDL-1687 IN RE: Ford Motor Co. E-350 Van Products Liability Litigation (No. II);
>
> 2. MDL-1471 IN RE: Compensation of Managerial, Professional and Technical Employees Antitrust Litigation;

-11-

3.               MDL-1663 IN RE: Insurance Brokerage Antitrust Litigation;

4.               MDL-1658 IN RE: Merck & Co., Inc., Securities, Derivative & "ERISA" Litigation;

5.               MDL-1777 IN RE: SFBC International, Inc., Securities & Derivative Litigation;

6.               MDL-1857 IN RE: Schering Marketing and Sales Practices Litigation (No. II);

7.               MDL-1851 IN RE: Desloratadine Patent Litigation;

8.               MDL-1337 IN RE: Holocaust Era German Industry, Bank & Insurance Litigation;

9.               MDL-1914 IN RE: Mercedes-Benz Tele Aid Contract Litigation;

10.             MDL-1419 IN RE: K-Dur Antitrust Litigation (D.J. Joseph A. Greenway, Jr.);

11.             MDL-1850 IN RE: Pet Food Products Liability Litigation;

12.             MDL-1384 IN RE: Gapabentin Patent Litigation;

13.             MDL-1479 IN RE: Neurontin Antitrust Litigation;

14.             MDL-1881 IN RE: Boscov's Department Store, LLC, Fair and Accurate Credit Transactions Act (FACTA) Litigation;

15.             MDL-1730 IN RE: Hypodermic Products Antitrust Litigation;

16.             MDL-1763 IN RE: Human Tissue Products Liability Litigation;

17.             MDL-1514 IN RE: Electrical Carbon Products Antitrust Litigation;

18.        MDL-1292 IN RE: Cendant Corporation Securities
Litigation;
19.        MDL-1550 IN RE: IDT Corp. Calling Card Terms
Litigation;

20.        MDL-1799 IN RE: Vonage Initial Public Offering
(IPO) Securities Litigation;

21.        MDL-1862 IN RE: Vonage Marketing and Sales
Practices Litigation; and,

22.        MDL-1938 -- IN RE: Vytorin/Zetia Marketing,
Sales Practices and Products Liability Litigation.

(JPMDL website, downloaded 5/14/2008) (emphasis added).

## C.    THE DISTRICT OF NEW JERSEY A GEOGRAPHIC FOCAL POINT OF THE LITIGATION AND IS CONVENIENT FOR ALL PARTIES.

The presence of a defendant's corporate headquarters or other principal place of business

in a forum militates strongly in favor of transfer to that forum as it "implies that relevant

witnesses and documents are likely to be found there." In re UICI "Association-Group" Insurance

Litigation, 305 F. Supp 1360,1362 (J.P.M.L. 2004); In re European Rail Pass Antitrust Litigation,

MDL No. 1386, 2001 WL 587855 (J.P.M.L., Feb. 7, 2001). Here, the corporate headquarters of

multiple defendants are in the District of New Jersey and the overwhelming tide of relevant

documents and witnesses is expected to reside there. Defendants, Actavis Totowa, LLC, Actavis

Elizabeth, LLC, Actavis, Inc., Actavis, U.S., Mylan, Inc. Mylan Laboratories, Inc. and Mylan

Pharmaceuticals, Inc. are citizens of New Jersey, and have their corporate headquarters located

within the District of New Jersey, and conduct their relevant business activities there. Their

boards of directors, officers, managers and key employees are all located within the District of

New Jersey.

-13-

As set forth in the FDA's recall announcement and its *Revised Warning Letter*, the manufacturing, processing and distribution of the defective Digitek® occurred in New Jersey. The FDA inspections and meetings that revealed the deviations from good manufacturing practice that resulted in misbranding and adulteration of drugs including Digitek® which were the subject of the FDA's *Revised Warning Letter* cited above, as well as the activity of manufacturing, testing, advertising and selling Digitek®, which the actions are based upon, occurred in the District of New Jersey. Furthermore, documents pertaining to this activity are believed to be kept in the District of New Jersey. Pre-trial discovery for all of the actions will involve the production and review the New Jersey Defendants' documents and conducting depositions of its key employees, officers and directors all of which are presumed to be located in the District of New Jersey.

The United States District Court for the District of New Jersey in Newark, New Jersey is a particularly convenient forum for litigation after consolidation of these actions. In *In re Worldcom, Inc. Securities & "ERISA" Litig.*, 226 F.Supp. 2d 1352 (J.P.M.L. 2002), this Panel consolidated several actions and transferred the consolidated action to the nearby Southern District of New York, noting, in particular, that "a litigation of this scope will benefit from centralization in a major metropolitan center that is well served by major airlines, provides ample hotel and office accommodations, and offers a well-developed support system for legal services." *Id.* at 1355. Newark, New Jersey is such a venue.

The courthouse in Newark, New Jersey is less than 5 miles from Newark International Airport. Newark a is also easily accessible by Amtrak. There are many hotels in Newark, New Jersey. Furthermore, the federal court house in Newark, New Jersey is less than 15 miles from

-14-

defendant Actavis Totowa, LLC and its plant where the Digitek® was, upon information and

belief, manufactured, misbranded and adulterated. Actavis Totowa, LLC is the defendant that

announced the recall of the defective Digitek® as set forth in the FDA recall announcement cited

above. Additionally, it was an Actavis Totowa, LLC plant in New Jersey that the FDA inspected

and found deviations from good manufacturing practices, involving Digitek® and other drugs.

The FDA inspection led to the *Revised Warning letter* where the FDA chastised Actavis Totowa,

LLC for:

> Significant deficiencies were found in the operations of your firm's quality control
> unit, and as a result there **is no assurance that many drug products
> manufactured and released into interstate commerce by your firm have the
> identity, strength, quality and purity that they purport to possess**.

The convenience of the Newark court house to the defendants is manifest. It is only

approximately 7 miles away from Actavis Elizabeth, LLC; 12 miles away form Actavis, Inc.; 20

miles away from Actavis, U.S.; 33 miles away from Mylan, Inc.; 19 miles away from Mylan

Laboratories, Inc.; and, 31 miles away from Mylan Pharmaceuticals Inc.

Fully supporting a decision that the District of New Jersey is the appropriate forum in this

matter is this Panel's recent finding that the it was the most appropriate forum for the

Vytorin/Zetia Marketing, Sales Practices and Products Liability Litigation, that:

> All actions share factual questions concerning allegations relating to the use
> and/or marketing of the drugs Vytorin and/or Zetia. Centralization under Section
> 1407 will eliminate duplicative discovery; prevent inconsistent pretrial rulings,
> including those with respect to certification of class actions; and conserve the
> resources of the parties, their counsel and the judiciary.
>
> We are persuaded that the District of New Jersey is an appropriate transferee
> forum for this litigation. Because Merck and Schering-Plough have their corporate
> headquarters within the District of New Jersey, relevant discovery may be found
> there. In addition, transfer to this district enjoys the support of defendants and
> several plaintiffs.

(JPMDL Transfer Order dated April 8, 2008 found at http://www.jpml.uscourts.gov/ MDL_1938-TransferOrder.pdf.)

Accordingly, convenience weighs in favor transferring and consolidating these actions in the United States District Court for the District of New Jersey.

## D. THE HONORABLE JOSEPH A. GREENAWAY, JR IS A SEASONED JURIST EXPERIENCED IN HANDLING COMPLEX LITIGATION

The experience and ability of the Honorable Joseph A. Greenaway Jr. is another factor which militates in favor of transferring these actions to the United States District Court for the District of New Jersey. Judge Greenaway has served as judge in the District of New Jersey for twelve (12) years handling complex litigation including products liability actions. Judge Greenaway has presided over consolidated litigation pursuant to a Transfer Order of this Panel, in MDL-1419 IN RE: K-Dur Antitrust Litigation since 2001.

The availability of an experienced and capable judge, such as Judge Greenaway, weighs in favor of transferring a case to that district. *See e.g., In re Hawaiian Hotel Room Rate Antitrust Litig.*, 438 F.Supp. 935, 936 (J.P.M.L. 1977); *In re Sugar Indus. Antitrust Litig.*, 437 F.Supp. 1204, 1208 (J.P.M.L. 1977); *In re Ampicillin Antitrust Litig.*, 315 F.Supp. 317, 319 (J.P.M.L. 1970). *See e.g., In re "Factor VIII or IX Concentrate Blood Prod. Liab. Litig.*, 853 F.Supp. 454, 455 (J.P.M.L. 1993); *In re Silicone Gel Breast Implants Prods. Liab. Litig.*, 793 F.Supp. at 1101; *In re Data General Corp. Antitrust Litig.*, 470 F.Supp. 855, 859 (J.P.M.L. 1979). Judge Greenaway is eminently qualified to preside over this litigation.

## V. CONCLUSION

Movants respectfully request, pursuant to 28 U.S.C. §1407, that:

    1. this Panel order that the Related Actions be centralized and transferred

because there the likelihood of overlapping discovery and the potential for conflicting pretrial rulings; and,

      2.   the United States District Court for District of New Jersey be the transferee court, and that all related individual or class actions be transferred thereto as "tag along" actions, for the foregoing reasons and because:

      a.   the Related Actions set forth similar allegations regarding the Defendants' conduct;

      b.   the activity central in the Related Actions, the manufacture and distribution of the defective, adulterated and misbranded Digitek® occurred in the District of New Jersey;

      c.   the documents, corporate witnesses and most of the Defendants are all located in the District of New Jersey;

      d.   the District Court of New Jersey's location in Newark, New Jersey is convenient for all parties; and,

      e.   Judge Greenaway is eminently qualified to handle this matter.

Respectfully submitted,

**LEVIN, FISHBEIN, SEDRAN & BERMAN**

Arnold Levin, Esquire
Fred S. Longer, Esquire
Michael M. Weinkowitz, Esquire
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500 (phone)
(215) 592-4663 (fax)
ALevin@lfsblaw.com
FLonger@lfsblaw.com
MWeinkowitz@lfsblaw.com

Joseph DePalma, Esquire
**LITE DEPALMA GREENBERG & RIVAS, LLC**
Two Gateway Center, 12th Floor
Newark, NJ 07102
(973) 623.3000 (phone)
(973).623.0858 (fax)
jdepalma@ldgrlaw.com

John R. Malkinson, Esquire
**MALKINSON & HALPERN, P.C.**
223 W. Jackson Blvd., Suite 1010
Chicago, IL 60606
(312) 427-9600 (phone)
(312) 427-9629 (fax)
MHPC@aol.com

Date:   May 14, 2008

-18-

## **"REVISED CERTIFICATE OF SERVICE"**

I hereby certify that I served a true and correct copy of the foregoing Plaintiffs' Motion

for Transfer and Coordination or Consolidation under 28 U.S.C. §1407 and Memorandum of

Law in support thereof this 20TH Day of May, 2008 upon the following persons, by First Class

Mail:

Clerk's Office
United States District Court for the
Eastern District of Louisiana
C-151 Hale Boggs Federal Bldg
United States Courthouse
500 Poydras Street
New Orleans, LA 70130

Clerk's Office
United States District Court for the
Western District of Missouri
1510 Charles Evans Whittaker
United States Courthouse
400 East Ninth Street
Kansas City, MO 64106

Clerk's Office
United States District Court for the
Northern District of Ohio
Carl B. Stokes United States
Court House
801 West Superior Avenue
Cleveland, OH 44113

Honorable Joseph A. Greenaway, Jr.
United States District Court for the
District of New Jersey
Martin Luther King, Jr. Federal Building
50 Walnut Street
Newark, NJ 07101



Magistrate Judge Madeline Cox Arleo
United States District Court for the
District of New Jersey
Martin Luther King, Jr. Federal Building
50 Walnut Street
Newark, NJ 07101

David M. Peterson, Esquire
D. Todd Matthews, Esquire
Nicholas S. Clevenger, Esquire
Christine C. Howard, Esquire
PETERSON & ASSOCIATES, P.C.
Park Plaza Building
801 W. 47th Street, Suite 107
Kansas City, MO 64112
***Counsel for Bobby White***
(W.D. Missouri 2008 4:08-cv-00320)

John R. Climaco, Esquire
Scott D. Simpkins, Esquire
Dawn M. Chmielewski, Esquire
CLIMACO, LEFKOWITZ, PECA, WILCOX & GAROFOLI CO., LPA
55 Public Square, Suite 1950
Cleveland, OH 44113
***Counsel for Joseph J. Novak***
(N.D. Ohio 1:08cv-01119)

Frank Piscitelli, Esquire
*Frank Piscitelli Co., LPA*
55 Public Square, Suite 1950
Cleveland, OH 44113
***Counsel for Joseph J. Novak***
(N.D. Ohio 1:08cv-01119)

D. Scott Kalish, Esquire
405 Western Reserve Building
1468 West Ninth Street
Cleveland, OH 44113
***Counsel for Joseph J. Novak***
(N.D. Ohio 1:08cv-01119)

Hugh R. Lambert, Esquire
Linda J. Nelson, Esquire
E. Alexis Bevis, Esquire
LAMBERT & NELSON, PLC
701 Magazine Street
New Orleans, LA 70130
***Counsel for Ruby I. Thrasher***
(E.D. La. 2008 2:08-cv-03167)

Daniel E. Becnel, Jr., Esquire
Matthew B. Moreland, Esquire
BECNEL LAW FIRM, LLC
106 West 7th Street
P. O. Drawer H
Reserve, LA 70084
***Counsel for Ruby I. Thrasher***
(E.D. La. 2008 2:08-cv-03167)

Ronnie G. Penton, Esquire
LAW OFFICE OF RONNIE G. PENTON
209 Hoppen Place
Bogalusa, LA 70427
***Counsel for Ruby I. Thrasher***
(E.D. La. 2008 2:08-cv-03167)

Jerrold S. Parker, Esquire
PARKER, WAICHMAN, ALONSO, LLP
111 Great Neck Road
Great Neck, NY 11021
***Counsel for Ruby I. Thrasher***
(E.D. La. 2008 2:08-cv-03167)

Joseph DePalma, Esquire
LITE DEPALMA GREENBERG & RIVAS, LLC
Two Gateway Center, 12th Floor
Newark, NJ 07102
***Counsel for Richard Clark and Willie Mae Wilburn***
(D.N.J., 08-2293)

John R. Malkinson, Esquire
MALKINSON & HALPERN, P.C.
223 W. Jackson Blvd., Suite 1010
Chicago, IL 60606
***Counsel for Richard Clark and Willie Mae Wilburn***
(D.N.J., 08-2293)

**ACTAVIS GROUP hf**
Dalshraun 1 220
Hafnarfjodur, Iceland

**ACTAVIS TOTOWA, LLC**
**(formerly known as Amide Pharmaceutical, Inc.)**
101 East Main Street
Little Falls, NJ 07424-5608

**ACTAVIS INC.**
14 Commerce Drive, Suite 301
Cranford, NJ

**ACTAVIS ELIZABETH, LLC**
200 Elmora Ave.
Elizabeth, NJ 07202

**ACTAVIS US**
60 Columbia Rd Bldg B.
Morristown, NJ 07960-4535

**MYLAN, INC.**
530 Main Street
Chester, NJ 07930

**MYLAN PHARMACEUTICALS, INC.**
1405/1425 Route 206 South
Bedminster, NJ 07921

**MYLAN LABORATORIES, INC.**
One Woodbridge Center, 9th Floor
Suite 920
Woodbridge, NJ 07095

**MYLAN BERTEK PHARMACEUTICALS INC.**
12720 Dairy Ashford Rd
Sugar Land, TX 7747

**UDL LABORATORIES, INC.,**
1718 Northrock Court
Rockford, IL 61103

**LEVIN, FISHBEIN, SEDRAN & BERMAN**

Arnold Levin, Esquire
Fred S. Longer, Esquire
Michael M. Weinkowitz, Esquire
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500 (phone)
(215) 592-4663 (fax)
ALevin@lfsblaw.com
FLonger@lfsblaw.com
Mweinkowitz@lfsblaw.com

Joseph DePalma, Esquire
**LITE DEPALMA GREENBERG & RIVAS, LLC**
Two Gateway Center, 12th Floor
Newark, NJ 07102
(973) 623.3000 (phone)
(973).623.0858 (fax)
jdepalma@ldgrlaw.com

John R. Malkinson, Esquire
**MALKINSON & HALPERN, P.C.**
223 W. Jackson Blvd., Suite 1010
Chicago, IL 60606
(312) 427-9600 (phone)
(312) 427-9629 (fax)
MHPC@aol.com

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

MAY 2 3 2008

FILED
CLERK'S OFFICE

RECYCLED PAPER
RECYCLABLE

LEVIN, FISHBEIN, SEDRAN & BERMAN
BY: Fred Longer, Esquire (FL-1682)
     Michael M. Weinkowitz, Esquire (MW-76033)
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500
(215) 592-4663 (telecopier)
MWeinkowitz@lfsblaw.com

FILED
CLERK'S OFFICE    MAY - 9 2008

AT 8:30_____
WILLIAM T. WALSH, CLERK    M

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| KEVIN CLARK, and WILLIE MAE WILBURN, individually, and on behalf of all others similarly situated, | CIVIL ACTION |
| *Plaintiffs,* | CASE NUMBER  08-2293 (JAG) |
| v. | |
| ACTAVIS GROUP hf, ACTAVIS TOTOWA, LLC (formerly known as Amide Pharmaceutical, Inc.), ACTAVIS INC., ACTAVIS ELIZABETH, LLC, ACTAVIS US, MYLAN, INC., MYLAN PHARMACEUTICALS, INC., MYLAN LABORATORIES, INC., MYLAN BERTEK PHARMACEUTICALS INC., *and,* UDL LABORATORIES, INC., | CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL |
| | JURY TRIAL DEMANDED |
| *Defendants.* | |

### CLASS ACTION COMPLAINT

#### I.    INTRODUCTION

Plaintiffs, Kevin Clark and Willie Mae Wilburn, on behalf of themselves and all others

similarly situated, alleges as follows:

1.    Plaintiffs bring this Class Action against the Defendants for design,

1

manufacturing, producing, supplying, inadequately inspecting, testing, selling and distributing

dangerous, defective, misbranded and adulterated Digitek® (digoxin tablets, USP) (hereinafter

referred to as "Digitek") containing an amount of the drug's active ingredient, digoxin, exceeding

the dose set forth on the label and in some cases exceeding the dose approved for medical

treatment in humans. By reason of the wrongful conduct of the Defendants, and the dangers

posed by the potential for overdoses of the drug, a massive, national recall of Digitek® tablets

has been initiated in the United States.

## II.    STATEMENT OF JURISDICTION AND VENUE

2.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332 (Diversity)

in that the state of citizenship of the representative Plaintiffs are different from the state of

citizenship of the Defendants, and the amount in controversy exceeds $75,000.00, exclusive of

interest and costs.

3.    Plaintiff alleges an amount in controversy in excess of $75,000.00 exclusive of

interest and costs, as to themselves and each member of the proposed Class.

4.    Federal jurisdiction is proper under the *Class Action Fairness Act*, 28 U.S.C. §

1332(d), as the amount exceeds $5,000,000 and diversity of citizenship exists between the

representative Plaintiff and the Defendants.

5.    Venue is proper pursuant to 28 U.S.C. § 1391. The Defendants have sufficient

minimum contacts with New Jersey or otherwise intentionally avails itself of the consumer

markets within New Jersey through the promotion, sale, marketing and/or distribution of its

products in the state to render the exercise of jurisdiction by the New Jersey courts permissible

under traditional notions of fair play and substantial justice.

2

## III. PARTIES

### A. PARTY PLAINTIFFS

6.     Plaintiff, Kevin Clark, at all times relevant herein was a citizen of the Commonwealth of Pennsylvania, who ingested Digitek® pursuant to a physician's prescription and who may have suffered serious personal injuries including kidney damage, among other symptoms, as a result of his ingestion of Digitek®.

7.     Plaintiff, Willie Mae Wilburn, at all times relevant herein was a citizen of the State of Illinois who ingested Digitek® pursuant to a physician's prescription, experienced during the period of her ingestion various changes, including changed cardiac symptoms and episodes of nausea, and dizziness, and who may have suffered serious personal injuries as a result of her ingestion of Digitek®.

8.     Plaintiffs, Kevin Clark and Willie Mae Wilburn, bring this action on behalf of themselves and all others similarly situated persons in the United States who were prescribed and ingested the Recalled Digitek®, who claim personal injuries or who assert wrongful death, and/or who claim the high likelihood of undetected or latent personal injuries and assert medical monitoring claims arising from the ingestion of the Recalled Digitek®.

### B. THE "ACTAVIS DEFENDANTS"

9.     Defendant Actavis Group hf is an international generic pharmaceutical company, with its principal place of business at Dalshraun 1 220 Hafnarfjodur, Iceland, and regularly conducts business throughout the United States and specifically in New Jersey, including but not limited to directing the operation and management of the other "Actavis Defendants," including Actavis, Inc., Actavis Totowa, LLC (formerly known as Amide Pharmaceutical, Inc.), Actavis

3

Elizabeth, LLC, and Actavis, US, in the design, development, manufacture, production, processing, compounding, formulating, testing, sale, marketing, labeling, packaging, dosing advertising, promotion, supply, releasing and/or distribution of Digitek®.

10.     Defendant Actavis Totowa, LLC (formerly known as Amide Pharmaceutical, Inc.) is a corporation organized and existing under the laws of Delaware with its principal place of business in New Jersey, at 101 East Main Street, Little Falls, NJ 07424-5608 and is a wholly-owned subsidiary, agent, and alter ego of Actavis Group hf.

11.     Defendant Actavis Elizabeth, LLC is a corporation organized and existing under the laws of Delaware with its principal place of business in New Jersey 200 Elmora Ave Elizabeth, NJ 07202 and is a wholly-owned subsidiary, agent, and alter ego of Actavis Group hf.

12.     Defendant Actavis, Inc. is a corporation organized and existing under the laws of Delaware with its principal place of business New Jersey, at 14 Commerce Drive, Suite 301,Cranford, NJ and is a wholly-owned subsidiary, agent, and alter ego of Actavis Group hf.

13.     Defendant Actavis, US is a corporation organized and existing under the laws of Delaware with its principal place of business in New Jersey, at 60 Columbia Rd Bldg B, Morristown, NJ 07960-4535 and is a wholly-owned subsidiary, agent, and alter ego of Actavis Group hf.

14.     Defendants Actavis Group hf., Actavis Totowa (formerly known as Amide Pharmaceutical, Inc.) Actavis Inc., Actavis Elizabeth, LLC and Actavis U.S. are referred to hereinafter collectively as "Actavis" or "Actavis" Defendants" unless otherwise stated.

15.     At material times hereto, the Actavis Defendants:

        a.     were, and are, engaged in the business of the design, development,

4

manufacture, production, processing, compounding, formulating, testing, sale, marketing, labeling, packaging, dosing advertising, promotion, supply, releasing and/or distribution of Digitek®. in the United States and New Jersey either directly or indirectly through third-parties or related entities;

b.   were, and are, in the business of profiting from the in the design, development, manufacture, production, processing, compounding, formulating, testing, sale, marketing, labeling, packaging, dosing advertising, promotion, supply, releasing and/or distribution of Digitek®;

c.   conducted continuous and substantial business in the state of New Jersey and,

d.   acted and gained knowledge itself and by and through its various agents, servants, employees, and/or ostensible agents.

## B.   THE "MYLAN DEFENDANTS"

16.   Defendant Mylan, Inc. is a corporation organized and existing under the laws of Pennsylvania with its principal place of business in New Jersey a 530 Main Street, Chester, NJ 07930 .

17.   Defendant Mylan Laboratories, Inc. ("Mylan Laboratories") is a corporation organized and existing under the laws of Pennsylvania with its principal place of business in New Jersey at One Woodbridge Center, 9th Floor, Suite 920, Woodbridge, NJ 07095.

18.   Defendant Mylan Pharmaceuticals, Inc. ("Mylan Pharmaceuticals") is a corporation organized and existing under the laws of West Virginia with its principal place of in New Jersey at 1405/1425 Route 206 South Bedminster, NJ 07921 and is a wholly-owned

5

subsidiary, agent, and alter ego of Defendant Mylan, Inc.

19.    Defendant Mylan Bertek Pharmaceuticals, Inc. ("Mylan Bertek") is a corporation organized and existing under the laws of Texas with its principal place of business at 12720 Dairy Ashford Rd Sugar Land, TX 7747 and is a wholly-owned subsidiary, agent, and alter ego of Defendant Mylan, Inc.

20.    Defendant UDL Laboratories, Inc. ("UDL") is a corporation organized and existing under the laws of West Virginia with its principal place of business in Illinois at 1718 Northrock Court, Rockford, IL 61103 and is a wholly-owned subsidiary, agent, and alter ego of Defendant Mylan, Inc.

21.    Defendants Mylan Inc., Mylan Laboratories, Mylan Pharmaceuticals, Mylan Bertek and UDL are referred to hereinafter collectively as "Mylan" or the "Mylan Defendants," unless otherwise stated.

22.    At material times hereto, the Mylan Defendants:

a.    were, and are, engaged in the business of the design, development, manufacture, production, processing, compounding, formulating, testing, sale, marketing, labeling, packaging, dosing advertising, promotion, supply, releasing and/or distribution of Digitek®. in the United States and New Jersey either directly or indirectly through third-parties or related entities;

b.    were, and are, in the business of profiting from the design, development, manufacture, production, processing, compounding, formulating, testing, sale, marketing, labeling, packaging, dosing advertising, promotion, supply, releasing and/or distribution of Digitek®.;

c.    conducted continuous and substantial business in the state of New Jersey

6

and,

d.    acted and gained knowledge itself and by and through its various agents,

servants, employees, and/or ostensible agents.

## IV.    FACTUAL ALLEGATIONS

### A.    The Drug - Digitek® (digoxin tablets, USP)

23.    Digitek® is the brand-name of one of the cardiac glycosides, a closely related

group of drugs having in common specific effects on the myocardium of the heart.

24.    Digitek® is a registered trademark of Defendant Bertek Pharmaceuticals.

25.    Digitek® is widely prescribed and used by millions of Americans to treat various

heart conditions, including atrial fibrillation, atrial flutter and congestive heart failure.

26.    Digitek® and digoxin are metabolized in the liver but excreted by the kidney.

27.    Digitek® is approved only for sale and distribution in the United States in the

following dosages:

a.    Digitek® (digoxin tablets, USP) 0.125 mg, and,

b.    Digitek® (digoxin tablets, USP) 0.250 mg

(collectively referred to hereinafter as the "approved dose").

28.    Each Digitek® tablet is approved by the United States Food and Drug

Administration ("FDA") only for sale and distribution if it contains the labeled amount of

digoxin.

29.    Digitek® tablets manufactured and produced with an amount of digoxin in excess

of the labeled dose are not approved for sale or distribution in the United States (hereinafter

"unapproved excessive dose").

7

## B. The FDA Warning Letters

### 1. The August 15, 2006 FDA Warning Letter

30.    Upon information and belief, some of the Recalled Digitek® was designed, developed, manufactured, produced, processed, compounded, formulated, tested, sold, marketed, labeled, packaged, dosed, advertised, promoted, supplied, released and/or distributed from a plant in Little Falls, New Jersey owned by one or more of the Actavis Defendants, which was acquired in December 2005 as part of Actavis' acquisition of another company's generic business.

31.    On or about August 15, 2006, the FDA issued a letter warning to the Actavis Defendants through defendant Actavis Totowa for failing to file periodic safety reports at its solid oral dose manufacturing facility in Little Falls, New Jersey (hereinafter referred to as the "*August, 2006 Warning Letter*").

32.    The *August, 2006 Warning Letter* is available on the FDA's website at http://www.fda.gov/foi/warning_letters/archive/g6235d.htm.

33.    In the *August, 2006 Warning Letter*, the FDA warned the Actavis Defendants through Actavis Totowa that it had violated its adverse medical event reporting obligations, marketing drugs without proper clearance and causing at least 26 adverse drug experiences (ADEs) by not submitting periodic safety reports.

34.    According to the FDA's *August 2006 Warning letter*, an FDA inspection between January and February 2006 revealed that there were six potentially serious and unexpected adverse drug events dating back to 1999 for products, including digoxin, that were not reported to the agency.

35.    The FDA's *August 2006 Warning letter* also warned the Actavis Defendants

8

through Actavis Totowa about not properly investigating serious and unexpected ADEs, not adequately reviewing ADE information, failing to file periodic safety reports which resulted in at least 26 ADEs which were never reported.

36. The FDA's *August 2006 Warning letter* also warned the Actavis Defendants through Actavis Totowa that it had not developed procedures for the surveillance, receipt, evaluation, and report of adverse events.

## 2. The Revised Warning Letter About the Actavis Defendants' "Significant Deviations from the Current Good Manufacturing Practice Regulations"

37. In or around February 1, 2007, the FDA issued a revised Warning Letter to the Actavis Defendants through Actavis Totowa (hereinafter "*Revised Warning Letter*") citing "significant deviations from the current Good Manufacturing Practice regulations."

38. The *Revised Warning letter* is available on the FDA's website at http://www.fda.gov/foi /warning_letters/archive/g6235d.htm.

39. In the *Revised Warning letter* the FDA noted several deviations from good manufacturing process, resulting in the adulteration of drug products manufactured by the Actavis Defendants, that were observed by the FDA during an inspection conducted July 10, 2006 to August 10, 2006.

40. According the FDA's *Revised Warning Letter*:

> Significant deficiencies were found in the operations of your firm's quality control unit, and as a result there **is no assurance that many drug products manufactured and released into interstate commerce by your firm have the identity, strength, quality and purity that they purport to possess.**

41. The deviation from good manufacturing process observed by the FDA were presented to Actavis Totowa on an FDA-483 (List of Inspections) at the close of the inspection on August 10, 2006.

9

42.	The FDA's *Revised Warning letter* cited deficiencies in the operations of the

Actavis Defendants' quality control unit, which included instances where the unit failed to

adequately investigate and resolve laboratory deviations and out-of-specification test results for

drug products. Specifically, according to the *Revised Warning letter*:

> Our investigators observed numerous instances where the quality
> control unit failed to adequately investigate and resolve laboratory
> deviations and out-of-specification test results involving drug
> products that ultimately were released for distribution into
> interstate commerce. Additionally, our investigators uncovered
> out-of-specification test results in laboratory raw data that were not
> documented in laboratory notebooks, and found that products were
> released based on retesting without any justification for discarding
> the initial out-of-specification test results.

43.	The FDA *Revised Warning letter* stated that the FDA found during its inspection

that analysts did not always document the preparation and testing of samples at the time they

were done:

> Master and batch production and control records were found to be
> deficient in that they did not include complete procedures for
> documenting the collection of samples. Although your firm's
> procedures require the collection of in-process blend uniformity
> samples of three times the weight of finished product tablets or
> capsules, master production records do not require, and batch
> records do not contain, documentation that the samples are being
> collected accordingly. [21 CFR 211.186(b)(9) and 21 CFR
> 211.188(b)(10)]

44.	The FDA also cited a failure to check for accuracy the input and outputs from a

system used to run the high-performance liquid chromatography during analysis of drug

products.

45.	Among other deficiencies cited by the FDA in the *Revised Warning letter* were:

a.	failure of the quality control unit to recognize that some tablets did not meet

in-process specifications;

10

b.      a lack of adequate procedures for conducting bulk product holding time studies;

failure to identify and control rejected in-process materials;

c.      not adequately qualifying select equipment; and,

d.      failure to establish and follow written procedures for maintaining manufacturing

equipment.

46.      By way of example, the FDA states in the *Revised Warning Letter* that:

> Your firm's cleaning validation studies were found to be
> inadequate and, as a result, there was no assurance that equipment
> is adequately cleaned between the manufacture of different drug
> products. [21 CFR 211.67(b)] For example:
>
> a) Cleaning validation was performed for the process trains without
> evaluating for sample recovery for numerous products, including:
> Amidal Nasal Decongestant; Amigesic Caplets, 750mg;
> Carisoprodol and Aspirin Tablets, USP, 200mg/325mg;
> Carisoprodol Tablets, USP, 350mg; Chlorzoxazone Tablets, USP,
> 250mg and 500mg; **Digoxin Tablets, USP, 0.25mg**.

47.      The FDA gave the Actavis Defendants through Actavis Totowa 15 working days

to provide a written listing of all released lots of finished drug products that remain within

specification that are associated with any out-of specification test results during manufacture and

to provide description of the actions taken to ensure that lots were suitable for release.

**C.      The Manufacture, Production, Labeling, Distribution and Sale
of Dangerous Digitek® Tablets Containing an Amount of Digoxin,
Exceeding the Labeled Dose Including Some With A Dose Exceeding that
Approved for Medical Treatment in Humans**

48.      The Defendants are drug companies, that upon information and belief, engaged in

the design, development, manufacture, production, processing, compounding, formulating,

testing, sale, marketing, labeling, packaging, dosing, advertising, promotion, supply, releasing

and/or distribution of Digitek® tablets containing an amount of digoxin, exceeding the dose on

the label.

11

49.     At all times relevant to this action, Defendants knew, and/or had reason to know,

that the Recalled Digitek® was not safe for the patients for whom the drug was prescribed

because the excess dose of digoxin can cause serious medical problems, digoxin overdose,

digitalis toxicity and, in certain patients, catastrophic injuries and death.

## D.    The Class I-Recall in the United States And Defendants' Failure to Provide Full, Complete and Adequate Information About the Recalled Digitek®

50.     On or about April 25, 2008, the United States Food and Drug Administration

("FDA") announced a Class I Recall of all lots of Bertek and UDL Laboratories Digitek®

(hereinafter "Recalled Digitek®"). The FDA announcement, available at http://www.fda.gov/

medwatch/safety/2008/safety08.htm#Digitek, stated:

---

**DIGITEK (DIGOXIN TABLETS, USP)**
Audience: Cardiologists, family physicians, pharmacists, other healthcare professionals, patients
[Posted 04/28/2008] Actavis Totowa LLC notified healthcare professionals of a Class I nationwide
recall of all strengths of Digitek, a drug used to treat heart failure and abnormal heart rhythms. The
products are distributed by Mylan Pharmaceuticals Inc., under a "Bertek" label and by UDL
Laboratories, Inc. under a "UDL" label. The product is being recalled due to the possibility that
tablets with double the appropriate thickness may contain twice the approved level of active
ingredient. The existence of double strength tablets poses a risk of digitalis toxicity in patents with
renal failure. Digitalis toxicity can cause nausea, vomiting, dizziness, low blood pressure, cardiac
instability and bradycardia. Several reports of illnesses and injuries have been reported. Patients
should contact their healthcare professional with questions.
[April 25, 2008 - Press Release - Actavis Totowa LLC]

---

51.     Class I Recalls are instituted only when there exists a reasonable probability that

use of the product will cause serious injury or death.

52.     The Recalled Digitek® is an adulterated drug and its label and packaging are

misbranded.

53.     As of the date that this Class Action Complaint was filed, Defendants released

little additional information about the Recalled Digitek® beyond the Press Release set forth in

paragraph 50 above. Defendants have failed to inform, the medical community, the public

including the Plaintiffs and the Class:

12

a. How many, and which lots of Digitek® contained amounts of unapproved digoxin;

b. How long Defendants manufactured and produced the Recalled Digitek® and how long the adulterated drug was supplied, sold, distributed and released into the stream of commerce;

c. How many "reports of illness and injuries have been received" and,

d. The nature and extent of the reports of illness and injuries that were received.

54. Defendants' failure to provide the medical community, the public, the Plaintiffs and the Class with full, complete and adequate information about the Recalled Digitek®, including the information set forth in the preceding paragraph is consistent with the safety violations which led the FDA to issue an *August 15, 2006 Warning Letter*, as set forth above.

### E. The Well-Known Serious and Life-threatening Injuries from Digoxin Overdose and Digitalis Toxicity

55. Digoxin overdose and digitalis toxicity can cause serious and life-threatening personal injury, and death.

56. The Digitek® label states, in relevant parts, under "Precautions" that:

**Use in Patients with Impaired Renal Function:** Digoxin is primarily excreted by the kidneys; therefore, patients with impaired renal function require smaller than usual maintenance doses of digoxin. Because of the prolonged elimination half-life, a longer period of time is required to achieve an initial or new steady-state serum concentration in patients with renal impairment than in patients with normal renal function. If appropriate care is not taken to reduce the dose of digoxin, such patients are at high risk for toxicity, and toxic effects will last longer in such patients than in patients with normal renal function.

* * *

**Adults:** *Cardiac:* Therapeutic doses of digoxin may cause heart block in patients with pre-existing sinoatrial or AV conduction disorders; heart block can be avoided by adjusting the dose of digoxin. Prophylactic use of a cardiac pacemaker may be considered if the risk of heart block is considered acceptable. High doses of digoxin may produce a variety of rhythm disturbances, such as first-degree, second-degree (Wenkebach), or third-degree heart block (including asystole); atrial tachycardia with block; AV dissociation; accelerated junctional (nodal) rhythm; unifocal or multiform ventricular premature contractions (especially bigeminy or trigeminy); ventricular tachycardia; and ventricular fibrillation. Digoxin produces PR prolongation and ST segment depression which should not by themselves be considered digoxin toxicity. Cardiac toxicity can also occur at therapeutic doses in patients who have conditions which may alter their sensitivity to digoxin.
*Gastrointestinal:* Digoxin may cause anorexia, nausea, vomiting and diarrhea. Rarely, the use of digoxin has been associated with abdominal pain, intestinal ischemia and hemorrhagic necrosis of the intestines.
*CNS:* Digoxin can produce visual disturbances (blurred or yellow vision), headache, weakness, dizziness, apathy, confusion and mental disturbances (such as anxiety, depression, delirium and hallucination).

57. Non-approved, excessive doses of digoxin significantly increase the likelihood

13

that overdosed patients will experience the known side-effects and reactions that can result from the approved doses of digoxin. In other words, the risk and dangers of approved doses are enhanced by an overdose of digoxin.

58.   Doses of digoxin exceeding the dose prescribed by a physician for medical treatment can cause personal injury and death.

59.   The Digitek® label states in relevant part that:

**Massive Digitalis Overdosage**: Manifestations of life-threatening toxicity include ventricular tachycardia or ventricular fibrillation, or progressive bradyarrhythmias, or heart block. The administration of more than 10 mg of digoxin in a previously healthy adult or more than 4 mg in a previously healthy child, or a steady-state serum concentration great than 10ng/mL often results in cardiac arrest.

DIGIBIND [Digoxin Immune Fab (Ovine)] should be used to reverse the toxic effects of ingestion of a massive overdose. The decision to administer DIGIBIND [Digoxin Immune Fab (Ovine)] to a patient who has ingested a massive dose of digoxin but who has not yet manifested life-threatening toxicity should depend on the likelihood that life-threatening toxicity will occur. Patients with massive digitalis ingestion should receive large doses of activated charcoal to prevent absorption and bind digoxin in the gut during enteroenteric recirculation. Emesis or gastric lavage may be indicated especially if ingestion has occurred within 30 minutes of the patient's presentation at the hospital. Emesis should not be induced in patients who are obtunded. If a patient presents more than 2 hours after ingestion or already has toxic manifestations, it may be unsafe to induce vomiting or attempt passage of a gastric tube, because such maneuvers may induce an acute vagal episode that can worsen digitalis-related arrhythmias.

Severe digitalis intoxication can cause a massive shift of potassium from inside to outside the cell, leading to life-threatening hyperkalemia. The administration of potassium supplements in the setting of massive intoxication may be hazardous and should be avoided. Hyperkalemia caused by massive digitalis toxicity is best treated with DIGIBIND [Digoxin Immune Fab (Ovine)]; initial treatment with glucose and insulin may also be required if hyperkalemia itself is acutely life-threatening.

60.   The Digitek® label states, in relevant part, under "Adverse Events" that:

In general, the adverse reactions of digoxin are dose dependent and occur at doses higher than those need to achieve a therapeutic effect. Hence, adverse reactions are less common when digoxin is used within the recommended dose range or therapeutic serum concentration range and when there is careful attention to concurrent medications an conditions.

Because some patients may be particularly susceptible to side effects with digoxin, the dosage of the drug should always be selected carefully and adjusted as the clinical conditions of the patient warrant. In the past, when high doses of digoxin were used and little attention was paid to the clinical status or concurrent medications, adverse reactions were more frequent and severe. Cardiac reactions accounted for about one-half, gastrointestinal disturbances about one-fourth and CNS and other toxicity for about one-fourth of these adverse reactions.

14

61. The Recalled Digitek® was adulterated, misbranded, defective, unreasonably dangerous and unfit for its intended uses. Defendants placed tens of thousands of patients, including Plaintiff and the Class, unnecessarily at risk of serious injury and/or death and may have caused them to suffer personal injuries and harm, including medical expenses, anxiety and fear induced from ingesting the defective and misbranded drug.

62. Defendants knew or should have known about the manufacturing and production defects, misbranding and negligent sale and distribution of the Recalled Digitek® and had a duty to design, develop, manufacture, produce, process, compound, formulate, test, sell, market, label, package, dose, advertise, promote, supply, release and/or distribute only safe Digitek® with approved doses of digoxin and doses of digoxin that were consistent with the dose on the label.

63. Defendants knew or should have known that they designed, developed, manufactured, produced, processed, compounded, formulated, tested, sold, marketed, labeled, packaged, dosed, advertised, promoted, supplied, released and/or distributed Digitek® with excessive unapproved amounts of digoxin before:

    a.    any of the Recalled Digitek® was released for distribution and sale; and,

    b.    they mislabeled the Recalled Digitek®.

64. Defendants failed to implement or utilize adequate safeguards, tests, inspections and quality assurance procedures to ensure the accuracy of the strength of Digitek®.

65. Defendants failed to implement or utilize adequate testing, including batch testing, batch dose verification, and other procedures, safeguards, and inspections to confirm, monitor and assess the quality, dose and safety of Digitek®.

66. Plaintiffs, Kevin Clark and Willie Mae Wilburn were, prescribed approved and Digitek® but unwittingly ingested the Recalled Digitek®, as did the members of the Class.

67. As a direct and proximate result of the liability-producing conduct of Defendants

15

and the defective and unreasonably dangerous condition of the Recalled Digitek®, the Plaintiffs and members of the Class may have suffered physical injury and damage.

68.     As a direct and proximate result of the liability-producing conduct of Defendants and the defective and unreasonably dangerous condition of the Recalled Digitek®, the Plaintiffs and members of the Class require medical monitoring.

69.     As a direct and proximate result of the liability-producing conduct of Defendants and the defective and unreasonably dangerous condition of the Recalled Digitek®, the Plaintiffs and members of the Class seek reimbursement of the amounts of money spent for the purchase of the defective, misbranded and adulterated Recalled Digitek®.

70.     As a direct and proximate result of the acts and omissions of Defendants, the Plaintiffs and the Class may have suffered serious physical injury, pain and suffering, loss of income, loss of opportunity, loss of family and social relationships, and medical, hospital, surgical expenses and other expenses related to diagnosis and treatment thereof, for which Defendants are liable

71.     As a direct and proximate result of the acts and omissions of Defendants, the Plaintiffs and members of the Class may have been prevented from pursuing their normal activities and employment, have experienced severe pain and suffering and mental anguish, and may have been deprived of their ordinary pursuits and enjoyments of life.

72.     Equity dictates that this Court provide the Plaintiff Class a remedy that provides them with sufficient information and medical monitoring appropriate for them to make informed decisions related to their physical well-being. Absent such notice the individual members of the Class will be irreparably harmed.

73.     Class members are also entitled to any procedural protections deemed necessary and appropriate to protect their legal interests.

74. Based upon the allegations set forth herein, the Defendants knew of facts that created a high degree of risk of physical harm to the Plaintiffs and the Class and that the Defendants deliberately proceeded to act in conscious disregard or indifference to that risk, and therefore that an award of punitive damages is warranted.

## V. CLASS ACTION ALLEGATIONS

75. Pursuant to Federal Rule Civil Procedure 23, Class Representative Plaintiffs, Kevin Clark and Willie Mae Wilburn, on behalf of themselves and all others similarly situated, seeks a nationwide Class defined as follows:

> All persons residing in the United States who were prescribed and ingested the Recalled Digitek®, during the time period when the Recalled Digitek® was manufactured, produced, distributed, released, sold or otherwise supplied, who suffered or may have suffered personal injuries or assert wrongful death claims arising from the ingestion of the Recalled Digitek®. Excluded from the Class are the Defendants, including any parent, subsidiary, affiliate or controlled person of the Defendants and their officers, directors, agents or employees, any judge or judicial officers assigned to this matter, plaintiffs' counsel and members of the immediate families of any excluded persons.

76. Digitek® was widely prescribed and has been ingested by millions of persons. The members of the Class are so numerous that joinder is impracticable and would involve millions of individual actions.

77. In this action, common issues of law and fact exist which relate to the defectiveness of the Recalled Digitek®; to Defendants' knowledge, conduct and duty in their manufacturing, testing, inspection, dosing, promotion, marketing, advertising, distribution, labeling, supplying, sales and recall of the Recalled Digitek®; and, these common issues predominate over any issues affecting only individual Class members. Common issues of law and fact include, but are not limited to:

a. Whether Defendants' manufacturing and production safety system exists, and if so, was designed and implemented in a reasonable manner.

17

b. Whether the Recalled Digitek® was and is unsafe for human ingestion;

c. Whether Defendants designed, manufactured, labeled, packaged, dosed, supplied, tested, inspected, distributed, released and sold the Recalled Digitek® with knowledge that it was a dangerously defective product;

d. Whether Defendants acted knowingly, recklessly, or negligently in designing, developing, manufacturing, labeling, packaging, testing, inspecting, dosing, supplying, distributing, releasing, selling and recalling the Recalled Digitek®;

e. Whether Defendants conducted, either directly or indirectly, adequate dose testing, batch testing or inspections of the Recalled Digitek®;

f. Whether Defendants had adequate safeguards in place to ensure that they were manufacturing, dosing, labeling, packaging, supplying, distributing, releasing or selling Digitek that was safe, not misbranded, or adulterated, and contained approved doses of digoxin.

g. Whether Defendants conducted, either directly or indirectly, adequate quality control, testing and/or inspection in the manufacturing and production of the Recalled Digitek®;

h. When Defendants discovered that the Recalled Digitek® had a dose of digoxin that was inconsistent with the dose stated in the label and sometimes not approved for use in humans, in relation to when the FDA and public were notified and the recall implemented and the speed to which Defendants acted to safeguard the public, the Plaintiffs and the Class;

i. Whether Defendants continued to manufacture, label, package, supply, market, distribute, promote, release and/or sell the Recalled Digitek®, notwithstanding knowledge of the drug's misbranding and adulteration and the dangerous nature and side-effects of the Recalled Digitek®;

j. Whether ingestion of the Recalled Digitek® causes an increased risk of

18

side-effects, personal injury and/or death;

      k.      Whether Defendants negligently monitored, tested and inspected the Recalled Digitek® such that earlier detection of the Recalled Digitek® could have occurred;

      l.      Why and how Defendants could have possibly failed to ascertain that the Recalled Digitek® had an unapproved dose of digoxin or a dose digoxin inconsistent with the dose set forth on the label before it was released, distributed and sold;

      m.      Whether the degree of reprehensibility of Defendants' conduct warrants the imposition of punitive damages;

      n.      Whether Defendants are strictly liable in tort for selling a dangerously defective product;

      o.      Whether Defendants breached their duty to warn about the dangers of the Recalled Digitek®;

      p.      Whether Defendants' conduct constituted negligence;

      q.      Whether Defendants' conduct constituted negligence under the doctrines of *negligence per se* and *res ipsa loquitur*;

      r.      Whether Defendants breached express or implied warranties;

      s.      Whether Defendants' conduct constituted fraudulent and /or negligent misrepresentation;

      t.      Whether Defendants' violated the *New Jersey Products Liability Act*;

      u.      Whether Defendants' violated the *New Jersey Consumer Fraud Act*;

      v.      Whether the members of the Class are entitled to medical monitoring at Defendants' expense;

      w.      Whether the Class are entitled to compensatory damages, and if so, the nature and extent of such damages; and,

19

x.      Whether punitive damages are warranted.

78.     The claims of the Class Representative are typical of the claims of the Class in that the named representatives and the members of the Class unwittingly ingested the Recalled Digitek® and have been diagnosed with an injury from the overdose.

79.     The Plaintiffs are members of the Class and may have sustained and/or will continue to sustain damages and injuries and are facing irreparable harm arising out of Defendants' tortious conduct.

80.     The Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class. Plaintiffs has retained counsel competent and experienced in complex Class Actions and products liability litigation. Plaintiffs has no known interests which are adverse to the interests of the other members of the Class. The interests of the Plaintiffs and the Class they seeks to represent are aligned because of their ingestion of the Recalled Digitek®.

81.     Class certification is appropriate under Fed.R.Civ.P. 23(b)(3) because common issues of law and fact relative to the design, development, manufacture, production, testing, labeling, dosing, packaging, inspection, supplying, distribution, release, sale and recall of the Recalled Digitek® predominate over individual issues. A Class Action is superior to other available methods for the fair and efficient adjudication of this litigation since individual joinder of all members of each Class is impracticable.

82.     Class certification of the common issues identified in the paragraphs above may also be appropriate pursuant to Fed.R.Civ.P. 23(c)(4)(A) with respect to particular issues set forth above or to be developed in the course of the litigation.

83.     A Class Action is superior to any other available method for the fair and efficient adjudication of this dispute because common questions of law and fact overwhelming predominate any questions that may affect only individual Class members, and there would be

enormous economies to the courts and the parties in litigating the common issues on a Classwide

instead of repetitive individual basis. A Class Action approach would serve to consolidate and

create a scenario with far fewer management difficulties because it provides the benefits of unity

adjudication, judicial economy, economies of scale and comprehensive supervision by a single

court. Any person who wishes to pursue an individual action outside the remedy sought in this

complaint will have the opportunity to opt-out.

84.     Maintenance of this action as a Class Action alleged is a fair and efficient method

for adjudication of this controversy. It would be impracticable and undesirable for each member

of the Class who has suffered harm to bring a separate action. In addition, the maintenance of

separate actions would place a substantial and unnecessary burden on the Courts and could result

in inconsistent adjudications, while a single Class Action can determine, with judicial economy,

the rights of all Class members.

85.     Class Certification is appropriate pursuant to Fed.R.Civ.P. 23(b)(2) because

Defendants acted on grounds generally applicable to the Class, making appropriate equitable

injunctive relief with respect to Plaintiffs and the Class Members. Plaintiffs, on behalf of

themselves and the Class, seek where appropriate legal or equitable relief in the form of a court

ordered and supervised Medical Monitoring program, funded by Defendants, to assist Plaintiffs

and the Class members in the early detection and treatment of illnesses caused by the ingestion of

the recalled Digitek®. Such a Program would include the following:

a.      A method to notify individuals who ingested the Recalled Digitek® of the
increased risk of harm that they have suffered as a result of that exposure;

b.      Provision for the accumulation and analysis of relevant medical and
demographic information from the Class Members including, but not limited to, the results of all
appropriate diagnostic tests performed on Class Members as part of a medical research and
education fund;

c.      Provision for the creation, maintenance, and operation of a medical
registry in which relevant demographic and medical information concerning all Class Members is

21

gathered, maintained and analyzed;

d.    Provision for medical research concerning the incidence, prevalence, natural course and history, diagnosis and treatment of side-effects induced by overdoses of digoxin;

e.    Publication, and other dissemination, of all such information to members of the Class and their physicians; and,

f.    Voluntary medical and diagnostic testing consistent with paragraphs (a) through (e) above, paid for by Defendants.

86.    Notice may be provided to Class members under the requirements of Fed.R.Civ.P. 23(c)(2) by such combination of print publication, broadcast publication, internet publication, and/or first Class mail that this Court determines best comport with modern Rule 23(c)(2) Class notice form, content and dissemination techniques as used in other medical products liability cases and as recommended by the *Manual for Complex Litigation* 4th ed.

87.    Plaintiffs knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a Class Action certified for the Class.

## VI.    CLAIMS FOR RELIEF

### COUNT 1
### PRODUCT LIABILITY – NEGLIGENCE
### (N.J.S.A. 2A:58C-1 *et seq.*)

88.    Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

89.    Defendants, directly or indirectly negligently designed, developed, manufactured, tested, produced, labeled, inspected, packaged, dosed, distributed, promoted, marketed, advertised, released, or sold the Recalled Digitek® in the stream of commerce, when it knew, or in the exercise of ordinary care, should have known that the drug posed a significant risk to the health, well-being and safety of the Plaintiffs and the Class, which risk was not known to

22

Plaintiffs, the Class, or their prescribers.

90. At all times material hereto, Defendants had a duty to the Plaintiffs and the Class to exercise reasonable care in the design, development, manufacture, production, inspection, testing, labeling, packaging, distribution, promotion, marketing, supplying, advertisement, distribution or sale of Recalled Digitek®.

91. Defendants breached their duty and were negligent in their actions, misrepresentations, and omissions toward Plaintiffs and the Class, and their prescribers, in that the Defendants:

a. failed to use reasonable care to design, develop, manufacture, produce, test, inspect, label, package, dose, promote, market, advertise, distribute, release or sell Recalled Digitek® that was safe for its intended and foreseeable uses, not defective, and not unreasonably dangerous;

b. sold, released, produced, and distributed of Digitek® without making proper and sufficient tests to determine the drug's stregnth/dose;

c. failed to use reasonable care to adequately warn foreseeable users such as Plaintiffs and the Class of the dangers of ingesting Recalled Digitek®;

d. failed to use reasonable care to make reasonable tests and inspections, and/or evaluations necessary to discover such defects and unreasonably dangerous conditions associated with the Recalled Digitek®;

e. failed to comply with and/or to use reasonable care to comply with standards of good manufacturing, production, inspection and testing practices, care including accepted industry standards, FDA recommendations, government regulations and statutes, in the design, development, manufacture, testing, inspecting, dosing, labeling, and otherwise production, distribution and release of Recalled Digitek®;

23

f. failed to use reasonable care to timely remove and/or recall from the market, and/or otherwise prevent the continued contact of Plaintiffs and the Class with such defects and unreasonably dangerous conditions of Recalled Digitek®;

g. failed to use reasonable care to investigate and/or use known and/or knowable reasonable alternative, manufacturing, production, testing and inspection processes for the Recalled Digitek®;

h. failed to use reasonable care to warn Plaintiffs and the Class of dangers known and/or reasonably suspected to Defendants to be associated with the Recalled Digitek®;

i. failed to use reasonable care to make the Recalled Digitek® safe;

j. negligently representing that the Recalled Digitek® was safe for use for its intended purpose, when, in fact, it was not;

k. failed to use reasonable care to make reasonable tests, inspections and/or evaluations necessary to discover such defects and unreasonably dangerous conditions associated with the Recalled Digitek®;

l. failed to timely use reasonable care to discover the dangerous conditions or character of the Recalled Digitek® and recall it; and,

m. failed to use reasonable care to timely conduct a Recall of the Recalled Digitek®, and whrn the recall was implemented, it failed to use reasonable care to implement the recall and inform the medical community, and the public, including the Plaintiffs and the Class of all relevant information such that the chance of harm was minimized to the fullest extent possible.

92. Defendants knew or should have known that Recalled Digitek® caused unreasonably dangerous risks and serious side-effects, including death, of which Plaintiffs would

24

not be aware. Defendants nevertheless advertised, marketed, supplied, released, sold and distributed the drug knowing that there were safer products.

93.     As a direct and proximate result of the negligence and breach of Defendants, Plaintiffs and the Class may have sustained serious injury. Defendants owed a duty to Plaintiffs and the Class to use reasonable care in its actions. Defendants' failure to use reasonable care proximately may have caused Plaintiffs and the Class' injuries.

94.     As a direct and proximate result of Defendants' negligence, Plaintiffs and the Class were harmed as aforesaid.

## COUNT 2
### *RES IPSA LOQUITOR*

95.     Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein

96.     The design, development, manufacture, production, misbranding, adulteration, distribution, supply, testing, inspection, release or sale of a pharmaceutical with an doses of the drug's active ingredient that were in excess of the dose on the label and sometimes in excess of the dose approved for human ingestion, *to wit* the Recalled Digitek®, is in and of itself an act that ordinarily bespeaks negligence.

97.     During the time when it was being designed, developed, manufactured and produced, the instrumentality, the Recalled Digitek®, was within the Defendants' exclusive control before being released, supplied, distributed or sold to the public including the Plaintiffs and the Class.

98.     There is no indication in the circumstances set forth herein that the injuries that result from the an overdose of digoxin, *to wit* the Recalled Digitek®, was the result of Plaintiffs of the Class' own voluntary act or neglect.

25

99. The acts and omissions set forth herein are the type that ordinarily bespeaks negligence and thus liability is established under the doctrine *res ipsa loquitur*.

100. Defendants had a duty to exercise reasonable care in the design, development, testing, manufacture, production, testing, inspection, labeling, packaging, supply, distribution, marketing, promotion, sale and release of the Recalled Digitek®, including a duty to not design, manufacture, produce, label, package, supply, distribute, market, promote, release or sell a pharmaceutical with doses of the drug's active ingredient that were in excess of the dose on the label and sometimes in excess of the dose approved for human ingestion, *to wit* the Recalled Digitek®.

101. As a direct and proximate result of the acts and omissions of the Defendants as aforesaid, the Plaintiffs and the Class were harmed as aforesaid.

## COUNT 3
## NEGLIGENCE *PER SE*

102. Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

103. At all times mentioned herein, Defendants had an obligation not to violate the law, in the design, development, manufacture, production, formulation, compounding, testing, inspecting, processing, assembling, testing, distribution, marketing, labeling, packaging preparation for use, release, sale and warning of the risks and dangers of the aforementioned product.

104. At all times herein mentioned, Defendants violated the Federal Food, Drug and Cosmetic Act, 21 U.S.C. Section 301, *et seq*., related amendments and codes and federal regulations provided thereunder, and other applicable laws, statutes and regulations.

105. Plaintiffs, and the Class, as a purchaser and consumer of the Recalled Digitek®,

are within the class of persons the statutes and regulations described above are designed to protect, and the injuries alleged herein are the type of harm these statutes are designed to prevent.

106.    Defendants' acts constitute an adulteration and misbranding as defined by the Federal Food, Drug and Cosmetics Act, 21 U.S.C. § 331, and the regulations promulgated therefrom and constitutes a breach of duty subjecting Defendants to civil liability for all damages arising therefrom, under theories of negligence *per se.*

107.    Defendants' manufacturing, production, testing and inspection processes are not good manufacturing processs Federal Food, Drug and Cosmetics Act, 21 U.S.C. § 331 and the regulations promulgated therefrom and constitutes a breach of duty subjecting Defendants to civil liability for all damages arising therefrom, under theories of negligence *per se.*

108.    The acts and ommissions set forth herein, demonstrate that Defendants failed to meet the standard of care set by the applicable statutes and regulations, which were intended for the benefit of individuals such as Plaintiffs, and the Class making Defendants negligent *per se*:

109.    As a direct and proximate result of the acts and omissions of the Defendants as aforesaid, the Plaintiffs and the Class were harmed as aforesaid.

### COUNT 4
### PRODUCT LIABILITY – DEFECTIVE DESIGN
### (N.J.S.A. 2A:58C-1 et seq.)

110.    Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraphs as though set forth fully at length herein:

111.    At all times material to this action, the Defendants were responsible for the design, development, manufacturing, production, testing, inspection, packaging, promoting, marketing, distributing, supply, labeling, release and/or sale the Recalled Digitek®.

112.    The Recalled Digitek® is defective and unreasonably dangerous to consumers.

113.    The Recalled Digitek® is defective in its design or formulation in that it is not

27

reasonably fit, suitable, or safe for its intended purpose and/or its foreseeable risks exceed the benefits associated with its design and formulation.

114. At all times material to this action, the Recalled Digitek® was expected to reach, and did reach, consumers in the State of New Jersey and throughout the United States, including the Plaintiffs and the Class herein, without substantial change in the condition in which it was sold.

115. At all times material to this action, the Recalled Digitek® was designed, developed, manufactured, produced, tested, packaged, promoted, marketed, distributed, labeled, released and/or sold by Defendants in a defective and unreasonably dangerous condition at the time it was placed in the stream of commerce in ways which include, but are not limited to, one or more of the following particulars:

a. When placed in the stream of commerce, the Recalled Digitek® contained an unreasonably dangerous design defect and was not reasonably safe as intended to be used, subjecting the Plaintiffs and the Class to risks that exceeded the benefits of the subject product, including but not limited to the risks serious bodily injuries and even death in an unacceptably high number of its users;

b. When placed in the stream of commerce, the Recalled Digitek® was defective in design and formulation, making the use of the Recalled Digitek® more dangerous than an ordinary consumer would expect, and more dangerous than other risks associated with the other digoxin medications and similar drugs on the market, including Digitek® with approved doses of digoxin, with doses that were consistent with the dose on the label;

c. The Recalled Digitek® design defects existed before it left the control of the Defendants;

d. The Recalled Digitek® was insufficiently tested and inspected;

28

e. The Recalled Digitek® caused harmful side-effects that outweighed any potential utility; and

f. The Recalled Digitek® was not accompanied by adequate instructions and/or warnings and labeling to fully apprise consumers, including the Plaintiffs and the Class, of the full nature and extent of the risks and side-effects associated with its use and that it contained an overdose of digoxin, thereby rendering Defendants liable, individually and collectively, to the Plaintiffs and the Class.

116. In addition, at the time the subject product left the control of the Defendants, there were practical and feasible alternative designs that would have prevented and/or significantly reduced the risk of injury to Plaintiffs and the Class without impairing the reasonably anticipated or intended function of the product. These safer alternative designs, including Digitek® with the approved dose of digoxin, consistent with the dose on the label, were economically and technologically feasible, and would have prevented or significantly reduced the risk of injury to Plaintiffs and the Class without substantially impairing the product's utility.

117. As a direct and proximate result of the acts and omissions of the Defendants as aforesaid, the Plaintiffs and members of the Class were harmed as aforesaid.

## COUNT 5
## PRODUCT LIABILITY – MANUFACTURING DEFECT
## (N.J.S.A. 2A:58C-1 et seq.)

118. Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein:

119. At all times material to this action, Defendants were engaged in the business of designing, developing, manufacturing, producing, testing, packaging, inspecting, promoting, marketing, distributing, supplying, labeling, releasing and/or selling the Recalled Digitek®.

120. At all times material to this action, the Recalled Digitek® was expected to reach,

29

and did reach, consumers in the State of New Jersey and throughout the United States, including the Plaintiffs and the Class without substantial change in the condition in which it was sold.

121. At all times material to this action, the Recalled Digitek® was designed, developed, manufactured, produced, tested, packaged, inspected, promoted, marketed, supplied, distributed, labeled, released and/or sold by Defendants in a defective and unreasonably dangerous condition at the time it was placed in the stream of commerce in ways which include, but are not limited to, one or more of the following particulars:

a. When placed in the stream of commerce, the Recalled Digitek® contained manufacturing defects which rendered the product unreasonably dangerous;

b. Thes manufacturing defects of the Recalled Digitek® occurred while the product was in the possession and control of the Defendants;

c. The Recalled Digitek® was not made in accordance with the Defendants' specifications or performance standards and/or those specifications and standards approved by the FDA; and,

d. The manufacturing defects of the Recalled Digitek® existed before it left the control of the Defendants;

122. As a direct and proximate result of the acts and omissions of the Defendants as aforesaid, the Plaintiffs and members of the Class were harmed as aforesaid.

## COUNT 6
### PRODUCT LIABILITY - FAILURE TO WARN
### (N.J.S.A. 2A:58C-1 et seq.)

123. Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

124. The Recalled Digitek® was defective and unreasonably dangerous when it left the possession of the Defendants in that it contained labeling, packaging and warnings insufficient to

30

alert consumers, including the Plaintiffs and the Class, of the dangerous risks and reactions associated with the Recalled Digitek®, including but not limited, failing to warn that the Recalled Digitek® contained a dose of digoxin inconsistent with the dose on the label and sometimes a dose exceeding the approved dose for use by humans.

125. The Plaintiffs and the Class were prescribed and used the subject product for its intended purpose.

126. The Plaintiffs and the Class could not have discovered any defect in the subject product through the exercise of reasonable care.

127. The Defendants, as designer, developer, manufacturers, producers, suppliers, inspectors, testers, distributors, releasors or sellers of the subject Recalled Digitek® , a prescription drug, are held to the level of knowledge of an expert in the field.

128. The label, warnings and dosing information that were given by the Defendants with the Recalled Digitek© were not accurate, clear and/or were ambiguous.

129. The label, warnings and dosing information that were given by the Defendants failed to properly warn physicians, the Plaintiffs, the Class and the public that the Recalled Digitek® contained amounts of digoxin exceeding that were inconsistent with the amount on the lable and sometimes contained a does not approved for use in humans and thus ingestion risked serious injuries, side effects and/or death.

130. The Plaintiffs, and the Class, individually and through theirs prescribing physician, reasonably relied upon the skill, superior knowledge and judgment of the Defendants.

131. The Defendants had a continuing duty to warn the Plaintiffs and the Class of the dangers associated with the Recalled Digitek®.

132. Had the Plaintiffs and the Class received adequate warnings or information regarding the dose of digoxin in the Recalled Digitek® and/or information regarding the risks of

31

ingesting the subject product, they would not have used it.

133.    As a direct and proximate result of the acts and omissions of the Defendants as aforesaid, the Plaintiffs and members of the Class were harmed as aforesaid.

## COUNT 7
## STRICT PRODUCTS LIABILITY

134.    Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraphs as though set forth fully at length herein.

135.    At all relevant times, Defendants were the designers, developers, manufacturers, producers, makers, dosers, processors, compounders, forumlaters, labelers, packagers, testers, inspectors, distributor, marketers, promoters, suppliers, releasors and sellers of the Recalled Digitek®, which, at all relevant times, was defective and unreasonably dangerous to consumers.

136.    At all relevant times, the Recalled Digitek® was defective in its design, manufacture and production in that it was not reasonably fit, suitable or safe for its intended purpose and/or its foreseeable risks exceed the benefits. The Recalled Digitek® was defective in design, manufacture and production in that it posed a greater likelihood of injury than other properly-dosed digoxin medicines and similar drugs on the market, including properly dosed Digitek® and was more dangerous than ordinary consumers can reasonably foresee.

137.    At all relevant times, the defective condition of the Recalled Digitek® rendered it unreasonably dangerous, and the Recalled Digitek® was in this defective condition at the time it left the hands of the Defendants. The Recalled Digitek® was expected to and did reach consumers, including Plaintiffs and the Class, without substantial change in the condition in which it was designed, developed, manufactured, labeled, dosed, produced, sold, distributed, marketed, promoted, supplied and otherwise released into the stream of commerce.

138.    At all relevant times, Plaintiffs and the Class were unaware of the significant

32

hazards and defects in the Recalled Digitek®. The Recalled Digitek® was unreasonably dangerous than would be reasonably contemplated by the ordinary user. During the period that Plaintiffs and the Class were taking the Recalled Digitek®, the medication was being utilized in a manner that was intended by the Defendants. At the time Plaintiffs and the Class received and consumed the Recalled Digitek®, it was represented to be safe and free from latent defects and was to have an approved dose of digoxin consistent with the does set forth on the label.

139. At all relevant times, Defendants knew or should have known of the danger associated with the use of the Recalled Digitek®, as well as the defective nature of the Recalled Digitek®, but continued to manufacture, sell, distribute, label, package, market, promote, release and/or supply the Recalled Digitek® so as to maximize sales and profits at the expense of the public health and safety and to maintain the Digitek® brand integrtiy, in conscious disregard of the foreseeable harm caused by the Recalled Digitek®.

140. At all relevant times, the Recalled Digitek® was in a defective and unreasonably dangerous condition which would not be recognized or contemplated by a reasonable person among the expected users and consumers at the time it left the control of the Defendants.

141. At all relevant times, the Recalled Digitek® was defective and unreasonably dangerous when used in reasonably expectable ways of handling and/or consumption.

142. At all relevant times, the Recalled Digitek® was expected to reach, and did reach, the ultimate user or consumer without substantial change in the condition in which it was sold, supplied, manufactured, produced, and/or distributed by Defendants.

143. At all relevant times, the Recalled Digitek® was defective and unreasonably dangerous under section 402(A) *Restatement (Second) of Torts*, and the *New Jersey Products Liability Act*.

144. Defendants are strictly liable to Plaintiffs and the Class for manufacturing,

33

producing and placing into the stream of commerce a product which was defective and unreasonably dangerous for its reasonably foreseeable uses at the time it left the control of Defendants.

145.    As a direct and proximate result of Defendants' defective and unreasonably dangerous products, Plaintiffs and members of the Class were harmed as aforesaid.

## COUNT 8
## BREACH OF EXPRESS WARRANTY

146.    Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraphs as though set forth fully at length herein.

147.    At all relevant times, Defendants warranted that the Recalled Digitek® was safe and not defective and/or unreasonably dangerous as stated above and warranted that it continued a dose of digoxin that consistent with the dose set forth on its label and was otherwise safe for human ingestion.

148.    At all relevant times, Defendant placed the Recalled Digitek® into the stream of commerce for sale and recommended its use to physicians, the FDA and consumers without adequately warning physicians, the FDA and consumers, including the Plaintiffs and members of the Class, of the risks associated with the use of the Recalled Digitek® and that it contained an amount of digoxin exceeding labeled dose and sometimes exceeding the approved dose for human ingestion.

149.    At all relevant times, Defendants had a duty to exercise reasonable care in the design, development, testing, manufacture, production, formulation, processing, compounding, labeling, packaging, inspections, supply, distribution, marketing, promotion, sale and release of the Recalled Digitek®, including a duty to:

    a.    Ensure that the product did not cause the user unreasonably dangerous

34

side-effects;

b. Ensure that the product was labeled accurately;

c. Ensure that the amount, stregnth and dose of the digoxin in the product was consistent with the that set forth on the label and to ensure that the does was approved by the FDA as a dose safe for use in humans;

d. Warn of dangerous and potentially fatal side-effects; and,

e. Disclose adverse material facts when making representations to physicians, the FDA and the public at large, including Plaintiffs and the Class.

150. When the Physicians of the Plaintiffs and Class Members prescribed the Recalled Digitek® and the Plaintiffs and the Class members decided to use the Recalled Digitek®, both Plaintiffs, the Class members and their physicians reasonably relied upon the Defendants and their agents to disclose known defects, risks, dangers and side-effects of the Recalled Digitek® and whether the Recalled Digitek® contained an dose of digoxin, consistent with its label, and not in excess of the dose approved for ingestion by humans.

151. Plaintiffs and the Class members' physician(s), the FDA and/or Plaintiffs and the Class members had no knowledge of the falsity or incompleteness of the Defendants' statements and representations concerning the Recalled Digitek® when Plaintiffs and the Class members' physician(s) prescribed and/or otherwise provided Recalled Digitek® and Plaintiffs and the Class Members purchased and used the Recalled Digitek® as designed, developed, tested, manufactured, produced, dosed, inspected, labeled, packaged, distributed, supplied, marketed, promoted, sold and otherwise released into the stream of commerce by the Defendants. Plaintiffs and the Class justifiably and detrimentally relied on the warranties and representations of Defendants in the purchase and use of the Recalled Digitek®.

152. At all relevant times, Defendants were under a duty to disclose the defective and

35

unsafe nature of the Recalled Digitek® to physicians, the FDA, consumers and users, such as the Plaintiffs and the Class. Defendants had sole access to material facts concerning the defects, and Defendants knew that physicians, the FDA and users, such as Plaintiffs and the members of the Class, could not have reasonably discovered such defects.

153. By the conduct alleged, Defendants, its agents and employees expressly warranted to Plaintiffs and the Class and their physicians(s) that the Recalled Digitek® was packaged and labeled accurately that it contained the approved dose of digoxin, that the drug was safe, merchantable and fit for the purpose intended.

154. This warranty was breached because the Recalled Digitek® was misbranded, adulterated and did not contain the amount of digoxin as stated in the label and sometimes the approved dose for ingestion by humans, nor was it safe and effective as Defendants represented, and Plaintiffs and the Class were harmed as aforesaid.

155. As a direct and proximate result of Defendants'defective and unreasonably dangerous Recalled Digitek® and their breach of express warranty, Plaintiffs and the Class were harmed as aforesaid.

## COUNT 9
## BREACH OF IMPLIED WARRANTY
## (N.J.S.A. 2A:58C-1 *et seq.*)

156. Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraphs as though set forth fully at length herein:

157. The Defendants designed, developed, manufactured, marketed, produced, tested, inspected, distributed, supplied, released and sold the Recalled Digitek® for the treatment of certain cardiac heart problems.

158. At the time that the Defendants designed, developed, manufactured, marketed, produced, tested, inspected, distributed, supplied, released and sold the Recalled Digitek®, they

36

knew of the use for which the subject product was intended and impliedly warranted it to be of merchantable quality and safe and fit for such use.

159. The Plaintiffs, and the Class, individually and through their prescribing physician, reasonably relied upon the skill, superior knowledge and judgment of the Defendants.

160. The Plaintiffs, and the Class were prescribed, purchased, and used the Recalled Digitek® for its intended purpose.

161. Due to the Defendants' wrongful conduct as alleged herein, the Plaintiffs and the Class could not have known about the mislabeling, misbranding, exceessive dose of digoxin, the nature of the risks and side-effects associated with the Recalled Digitek® until after they used it.

162. Contrary to the implied warranty for the subject product, the Recalled Digitek® was not of merchantable quality, and was not safe or fit for its intended uses and purposes, as alleged herein.

163. As a direct and proximate result of the acts and omissions of Defendants and the defective and unreasonably dangerous Recalled Digitek® and their breach of implied warranty, Plaintiffs and the Classs were harmed as aforesaid, and Plaintiffs and the Class may have suffered injuries and damages including death.

## COUNT 10
## MISREPRESENTATION AND SUPPRESSION BY DEFENDANTS

164. Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraphs as though set forth fully at length herein:

165. Defendants misrepresented to Plaintiffs and the Class and the medical community the safety and effectivenss of the Recalled Digitek® and/or fraudulently, intentionally and/or negligently concealed material information, including adverse information regarding the safety and effectiveness of the Recalled Digitek® and the dose of digoxin contained therein.

37

166. Defendants made misrepresentations and actively concealed adverse information at a time when the Defendants knew, or should have known, that the Recalled Digitek® had defects, dangers, and characteristics that were other than that what the Defendants had represented to Plaintiffs, the Class, the public, the FDA and the medical community generally. Specifically, Defendants misrepresented to and/or actively concealed from Plaintiffs, the Class, the FDA and, the medical community and consuming public that:

a. Some doses of digoxin in the Recalled Digitek® was not a dose that was approved by the FDA;

b. The dose of the digoxin in the Recalled Digitek® was not what the label represented the dose to be;

c. Some of doses of digoxin in the Recalled Digitek® exceeded the dose approved for use in humans;

d. The dose of digoxin in the Recalled Digitek® was unsafe, hazardous dangerous; and,

e. Ingesting the Recalled Digitek® would result in an overdose.

167. The misrepresentations of and/or active concealment alleged were perpetuated directly and/or indirectly by Defendants.

168. Defendants knew or should have known that these representations were false and made the representations with the intent or purpose that Plaintiffs and the Class would rely on them, leading to the use of the Recalled Digitek®.

169. At the time of Defendants' fraudulent misrepresentations, Plaintiffs and the Class were uanware of the falsity of the statements being made and believed them to be true. Plaintiffs and the members of the Class had no knowledge of the information concealed and/or suppressed by Defendants.

170. Plaintiffs and the Class justifiably relied on and/or were induced by the misrepresentations and/or active concealment and relied on the absence of safety information

38

which the Defendants did suppress, conceal or failed to disclose to the detriment of the Plaintiffs and the Class.

171.    Defendants had a duty to warn Plaintiffs, the Class, and the public, the FDA and the medical community, about the misbranding, adulteration and potential risks and complications associated with the Recalled Digitek® in a timely manner but failed to do so.

172.    The misrepresentations and active fraudulent concealment by the Defendants constitutes a continuing tort against the Plaintiffs and the Class who ingested the Recalled Digitek®.

173.    Defendants made the misrepresentations and actively concealed information about the defects and dangers of the Recalled Digitek® with the intention and specific desire that the healthcare professionals treating the Plaintiffs and the Class, the Plaintiffs and the Class themselves, and the consuming public would rely on such or the absence of information in selecting and using the Recalled Digitek® as a medical treatment.

174.    As a direct and proximate result of the fraudulent acts and omissions, suppression and misrepresentation of Defendants, Plaintiffs and the Class may have suffered injuries and damages including death.

## COUNT 11
## FRAUD

175.    Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

176.    Defendants fraudulently, intentionally, wilfully and wantonly, purposefully, knowingly, recklessly, negligently and/or in fact materially misrepresented both affirmatively and by omission that the Recalled Digitek® was of good quality, non-defective, safe for its intended use, merchantable, and fit for its particular purposes.

39

177. Defendants intended, knew, and/or should have known that Plaintiffs and the Class would be induced, by the aforesaid misrepresentations, to use the Recalled Digitek®.

178. In using the Recalled Digitek®, Plaintiffs and the Class justifiably relied on Defendants' representations that its Recalled Digitek® was of good quality, non-defective, labeled accurately, not adulterated and was safe for its intended use, merchantable, and fit for its particular purposes.

179. The Recalled Digitek® was, in fact, misbranded, adulterated, defective and unreasonably dangerous, as recited above.

180. As a direct and proximate result of the defective and unreasonably dangerous Recalled Digitek® as well as its affirmative misrepresentations and omissions, Plaintiffs and the Class were harmed as aforesaid.

## COUNT 12
## NEGLIGENT MISREPRESETANTION

181. Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraphs as though set forth fully at length herein.

182. Defendants, in addition to knowing misrepresetnations, made misrepresentations without any reasonable grounds for believing their statements to be true to Plaintiffs and the Class, other patients, and the medical community.

183. Defendants, through its misrepesentations, intended to induce justifiable reliance by Plaintiffss, the Class, other patients, and the medical community.

184. Defendants, through its labeling, marketing compaign and communications with treating physicians, was in a relationship so close to that of Plaintiffs, the Class and other patients that it approaches and resembles privity.

185. Defendants owes a duty to the medical community, Plaintiffs, the Class, and other

consumers, to conduct appropriate and adequate inspections and tests for all of their products, including the Recalled Digitek®, and to use safe and good manufacturing and production practices, to provide appropriate and adequate information and warnings but they failed to do so.

186. Defendants failed to conduct appropriate or adequate inspections, tests on the Recalled Digitek®.

187. As a direct and proximate result of Defendants' negligent misrepresentations the Plaintiffs and the Class were harmed as aforesaid.

## COUNT 13
## VIOLATIONS OF NEW JERSEY CONSUMER FRAUD ACT
## (N.J.S.A. 56:8-1 *et seq.*)

188. Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraphs as though set forth fully at length herein.

189. The Recalled Digitek® is considered "merchandise" as that term is defined by *N.J.S.A.* 56:8-1(c).

190. At all relevant times, Defendants knew or should have known that the use of the Recalled Digitek® caused serious and life-threatening injuries but failed to warn the public, including the Plaintiffs and the Class, of the same.

191. At all relevant times, Defendants made untrue, deceptive or misleading representations of material facts to and omitted and/or concealed material facts from Plaintiffs, the Class, the FDA, the public and the medical community in the product packaging, labeling, advertising, direct-to-consumer advertising, promotional campaigns and other materials, among other ways, regarding the safety and amount of digoxin of the Recalled Digitek®. Moreover, Defendants downplayed and/or understated the serious nature of the risks associated with Recalled Digitek® in order to increase the sales of the Recalled Digitek® and maintain their share of the digoxin market and maintaining the integrity of the Digitek® brand.

41

192.    At all relevant times, Defendants' statements and omissions were undertaken with the intent that the FDA, physicians, and consumers, including the Plaintiffs and the Class, would rely on the Defendants' statements and/or omissions.

193.    Plaintiffs and the Class were prescribed and/or otherwise provided with, and consumed, the Recalled Digitek® and have or may have suffered ascertainable losses of money as a result of the Defendants' use or employment of the methods, acts or practices or failure to act, alleged herein.

194.    The aforesaid misbranding, adulteration, supply, distribution and sale and release of the Recalled Digitek® into the stream of commerce constitutes an unconscionable commercial practice, deception, false pretense, misrepresentations, and/or the knowing concealment, suppression, or omission of material facts with the intent that others would rely upon such concealment, suppression or omission in connections with the sale or advertisement of such merchandise or services by Defendants.

195.    At all relevant times, Defendants concealed, omitted, or minimized that the Recalled Digitek® had an amount of digoxin inconsistent with the stated dose on the label and sometimes exeeding the approved dose for use in humans or provided mis-information about adverse reactions, risks and potential harms from the Recalled Digitek® and succeeded in persuading consumers, including Plaintiffs and the Class to purchase and ingest the Recalled Digitek® despite the lack of safety and the risk of adverse medical reactions, including but not limited to those set forth in the Digitek® label.

196.    At all relevant times, Defendants practice of promoting and marketing the Recalled Digitek® created and reinforced a false impression as to the safety of the Recalled Digitek®, thereby placing consumers, including Plaintiffs and the Class, at risk of serious and potential lethal effects.

42

197. At all relevant times, the Recalled Digitek® lacked appropriate warnings and information about the dose of Digoxin, and the packaging and labels used by Defendants were misleading, inaccurate, incomplete and/or untimely.

198. Defendants violated their post-manufacture duty to warn which arose when it knew, or with reasonable care should have known, that the Recalled Digitek® was injurious and sometimes fatal.

199. At the time when consumers, including the Plaintiffs and the Class, purchased and ingested the Recalled Digitek®, Defendants intended that others would rely upon the concealment, suppression or omission of the risks of ingesting the Recalled Digitek®.

200. Defendants' actions in connection with design, development, manufacture, production, labeling, packaging, supplying, testing, inspecting, distributing, marketing, release and sale of the Recalled Digitek® as set forth herein evidence a lack of good-faith, honesty in fact and were not observant of fair dealing so as to constitute unconscionable commercial practices.

201. Defendants acted willfully, knowingly, intentionally, unconscionably and with reckless indifference when committing these acts of consumer fraud.

202. As a proximate result of the acts of consumer fraud set forth above, Plaintiffs and the Class purchased and ingested an unsafe, misbranded, adulterated, product and incurred monetary expense and the risk to themselves and members of their households that they would consume the Recalled Digitek® and thereby suffer an increased risk of harm as previously set forth herein.

203. The conduct of the Defendants, as set forth above, constitutes unfair, deceptive, unlawful, and/or unconscionable acts and/or practices prohibited under the *New Jersey Consumer Fraud Act*, N.J.S.A. 56:8-2, et seq. and the Consumer Protection Statutes of the various states.

43

204. As a direct and proximate result of Defendants' unfair, deceptive, unlawful, and/or unconscionable acts or practices in violation of the aforesaid Consumer Protection Laws.

**COUNT 14**
**MEDICAL MONITORING**

205. Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

206. The Plaintiffs and the Class had significant and extensive exposure to the Recalled Digitek® with their ingestion of the same

207. The ingestion of the Recalled Digitek® caused toxicity to Plaintiffs and the Class from the chemical drug ingested.

208. The ingestion of the Recalled Digitek® exposed Plaintiffs and the Class to serious personal injuries for which the Plaintiffs and the Class were at risk

209. The ingestion of the Recalled Digitek® significantly increased the chance of onset of personal injuries to the Plaintiffs and the Class because of their exposure

210. There is a significant value for the Plaintiffs and the Class in the early diagnosis, detection and treatment of the personal injuries from their ingestion of the Recalled Digitek®.

211. During all times relevant hereto, the Defendants knew or should have known of the danger that ingestion of the Recalled Digitek® would cause Plaintiffs and the Class because of its defects, which were known or should have been known by Defendants to cause a signficantly increased risk of developing personal injuries and potentially death from a digoxin overdose or digitalis toxicity.

212. During all times relevant hereto, the Defendants knew or should have known that the dangers of ingestion of the Recalled Digitek® enhanced the risk of contracting serious medical conditions in the Plaintiffs and the Class, which would make it necessary for them to

44

undergo medical surveillance and testing in order to monitor for the development of such injuries and permit early diagnosis or treatment of the same.

213.     During all relevant times hereto, Defendants knew or should have known of the dangers of ingestion of the Recalled Digitek®, would make it necessary for the Plaintiffs, and members of the Class to undergo medical surveillance in order to monitor for the development of injuries related to digoxin overdose and digitalis toxicity and permit early medical diagnosis or treatment of any such condition.

214.     The failure of the Defendants to provide the Plaintiffs and the Class with adequate warnings of the danger from ingesting the Recalled Digitek® has made it necessary that the Plaintiffs and the Class undergo regular medical surveillance and testing in order to monitor for the development of injuries related to digoxin overdose and digitalis toxicity and permit early medical diagnosis or treatment of any such conditions. Such conduct by Defendants was reckless, wanton, and willful and in conscious disregard of the safety and health of the Plaintiffs and the Class.

215.     Equity dictates that this Court provide the Plaintiffs Class a remedy that provides them with sufficient information and medical monitoring appropriate for them to make informed decisions related to their physical well-being. Absent such notice the individual members of the Class will be irreparably harmed.

216.     Class members are also entitled to any procedural protections deemed necessary and appropriate to protect their legal interests.

## COUNT 15
## UNJUST ENRICHMENT

217.     Plaintiffs and the Class incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

45

218. Defendants accepted payment from Plaintiffs and the members of the Class for the purchase of the Recalled Digitek®.

219. Plaintiffs and the Class did not receive a safe and effective drug for which they paid and as aforesaid, received a dangerous and defective drug.

220. It would be inequitable for Defendants to retain this money because Plaintiffs and the Class did not in fact receive a safe and effective drug.

## V.    PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs and the Class, demands judgment against Defendants for damages including exemplary damages if applicable to which they are entitled by law, as well as all costs of this action, to the full extent of the law including:

1. an Order certifying the Plaintiffs Class and any appropriate sub-class thereof under Fed.R.Civ.P. 23, and appointing Plaintiffs and their counsel to represent the Plaintiffs Class.

2. a preliminary injunction (to be made permanent) or other order providing for equitable notice to all members of the Class advising them of *inter alia* Defendants' misconduct; their increased risk of latent injury as a result of their ingestion of the Recalled Digitek®; the potential that the development digitalis toxicity and other injuries by members of the Class may be related to their ingestion of the Recalled Digitek®; and their need to take legal action to preserve their rights with respect to any damages they may have suffered as a result of their ingestion of the Recalled Digitek®;

3. An Order establishing a court-administered Medical Screening Program, to be funded by Defendants, to provide for and/or reimburse medical and diagnostic tests for each member of the Class to detect for damage and injuries from an overdose of digoxin, digitialis toxicity and other latent or unrecognized injuries, and, if such injuries are detected and

46

Plaintiffss and Class members;

11.     An award of pre and post judgment interest at the lawful rate;

12.     Any and all damages available by statute or commonlaw available under any of

the Counts of this Class Action Complaint;

13.     Awarding Plaintiffs and the Class punitive damages to deter Defendants'

outrageous and wanton, willful conduct and flagrant disregard for the health, welfare, lives of the

Plaintiffs and the Class;

14.     An award of reasonable attorneys' fees and costs and expert fees;

15.     A trial by jury on all issues of the case; and

16.     For any other relief as this court may deem equitable and just.

## VI.     JURY TRIAL DEMANDED

Plaintiffs and the Class demand that all issues of fact of this case be tried to a properly

impaneled jury.

BY:

Michael Weinkowitz, Esquire
**Fred Longer, Esquire**
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500
(215) 592-4663 (fax)
MWeinkowitz@lfsblaw.com

*Co-counsel:*     John R. Malkinson
MALKINSON & HALPERN, P.C.
223 W. Jackson Blvd., Suite 1010
Chicago, IL 60606

Dated: May 8, 2008

**2**

RECYCLED PAPER
RECYCLABLE

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

MAY 23 2008

FILED
CLERK'S OFFICE

## "REVISED SCHEDULE OF ACTIONS"

1.      *Ruby I. Thrasher, individually on behalf of all others similarly situated v. Actavis Group, Actavis Totowa, LLC, Mylan Pharmaceuticals, Inc., Mylan Bertek Pharmaceuticals Inc., And, UDL Laboratories, Inc.*, E.D. La. 2008 (2:08-cv-03167)(Judge Helen G. Gerrigan/Magistrate Judge Alma L. Chasez).

2.      *Bobby White, individually on behalf of all others similarly situated v. Actavis Totowa, LLC, Mylan Laboratories, Inc., UDL Laboratories, Inc., Mylan Pharmaceuticals, Inc.*, W.D. Missouri 2008 4:08-cv-00320)(Judge Dean Whipple).

3.      *Joseph J. Novak v. Actavis Totowa, LLC, Actavis Group Hf, Mylan, Inc., Mylan Pharmaceuticals, Inc., UDL Laboratories, Inc.*, N.D. Ohio 1:08cv-01119)(Judge Solomon Oliver, Jr. / Magistrate Judge Perlman).

4.      *Kevin Clark and Willie Mae Wilburn, individually and on behalf of all others similarly situated v. Actavis Group Hf, Actavis Totowa, LLC (Formerly Known as Amide Pharmaceutical, Inc.), Actavis Inc., Actavis Elizabeth, Llc, Actavis Us, Mylan, Inc., Mylan Pharmaceuticals, Inc., Mylan Laboratories, Inc., Mylan Bertek Pharmaceuticals Inc., And, UDL Laboratories, Inc.*, D.N.J., 08-2293 (JAG) (Judge Joseph A. Greenaway, Jr./Magistrate Judge Madeline Cox Arleo).

RECEIVED
CLERK'S OFFICE
JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

**3**

RECYCLED PAPER
RECYCLABLE

UNITED STATES DISTRICT COURT
WESTERN DISTRICT, CENTRAL DIVISION
OF MISSOURI

----------------------------------------------------------------x

BOBBY WHITE, individually and
On behalf of all others similarly situated,

Plaintiffs,

**CLASS ACTION COMPLAINT
AND JURY DEMAND**

v.

ACTAVIS TOTOWA, LLC,
MYLAN LABORATORIES, INC.
UDL LABORATORIES, INC. and
MYLAN PHARMACUTICALS, INC.

Plaintiff, BOBBY WHITE, by and through his undersigned attorneys PETERSON &
ASSOCIATES, PC hereby commences this action individually, and on behalf of the Class
identified below, and seeks Class status on behalf of himself and the Class as described below.

## NATURE OF THE CASE/OVERVIEW

1.     Plaintiff brings this action on behalf of all persons residing in the United
States who purchased Digitek® or Bertek®. Plaintiff brings this action pursuant to Rule 23 of
the Federal Rules of Civil Procedure (hereinafter "F.R.C.P.") to recover compensatory, equitable,
actual and punitive damages, injunctive relief, and attorneys' fees.

2.     Plaintiff seeks to represent the following class:

**Digitek® and Bertek® Class**: All citizens, residents, or domiciliaries of the
United States who have purchased Digitek® or Bertek® and such citizens', residents' and
domiciliaries' estates, representatives, administrators, spouses, children, relatives and "significant
others" as their heirs or survivors.

3.     Defendants Actavis Totowa, LLC, Mylan Laboratories, Inc., Mylan
Pharmaceuticals, Inc. and UDL Laboratories, Inc. (hereafter collectively referred to as

"Defendants") designed, researched, manufactured, tested, sought approval by the United States Food and Drug Administration (hereinafter "FDA"), advertised, promoted, marketed, sold and/or distributed Digitek® and Bertek® for the treatment of heart failure and abnormal heart rhythms.

4.      As a result of Defendants' actions, a double strength of digoxin was placed into all tablets of Digitek® and Bertek®.

5.      As a result of the defective nature of Digitek® and Bertek®, the drug substantially increases the risk of digitalis toxicity in patients with renal failure. Digitalis toxicity can cause nausea, vomiting, dizziness, low blood pressure, cardiac instability and bradycardia. Death can also result from excessive Digitalis intake.

6.      At all times relevant, Defendants misrepresented the safety of Digitek® and Bertek® and negligently designed, manufactured, marketed, advertised, promoted, sold and distributed Digitek® and Bertek® as a safe and effective medication for the treatment of heart failure and abnormal heart rhythms

7.      At all times relevant, Defendants failed to warn of the dangers of Digitek® and Bertek® including but not limited to the fact that Digitek® and Bertek® substantially increases the risk of digitalis toxicity.

8.      At all times relevant, Defendants knew, and had reason to know, or should have known, that Digitek® and Bertek® was not properly manufactured thereby defrauding Plaintiff, members of the Plaintiff Class, physicians, patients and the population-at-large while increasing the risk of digitalis toxicity while at the same time failing to treat heart failure and/or abnormal heart rhythms.

2

9. At all times relevant to this action, Defendants knew, and had reason to know, or should have known, that its representations that Digitek® and Bertek® were safe and effective were materially false and misleading.

10. As a result of the defective nature of Defendants' products, Digitek® and Bertek® failed to properly treat heart failure and/or abnormal heart rhythms. Defendants knew, had reason to know, and/or should have known of this tendency and the resulting risk of injuries and deaths, but failed to warn Plaintiff and all other Plaintiff Class members, and/or their physicians, preventing Plaintiff and Plaintiff Class members, and/or their physicians, and or the medical community from making informed choices about the selection of proper digoxin medications.

11. As a result of the defective nature of Defendants' products, Digitek® and Bertek® increases the risk of digitalis toxicity thereby placing patients at an increased risk of heart failure and/or abnormal heart rhythms and the side effects that result therefrom. Defendants knew, had reason to know, and/or should have known of this tendency and the resulting risk of injuries and deaths, but failed to warn Plaintiff and all other Plaintiff Class members, and/or their physicians, preventing Plaintiff and Plaintiff Class members, and/or their physicians, and or the medical community from making informed choices about the selection of the digoxin medication.

12. Defendants concealed their knowledge of the defects in their products from the Plaintiff, all Plaintiff Class members, and/or their physicians, hospitals, pharmacists and/or the FDA.

3

13. Consequently, Plaintiff and all Plaintiff class members seek compensatory damages as a result of their use of Digitek® and Bertek®, which causes, may cause and/or continue to cause Plaintiff and all Plaintiff Class members to suffer economic loss, physical pain, mental anguish, medical and other expenses.

14. Further, Plaintiff and all Plaintiff Class members seek equitable and other relief for themselves, and all others similarly situated, to compensate them in whole or in part for the following economic issue which confront them as a result of their relying upon the safety and proper efficacy of Digitek® and Bertek®:

    a.    the increased cost of medical expenses, including but not limited to, those un-reimbursed by insurance policies, those uninsured, and/or the payment of higher insurance rates due to their use of Digitek® and Bertek®;

    b.    additional medical monitoring above and beyond that which is needed prior to Plaintiff and Plaintiff Class members' use of Digitek® and Bertek®;

    c.    reimbursement for the costs associated with purchasing Digitek® and/or Bertek®;

    d.    for whatever further relief the Court deems just and proper under the circumstances.

## JURISDICTION & VENUE

15. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 and the Class Action Fairness Act. Venue is proper in this Court because Plaintiff resides within the District.

16. At all times relevant hereto, Actavis Totowa, LLC was engaged in the business of manufacturing, marketing, promoting, selling, and/or distributing Digitek® and Bertek®.

4

17. At all times relevant hereto, Mylan Laboratories, Inc. was engaged in the business of manufacturing, marketing, promoting, selling, and/or distributing Digitek® and Bertek®.

18. At all times relevant hereto, Mylan Pharmaceuticals, Inc. was engaged in the business of manufacturing, marketing, promoting, selling, and/or distributing Digitek® and Bertek®.

19. At all times relevant hereto, UDL Laboratories, Inc. was engaged in the business of manufacturing, marketing, promoting, selling, and/or distributing Digitek® and Bertek®.

20. Actavis Totowa, LLC placed defective Digitek® and Bertek® into the stream of interstate and worldwide commerce.

20. Mylan Laboratories, Inc. placed defective Digitek® and Bertek® into the stream of interstate and worldwide commerce.

21. Mylan Pharmaceuticals, Inc. placed defective Digitek® and Bertek® into the stream of interstate and worldwide commerce.

22. UDL Laboratories, Inc. placed defective Digitek® and Bertek® into the stream of interstate and worldwide commerce.

23. As a direct and proximate result of Actavis Totowa, LLC placing Digitek® and Bertek® into stream of commerce, Plaintiff and the class members have suffered and continue to suffer monetary damages, and will continue to suffer such damages indefinitely.

5

24. As a direct and proximate result of Mylan Laboratories, Inc. placing Digitek® and Bertek® into stream of commerce, Plaintiff and the class members have suffered and continue to suffer monetary damages, and will continue to suffer such damages indefinitely.

25. As a direct and proximate result of Mylan Pharmaceuticals. Inc. placing Digitek® and Bertek® into stream of commerce, Plaintiff and the class members have suffered and continue to suffer monetary damages, and will continue to suffer such damages indefinitely.

26. As a direct and proximate result of UDL Laboratories. Inc placing Digitek® and Bertek® into stream of commerce, Plaintiff and the class members have suffered and continue to suffer monetary damages, and will continue to suffer such damages indefinitely.

27. Plaintiff and class members have incurred and will incur significant financial damages.

26. Upon information and belief, at all relevant times, Actavis & Co. Inc., was present and doing business in the State of Missouri and in the Western District, Central Division of Missouri in particular.

29. At all relevant times, Actavis Totowa, LLC transacted, solicited, and conducted business in the State of Missouri and derived substantial revenue from such business.

30. At all relevant times, Actavis Totowa. LLC expected or should have expected that its acts would have consequences within the United States of America, and the Western District, Central Division of Missouri in particular.

31. Upon information and belief, at all relevant times, Mylan Laboratories, Inc., was present and doing business in the State of Missouri and in the Western District, Central Division of Missouri in particular.

6

32. At all relevant times, Mylan Laboratories, Inc. transacted, solicited, and conducted business in the State of Missouri and derived substantial revenue from such business.

33. At all relevant times, Mylan Laboratories, Inc. expected or should have expected that its acts would have consequences within the United States of America, and the Western District, Central Division of Missouri in particular.

34. Upon information and belief, at all relevant times, Mylan Pharmaceuticals, Inc., was present and doing business in the State of Missouri and in the Western District, Central Division of Missouri in particular.

35. At all relevant times, Mylan Pharmaceuticals, Inc. transacted, solicited, and conducted business in the State of Missouri and derived substantial revenue from such business.

36. At all relevant times, Mylan Pharmaceuticals, Inc. expected or should have expected that its acts would have consequences within the United States of America, and the Western District, Central Division of Missouri in particular.

37. Upon information and belief, at all relevant times, UDL Laboratories, Inc., was present and doing business in the State of Missouri and in the Western District, Central Division of Missouri in particular.

38. At all relevant times, UDL Laboratories, Inc. transacted, solicited, and conducted business in the State of Missouri and derived substantial revenue from such business.

39. At all relevant times, UDL Laboratories, Inc. expected or should have expected that its acts would have consequences within the United States of America, and the Western District, Central Division of Missouri in particular.

## PARTIES

7

40. Plaintiff, Bobby White, is and was at all times hereinafter mentioned, a citizen of the United States of America, and resides in the State of Missouri.

41. Plaintiff, Bobby White purchased and ingested Digitek® and/or Bertek® up to a time when his pharmacy contacted him to inform him of the recall announced on April 25, 2008 and as such, Plaintiff, Bobby White is a member of the proposed Class herein.

42. Defendant Actavis Co., Inc. is a privately held entity, duly formed and existing under and by the virtue of the laws of the State of New Jersey, with its principal place of business located at One New England Ave., Piscataway, NJ 08854.

43. Defendant Mylan Laboratories, Inc. is a publicly traded entity, duly formed and existing under and by the virtue of the laws of the State of New Jersey, with its principal place of business located at 1500 Corporate Drive, Canonsburg, PA 15317.

44. Defendant Mylan Pharmaceuticals, Inc. is an entity and division of Mylan Laboratories, Inc., duly formed and existing under and by the virtue of the laws of the State of West Virginia, with its principal place of business located at 781 Chestnut Ridge Rd., Morgantown, WV 26505.

45. Defendant UDL Laboratories, Inc. is an entity and division of Mylan Laboratories, Inc., duly formed and existing under and by the virtue of the laws of the State of Illinois, with its principal place of business located at 1718 Northrock Court, Rockford, IL 61103.

## FACTUAL ALLEGATIONS

46. Digitek@ and Bertek@ is a drug product comprised of digoxin and was approved for market by the FDA on December 23, 1999.

8

47. Digitek® and Bertek® are marketed as drugs to treat heart failure and abnormal heart rhythm.

48. Defendants knew, or had reason to know, of the defect in Digitek® and Bertek® prior to the April 25, 2008 recall. This knowledge was concealed from Plaintiff, Plaintiff Class members, the medical community, and the public at large.

49. Defendants' dangerous and careless conduct of concealment, equates to conduct purposely committed, without regard for the rights and safety of the Plaintiff and members of the Class.

## CLASS DEFINITION

50. Plaintiff brings this action pursuant to Federal Rules of Civil Procedure Rule 23 on behalf of himself, and all others similarly situated, including the classes and subclasses defined as follows:

### Digitek® and Bertek® Class:

All citizens, residents or domiciliaries of the Untied States who are presently or have purchased Digitek® or Bertek® and such citizens', residents' and domiciliaries' estates, representatives, administrators, spouses, children, relatives and "significant others" as their heirs or survivors.

51. Excluded from the Class are:

a. Actavis Totowa, LLC's officers and directors;

b. Mylan Laboratories, Inc.'s officers and directors;

c. Mylan Pharmaceuticals, Inc.'s officers and directors;

d. UDL Laboratories, Inc.'s officers and directors;

e. any judge or judicial official assigned to this matter and his or her immediate family; and

f. any legal representative, successor, or assign of any excluded persons or entities.

9

52. Plaintiff and Plaintiff Class contemplate sub-classes so as to ameliorate any choice of law concerns and/or be compliant with Fed.RCiv.P. 23(a) and 23(b); more specifically such sub-classes are contemplated based upon the 50 states and the Common Wealth of Puerto Rico and the District of Columbia

53. While Plaintiff and Plaintiff Class may seek sub-classes as set forth above, this will be the subject of the Class certification briefing which will be filed and prepared as soon as practical. To this end, Plaintiff and the Plaintiff Class therefore, and in the alternative to the proposed Class set forth above, define the proposed Class and/or initial subclass herein as:

> All citizens of Missouri state or residents of the State of Missouri who are presently or have purchased Digitek® and Bertek® and such citizens' and residents' estates, representatives, administrators, spouses, children, relatives and "significant others" as their heirs or survivors.

## CLASS ACTION ALLEGATIONS

54. Numerosity of the Class: The proposed Class is so numerous that joinder is impractical. The disposition of these claims through this class action will be more efficient and will benefit the parties and the Court. Some estimates place the number of patients taking Digitek® and Bertek® in the "millions", but suffice to say there may be hundreds of thousands of members of the Class. The identities of the individual members of the class are ascertainable through, inter *alia*, medical and pharmaceutical records, as well as Class members may be informed of the pendency of this class action by direct mail, internet, or other means.

55. Predominance of Common Questions of Fact and Law: A well-defined community of interest in the questions of law and fact common to the Digitek® and Bertek® Class predominate over questions affecting only individual class members including, but not limited to, the following:

10

a.   whether defendants' failure to give adequate and timely warning of the dangers of the Digitek® and Bertek® constitutes negligence and/or negligence per se;

b.   whether Defendants concealed adverse information from Plaintiff and the Digitek® and Bertek® Class regarding the testing and safety of the Digitek® and Bertek®;

c.   whether Defendants violated applicable state consumer protection laws;

d.   whether Plaintiff and the Class members are entitled to recover compensatory, exemplary, punitive, and/or other damages as a result of Defendants' unlawful conduct;

e.   what is the proper mechanism for assessing and awarding damages and administering other relief to the Class members, including relief to reduce the threat of future harm to Class members;

f.   whether Defendants designed, manufactured, and/or marketed a defective product;

g.   whether Defendants failed to identify the safety concerns of Digitek® and Bertek® shown in reports and/or studies;

h.   whether Defendants' conduct in designing, manufacturing, failing to warn, selling and/or marketing Digitek® and Bertek® fell below the duty of care owed by Defendants to Plaintiff and members of the Plaintiff Class;

i.   whether Defendants recklessly delayed reporting the double dose of digoxin in Digitek® and Bertek® to the FDA, the medical community, pharmaceutical community, other regulatory authorities, the public, the Defendants herein and the Plaintiff class actions members;

j.   whether Defendants intentionally delayed reporting of the double dose of digoxin in Digitek® and Bertek® to the FDA, the medical community, pharmaceutical community, other regulatory authorities, the public, the Defendants herein and the Plaintiff class actions members;

k.   whether Defendants violated Federal statutes in not timely reporting the double dose of digoxin in Digitek® and Bertek®;

l.   whether Defendants violated Federal regulations in not timely reporting the double dose of digoxin in Digitek® and Bertek®;

m.   whether Defendants violated State statutes in not timely reporting the double dose of digoxin in Digitek® and Bertek®;

11

n. whether Defendants violated State regulations in not timely reporting the double dose of digoxin in Digitek® and Bertek®;

o. whether Defendants negligently, recklessly or intentionally concealed information about the safety and proper efficacy of Digitek® and Bertek® from the Plaintiff and the Plaintiff Class, as well as their- physicians, hospitals, healthcare professionals, and the FDA,

p. whether Defendants watered down and/or diluted the actual risk of and safety concerns of Digitek® and Bertek';

q. whether Defendants under-reported the adverse events associated with Digitek ®and Bertek®;

r. whether Defendants are strictly liable in tort for selling a defective product;

s. whether Defendants' conduct constitutes fraudulent concealment;

t. whether Defendants conduct constitutes fraudulent misrepresentation;

u. whether Defendants' conduct constitutes negligent misrepresentation;

v. whether Defendants' conduct constitutes negligence;

w. whether Defendants are liable for intentional and/or negligent infliction of emotional distress;

x. whether Defendants breached express warranties;

y. whether Defendants breached implied warranties of merchantability;

aa. whether Defendants failed to adequately warn or notify consumers regarding the dangerous side effects, safety concerns, and/or lack of proper efficacy of Digitek® and Bertek®;

bb. whether Defendants failed to test and/or failed to adequately test Digitek® and Bertek®, generally;

cc. whether Plaintiff Class members have sustained irreparable ham and whether they are entitled to equitable relief including restitution and, if so, the nature and extent of such damages;

dd. whether the Plaintiff Class is entitled to compensatory damages and, if so, the nature and extent of such damages;

12

ee. whether Defendant is liable for punitive damages, and if so, how much is necessary and appropriate to punish them for their conduct, deter others and fulfill the policies and purposes of punitive and/or exemplary damages;

ff. how many and all punitive and/or exemplary damages awarded to Plaintiff should be equitably allocated among the Plaintiff and the Plaintiff Class;

gg. whether Defendants acted to defraud, misrepresent, and deceive the Plaintiff and/or the Plaintiff Class;

hh. Whether Defendants failed to adequately test their products;

ii whether Defendants failed to adequately reveal the results, if any, that were yielded by the testing of their product to the Plaintiff, Plaintiff Class, their physicians, hospitals, the FDA, and other healthcare professionals;

jj. whether Defendants failed to adequately warn of the side effects and safety concerns of Digitek® and Bertek®, and/or supplement its warnings as it discovered new side effects and safety concerns revealed through the aforementioned tests, studies, and/or reports;

kk. whether Defendants failed to adequately warn of the side effects and safety concerns of Digitek® and Bertek®, and/or supplement its warnings as they discovered new side effects and safety concerns that Digitek® and Bertek® caused because of underreporting, underestimating, and/or downplaying the serious and dangerous side effects of Digitek® and Bertek®;

ll. whether the safety defects in the Defendants' Digitek® and Bertek® constitute a design defect for purposes of strict products liability;

56. Typicality: Having been a victim of Defendants' unlawful conduct, Plaintiff is a member of the Digitek® and Bertek® Class. Plaintiff purchased and ingested Digitek® and/or Bertek®. All members of the class have purchased and ingested Digitek and/or Bertek®. Plaintiff and members of the Digitek® and Bertek® Class have similarly suffered harm arising from Defendants' violations of law, as alleged herein.

13

57. Adequacy of Representation: Plaintiff is an adequate representative of the Plaintiff Class because he is a member of the Plaintiff Class and his interests do not conflict with the interests of the members of the Plaintiff Class he seeks to represent. Further, Plaintiff is represented by experienced and able counsel who have litigated numerous other mass torts and products liability class actions, and they intend to prosecute this action vigorously for the benefit of the entire Plaintiff Class. Plaintiff and his counsel will fairly and adequately protect the interests of the members of the Plaintiff Class.

58. Superiority: A class action is superior to other available methods for the efficient adjudication of this litigation since individual litigation of each Class members' claims is impracticable. It would be unduly burdensome to the courts in which individual litigations would proceed. Further, individual litigations present a potential for inconsistent and/or contradictory judgments and further increases the delay and expense to all parties and the courts. By contrast, the class action device presents far fewer management difficulties and provides the benefit of a single adjudication, economies of scale, and comprehensive supervision by a single court. Additionally, notice of the pendency and/or resolution of this class action can be provided to Class members by direct mail.

59. This action is also properly certified under the provisions of Federal Rule of Civil Procedure Rule 23 because:

a. the prosecution of separate actions by individual members of the Class would create a risk of inconsistency of varying adjudications with respect to individual Class members, thus establishing incompatible standards of conduct for Defendants' financing activities;

b. due to the nature of the relief sought, the prosecution of separate actions by the individual members of the Class would create a risk of adjudications with respect to them that would as a practical matter, be dispositive of the interests of the other members of the Class not parties to

14

such adjudications or would substantially impair or impede the ability of such members of the Class to protect their interests; and

c.    by failing to make the written disclosures required by applicable laws, Defendants have and acted or refused to act in respects generally applicable to the Class, thereby making appropriate final injunctive relief with regard to the members of the Class as a whole in terms of the nature of the relief sought.

## EQUITABLE TOLLING OF APPLICABLE STATUTES OF LIMITATIONS

60.    The running of any statute of limitations has been tolled by reason of Defendants' fraudulent concealment. Defendants, through suppressing reports, failing to follow through on FDA notification requirements, failing to disclose a known defect to physicians or Class members, and misrepresenting their products as safe for intended use, actively concealed from Plaintiff, the Class, Plaintiffs and the Class's prescribing physicians the true risks associated with Digitek® and Bertek®.

61.    As a result of Defendants' actions, Plaintiff, and the Class, and their prescribing physicians were unaware, and could not reasonably know or have learned through reasonable diligence that Plaintiff and Class members had been exposed to the risks alleged herein and that those risks were the direct and proximate result of Defendants' acts and omissions.

62.    Furthermore, defendants are estopped from relying on any statute of limitations because of their fraudulent concealment of the true character, quality and nature of Digitek® and Bertek®. Defendants were under a duty to disclose the true character, quality and nature of Digitek® and Bertek® because this was non-public information over which the Defendants had and continues to have exclusive control, and because Defendants knew that this information was not available to the Plaintiff and Class members, medical providers and/or to

15

their facilities. In addition, the Defendants are estopped from relying on any statute of limitations because of their concealment of these facts.

63.    Plaintiff and the Class had no knowledge that Defendants were engaged in the wrongdoing alleged herein. Because of the fraudulent acts of concealment of wrongdoing by the Defendants, the Plaintiff and the Class could not have reasonably discovered the wrongdoing at any time prior to April 25, 2008. Also, the economics of this fraud should be considered. Defendants had the ability to and did spend enormous amounts of money in furtherance of their purpose of marketing and promoting a profitable drug, notwithstanding the risks about which they were aware. Plaintiff and the Class and medical professionals could not have afforded and could not have possibly conducted studies to determine the nature, extent and identity of related health risks, and were forced to rely on only the Defendants' representations.

## FIRST CAUSE OF ACTION
## AS AGAINST THE DEFENDANT
## (NEGLIGENCE AND NEGLIGENCE PER SE)

64.    Plaintiff, BOBBY WHITE, individually, and on behalf of all others similarly situated, repeats, reiterates and re-alleges each and every allegation of this Complaint in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

65.    Defendants had a duty to exercise reasonable care in the designing, researching, manufacturing, marketing, supplying, promoting, packaging, sale and/or distribution of Digitek® and Bertek® into the stream of commerce, including a duty to assure that the products would work as intended, marketed, promoted, and/or advertised and/or did not cause users to suffer unreasonable, dangerous side effects.

16

66.     Defendants failed to exercise ordinary care in the designing, researching, manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, and/or distribution of Digitek® and Bertek® into interstate commerce in that Defendants knew or should have known that the products did not work and/or function as intended and/or created a high risk of unreasonable, dangerous side effects, including but not limited digitalis toxicity, nausea, vomiting, dizziness, low blood pressure, cardiac instability, bradycardia, death and/or other severe and permanent health consequences.

67.     The negligence of the Defendant, their agents, servants, and/or employees, included but was not limited to the following acts and/or omissions:

- a.     manufacturing, producing, promoting, formulating, creating, and/or designing Digitek® and Bertek® without proper quality controls in place;

- b.     manufacturing, producing, promoting, formulating, creating, and/or designing Digitek® and Bertek® without adequately testing it;

- c.     not conducting sufficient testing programs to determine whether or not the aforesaid products were safe for use; in that Defendants herein knew or should have known that Digitek® and Bertek® was unsafe and unfit for use by reason of the dangers to its users and/or because there was no proper efficacy data and/or testing performed;

- d.     selling Digitek® and Bertek® without making proper and sufficient tests to determine the dangers and/or total lack of proper efficacy to its users;

- e.     negligently failing to adequately and correctly warn the Plaintiff and Plaintiff Class members, the public, the medical and healthcare professionals and/or the FDA of the dangers and/or lack of proper efficacy;

- f.     negligently failing to recall or otherwise notify users at an earliest date that it became known that said products were, in fact, dangerous and defective and/or lacked proper efficacy;

- g.     failing to provide adequate instructions regarding safety precautions and/or efficaciousness to be observed by users, handlers, and persons who would reasonably and foreseeably come into contact with, and more particularly, use Digitek® and Bertek®;

17

h.    failing to test Digitek® and Bertek® and/or failing to adequately, sufficiently and properly test Digitek® and Bertek®;

i.    negligently advertising and recommending the use of the aforesaid drug without sufficient knowledge as to its dangerous propensities and/or lack of proper efficacy;

j.    negligently representing that Digitek® and Bertek® was safe and efficacious for use for its intended purpose, when, in fact, it lacked proper efficacy and its safety is questionable;

k.    negligently representing that Digitek® and Bertek® had equivalent safety and the proper efficacy as other like, comparable, and/or similarly intended medications;

l.    negligently designing Digitek® and Bertek® in a manner which was dangerous and lacked proper efficacy to their users;

m.    negligently manufacturing Digitek® and Bertek® in a manner which was dangerous and lacked proper efficacy to their users;

n.    negligently producing Digitek® and Bertek® in a manner which was dangerous and lacked proper efficacy to their users;

o.    negligently assembling Digitek® and Bertek® in a manner which was dangerous and lacked proper efficacy to their users;

p.    concealing information concerning tests, and/or reports, and/or studies from the Plaintiff and Plaintiff Class members in knowing that Digitek® and Bertek® was unsafe, dangerous, and/or non-conforming with accepted industry standards, as well as lacked proper efficacy and /or proper efficacy data; and

q.    improperly concealing and/or misrepresenting information from the Plaintiff and Plaintiff Class members, healthcare professionals, and/or the public, concerning the severity of risks and dangers of Digitek® and Bertek® and/or the lack of proper efficacy of Digitek® and Bertek®

68.    Defendants under-reported, underestimated and downplayed the serious

dangers and/or the lack of proper efficacy of Digitek® and Bertek®.

18

69.    Defendants negligently compared the safety risk, efficacy, and/or dangers

of Digitek® and Bertek®' with other medication used for the treatment of heart failure and
abnormal heart rhythms.

70.    Defendants were negligent in the designing, researching, supplying,
manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing
and/or sale of Digitek® and Bertek® in that they:

   a.    failed to use due care in designing and manufacturing Digitek® and
         Bertek® so as to avoid the aforementioned risks and or lack of proper
         efficacy to individuals when Digitek® and Bertek® were used for its
         intended purpose;

   b.    failed to accompany their products with proper warnings regarding all
         possible adverse side effects concerning the failure and/or malfunction of
         Digitek® and Bertek®, which includes the proper efficaciousness of
         same;

   c.    failed to accompany their products with proper and/or accurate warnings
         regarding all possible adverse side effects associated with the use of
         Digitek® and Bertek as well as accurate efficacy data;

   d.    failed to warn Plaintiff and Plaintiff Class members of the severity and
         duration of such adverse effects as well as the lack of long-term proper
         efficacy, as the warnings given did not accurately reflect the symptoms,
         severity of the side effects and true efficaciousness;

   e.    failed to conduct adequate testing, including pre-clinical and clinical
         testing and post-marketing surveillance to determine the safety and/or
         proper efficacy of Digitek® and Bertek®;

   f.    failed to warn Plaintiff and Plaintiff Class members, prior to actively
         encouraging the sale of Digitek® and Bertek®, either directly or
         indirectly, orally or in writing, about the need for more comprehensive,
         more regular medical monitoring than usual to ensure early discovery of
         potentially serious side effects and/or failed proper efficacy; and

   g.    were otherwise negligent.

71.    Despite the fact that Defendant knew or should have known that Digitek®

and Bertek®  caused unreasonably dangerous side effects and/or lacked proper efficacy,

19

Defendants continued to market, manufacture, distribute and/or sell Digitek® and Bertek® to consumers, including the Plaintiff and Plaintiff Class members.

72.    Defendants knew or should have known that consumers such as the Plaintiff and Plaintiff Class members would forseeably suffer injury, both physical and economic, and/or be increased risk of suffering injury as a result of Defendants' failure to exercise ordinary care, as set forth above.

73.    Defendants' actions and or inactions. as set forth herein, by virtue of violating statutes, ordinances and/or rules and/or regulations, constituted negligence per se.

74.    Defendants knew or should have known that consumers such as the Plaintiff would forseeably suffer injury, and/or be at increased risk of suffering injury, including personal injuries and financial harm, as a result of Defendants' failure to exercise ordinary care, as set forth above.

75. Defendants' negligence was the proximate cause of Plaintiff's injuries and those of the Plaintiff Class, harm and economic loss which they suffered and/or will continue to suffer.

76.    By reason of the foregoing Plaintiff and Plaintiff Class experienced and/or are at risk of experiencing serious and dangerous side effects, as well as have incurred financial damage and injury.

77.    As a result of the foregoing acts and omissions the Plaintiff and Plaintiff Class requires and/or will require more health care and services and did incur medical, health, incidental and related expenses. Plaintiff and Plaintiff Class are informed and believe and further allege that Plaintiff will in the future be required to obtain further medical and/or hospital care, attention, and services.

20

78. By reason of the foregoing, Plaintiff and Plaintiff Class have been damaged as against the Defendants in the sum in excess of ONE HUNDRED MILLION DOLLARS ($100,000,000.00).

## SECOND CAUSE OF ACTION
## (STRICT LIABILITY)

79. Plaintiff, BOBBY WHITE, individually, and on behalf of all others similarly situated, repeats, reiterates and re-alleges each and every allegation of this Complaint in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

80. At all times herein mentioned, Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed Digitek® and Bertek® used by Plaintiff BOBBY WHITE, and the Plaintiff Class members.

81. That Digitek® and Bertek® were expected to and did reach the usual consumers, handlers, and persons coming into contact with said products without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by the Defendants.

82. At those times, the Digitek® and Bertek® were in an unsafe, defective, and inherently dangerous condition, which was unreasonably dangerous to users, and in particular, Plaintiff, BOBBY WHITE, and members of the Plaintiff Class.

83. Digitek® and Bertek® were so defective in design or formulation that when it left the hands of the manufacturer and/or suppliers the foreseeable risks exceeded the benefits associated with the design or formulation Digitek® and Bertek®.

84. At all times herein mentioned, Digitek® and Bertek® were in a defective condition and unsafe, and Defendants knew or had reason to know that said products were

21

defective and unsafe, especially when used in the form and manner as provided by the Defendants.

85.    Defendants knew, or should have known, that at all times herein mentioned Digitek® and Bertek® were in a defective condition, and were inherently dangerous and unsafe.

86.    At the time of use of Digitek® and Bertek® by Plaintiff, BOBBY WHITE, and members of the Plaintiff Class for the purposes and in a manner normally intended, namely for treatment of heart failure and abnormal heart rhythm.

87.    Defendants, with this knowledge, voluntarily sought FDA approval and continued to market their Digitek® and Bertek® products in a dangerous condition for use by the public, and in particular the Plaintiff, BOBBY WHITE, and members of the Plaintiff Class.

88.    Defendants had a duty to create a product that was not unreasonably dangerous for its intended use.

89.    Defendants' Digitek® and Bertek® products were designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed in a defective condition by Defendants and were unreasonably dangerous to their intended users, including Plaintiff, BOBBY WHITE, and members of the Plaintiff Class.

90.    Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed a defective product which created an unreasonable risk to the health of consumers and to Plaintiff, BOBBY WHITE, and members of the Plaintiff Class. Defendants are therefore strictly liable for the injuries sustained by the Plaintiff.

22

91. Neither the Plaintiff, BOBBY WHITE, nor the members of the Plaintiff Class acting as a reasonably prudent person could discover that Digitek® and Bertek® were defective as herein mentioned and perceived its danger.

92. Digitek® and Bertek® designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants was defective due to inadequate warnings or instructions as the Defendants knew or should have known that the products created a risk of serious and dangerous side effects including, but not limited to, digitalis toxicity, nausea, vomiting, dizziness, low blood pressure, cardiac instability, bradycardia, death and/or other severe and permanent health consequences.

93. Digitek® and Bertek® designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants is defective due to inadequate post-marketing surveillance and/or warnings because, after Defendants knew or should have known of the risks of serious side effects including, but not limited to, digitalis toxicity, nausea, vomiting, dizziness, low blood pressure, cardiac instability, bradycardia, death and/or other severe and permanent health consequences.

94. By reason of the foregoing, the Defendants are strictly liable in tort to the Plaintiff, BOBBY WHITE, and members of the Plaintiff Class for the manufacturing, marketing, promoting, distribution, and selling of defective products, to them.

95. Defendants' defective design, manufacturing defect, and inadequate warnings of Digitek® and Bertek® were acts that amount to willful, wanton, and/or reckless conduct by Defendants.

96. That said defects in Defendants' Digitek® and Bertek® were a substantial factor in causing Plaintiffs injuries and injuries to the members of the Plaintiff Class and/or

23

placing the Plaintiff and members of the Plaintiff Class at increased risk of serious injury and/or harm.

97.　As a direct and proximate result of the defective condition of Digitek® and Bertek®, as manufactured and sold by said Defendants, Plaintiff and members of the Class, suffered and will continue to suffer damages.

98.　By reason of the foregoing Plaintiff and Plaintiff Class experienced and/or are at risk of experiencing serious and dangerous side effects, as well as have incurred financial damage and injury.

99.　As a result of the foregoing acts and omissions the Plaintiff and Plaintiff Class requires and/or will require more health care and services and did incur medical, health, incidental and related expenses. Plaintiff and Plaintiff Class are informed and believe and further allege that Plaintiff will in the future be required to obtain further medical and/or hospital care, attention, and services.

100.　By reason of the foregoing, Plaintiff and Plaintiff Class have been damaged as against the Defendants in an amount in excess of ONE HUNDRED MILLION DOLLARS ($100,000,000.00).

## THIRD CAUSE OF ACTION
## (BREACH OF EXPRESS WARRANTY)

101.　Plaintiff, BOBBY WHITE, individually, and on behalf of all others similarly situated, repeats, reiterates and re-alleges each and every allegation of this Complaint in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

24

102. Defendants expressly warranted that Digitek® and Bertek® were safe and well accepted by users.

103. Digitek® and Bertek® does not conform to these express representations because the prescription drug is not safe and it is associated with numerous serious side effects not accurately warned about by Defendants. As a direct and proximate result of the breach of said warranties, Plaintiff, BOBBY WHITE, and members of the Plaintiff Class suffered and/or will continue to suffer, and/or are at increased risk to suffer severe and permanent personal injuries, harm and/or economic loss.

104. Plaintiff, BOBBY WHITE, and members of the Plaintiff Class did rely on the express warranties of the Defendants herein.

105. Members of the medical community, including physicians and/or other healthcare professionals, relied upon the representations and warranties of the Defendants in recommending and/or prescribing Digitek® and Bertek®.

106. The Defendants herein breached the aforesaid express warranties, as Digitek® and Bertek® were defective.

107. Defendants expressly represented to Plaintiff, the Plaintiff Class and/or their physicians, healthcare providers, and/or the FDA that Digitek® and Bertek® were safe, efficacious, and fit for use for the purposes intended, that the prescription drugs were of merchantable quality, that Digitek® and Bertek® did not produce any dangerous side effects in excess of those risks associated with other, nondefective digoxin agents, that the side effects the prescription drug did produce were accurately reflected in the warnings and that Digitek® and Bertek® were adequately tested and fit for its intended use.

25

108. Defendants impliedly warrant further that Digitek® and Bertek® were safe and properly efficacious.

109. Defendants knew or should have known that, in fact, the aforesaid representations and warranties are false, misleading and untrue in that Digitek® and Bertek® are not fit for the use intended, and, in fact, produced serious injuries to the users that are not accurately identified and represented by Defendants.

110. By reason of the foregoing Plaintiff and Plaintiff Class experienced and/or are at risk of experiencing serious and dangerous side effects, as well as have incurred financial damage and injury.

111. As a result of the foregoing acts and omissions the Plaintiff and Plaintiff Class requires and/or will require more health care and services and did incur medical, health, incidental and related expenses. Plaintiff and Plaintiff Class are informed and believe and further allege that Plaintiff will in the future be required to obtain further medical and/or hospital care, attention, and services.

112. By reason of the foregoing, Plaintiff and Plaintiff Class have been damaged as against the Defendants in an amount in excess of ONE HUNDRED MILLION DOLLARS ($100,000,000.00).

## FOURTH CAUSE OF ACTION
## (BREACH OF IMPLIED WARRANTY)

113. Plaintiff, BOBBY WHITE, individually, and on behalf of all others similarly situated, repeats, reiterates and re-alleges each and every allegation of this Complaint in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

26

114. At all times herein mentioned, the Defendants manufactured, compounded, portrayed, distributed, recommended, merchandized, advertised, promoted and sold the Digitek® and Bertek® for the treatment of heart failure and abnormal heart rhythms.

115. At the time Defendants marketed, sold, and distributed Digitek® and Bertek® for use by Plaintiff, BOBBY WHITE, and members of the Plaintiff Class, Defendants knew of the use for which Digitek® and Bertek® was intended and impliedly warranted the products to be of merchantable quality and safe and fit for such use.

116. The Defendants impliedly represented and warranted to the Plaintiff, BOBBY WHITE, and members of the Plaintiff Class and/or their physicians, healthcare providers, and/or the FDA that Digitek® and Bertek® were safe and of merchantable quality and fit for the ordinary purpose for which said products were to be used.

117. That said representations and warranties aforementioned are false, misleading, and inaccurate in that Digitek® and Bertek® are unsafe, unreasonably dangerous, improper, not of merchantable quality, and defective.

118. Plaintiff, BOBBY WHITE, members of the Plaintiff Class and/or members of the medical community and/or healthcare professionals did rely on said implied warranty of merchantability of fitness for a particular use and purpose.

119. Plaintiff, BOBBY WHITE, members of the Plaintiff Class and or their physicians and/or healthcare professionals reasonably relied upon the skill and judgment of Defendants as to whether Digitek® and Bertek® are of merchantable quality and safe and fit for its intended use.

120. Digitek® and Bertek® were injected into the stream of commerce by the Defendants in a defective, unsafe, and inherently dangerous condition and the products and

27

materials were expected to and did reach users, handlers, and persons coming into contact with said products without substantial change in the condition in which they were sold.

121.    The Defendants herein breached the aforesaid implied warranties, as Digitek® and Bertek® were not fit for their intended purposes and uses.

122.    By reason of the foregoing Plaintiff and Plaintiff Class experienced and/or are at risk of experiencing serious and dangerous side effects, as well as have incurred financial damage and injury.

123.    As a result of the foregoing acts and omissions the Plaintiff and Plaintiff Class requires and/or will require more health care and services and did incur medical, health, incidental and related expenses. Plaintiff and Plaintiff Class are informed and believe and further allege that the Plaintiff will in the future be required to obtain further medical and/or hospital care, attention, and services.

124.    By reason of the foregoing, Plaintiff and Plaintiff Class have been damaged as against the Defendants in an amount in excess of ONE HUNDRED MILLION DOLLARS ($100,000,000.00).

## FIFTH CAUSE OF ACTION
## (FRAUDULENT MISREPRESENTATION)

125.    Plaintiff, BOBBY WHITE, individually, and on behalf of all others similarly situated, repeats, reiterates and re-alleges each and every allegation of this Complaint in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

126.    The Defendants falsely and fraudulently represented to the medical and healthcare community, and to the Plaintiff and Plaintiff Class members, and/or the FDA, and/or

28

the public in general, that said products, Digitek® and Bertek®, had been tested and were found to be safe and/or effective for use.

127. That representations made by Defendant were, in fact, false.

128. These representations were made by said Defendant with the intent of defrauding and deceiving the Plaintiff and Plaintiff Class members, the public in general, and the medical and healthcare community in particular, and were made with the intent of inducing the public in general, and the medical and healthcare community in particular, to recommend, dispense and/or purchase said products, Digitek® and Bertek®, for use in treating heart failure and abnormal heart rhythms, all of which evinced a callous, reckless, willful, depraved indifference to the health, safety and welfare of the Plaintiff and Plaintiff Class members herein.

129. At the time the aforesaid representations were made by the Defendants and, at the time the Plaintiff and Plaintiff Class members used Digitek® and Bertek®, the Plaintiff and Plaintiff Class members were unaware of the falsity of said representations and reasonably believed them to be true.

130. In reliance upon said representations, the Plaintiff and Plaintiff Class members were induced to and did purchase and use Digitek® and Bertek®, thereby sustaining damage and injury and/or being at an increased risk of sustaining severe and permanent personal injuries in the future.

131. Said Defendants knew and were aware or should have been aware that Digitek® and Bertek® had not been sufficiently tested, were defective in nature, and/or that they lacked adequate and/or sufficient warnings.

132. Defendants knew or should have known that Digitek® and Bertek® had a potential to, could, and would cause severe and grievous injury to the users of said products, and

29

that they were inherently dangerous in a manner that exceeded any purported, inaccurate, and/or down-played warnings and that Digitek® and Bertek® lacked proper efficacy testing data that was accurate.

133. Defendants brought Digitek® and Bertek® to the market, and acted fraudulently, wantonly and maliciously to the detriment of the Plaintiff and Plaintiff Class members.

134. By reason of the foregoing Plaintiff and Plaintiff Class experienced and/or are at risk of experiencing serious and dangerous side effects, as well as have incurred financial damage and injury.

135. As a result of the foregoing acts and omissions the Plaintiff and Plaintiff Class requires and/or will require more health care and services and did incur medical, health, incidental and related expenses. Plaintiff and Plaintiff Class are informed and believe and further allege that Plaintiff will in the future be required to obtain further medical and/or hospital care, attention, and services.

136. By reason of the foregoing, Plaintiff and Plaintiff Class have been damaged as against the Defendants in an amount in excess of ONE HUNDRED MILLION DOLLARS ($100,000,000.00).

## SIXTH CAUSE OF ACTION
## (FRAUDULENT CONCEALMENT)

137. Plaintiff, BOBBY WHITE, individually, and on behalf of all others similarly situated, repeats, reiterates and re-alleges each and every allegation of this Complaint in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

30

138. At all times during the course of dealings between Defendants and Plaintiff,

members of the Plaintiff Class and/or Plaintiffs' healthcare providers, and/or the FDA, Defendants misrepresented the safety of Digitek® and Bertek®.

139. At all times during the course of dealing between Defendants and Plaintiff, BOBBY WHITE, members of the Plaintiff Class and/or Plaintiffs healthcare providers, and/or the FDA, Defendants misrepresented the proper efficacy of Digitek® and Bertek® in that the products contained twice the active ingredients approved by the FDA for the treatment of heart failure and abnormal heart rhythms those exposing Plaintiff and Plaintiff class members to substantial inherent harms.

140. Defendants knew or were reckless in not knowing that its representations were false.

141. Defendant fraudulently concealed and/or intentionally omitted the following material information: that Digitek® and Bertek® are not as safe as other available digoxin medications and that Digitek® and Bertek® lack the proper efficacy.

142. Defendant fraudulently concealed and/or intentionally omitted the following material information: that the risks of adverse events with Digitek® and Bertek® are higher than those with other available digoxin medications.

143. Defendants fraudulently concealed and/or intentionally omitted the following material information: that the risks of adverse events with the Digitek® and Bertek® were not adequately tested for and/or known by Defendants.

31

144. Defendants fraudulently concealed and/or intentionally omitted the following material information: that Defendants were aware of dangers of Digitek® and Bertek®, in addition to and above and beyond those associated with other digoxin medications.

145. Defendants fraudulently concealed and/or intentionally omitted the following material information: that Digitek® and Bertek® are defective, and it causes dangerous side effects, including but not limited to, digitalis toxicity, nausea, vomiting, dizziness, low blood pressure, cardiac instability, bradycardia, death and/or other severe and permanent health consequences, in a much more and significant rate than other available digoxin medications.

146. Defendants were under a duty to disclose to Plaintiff, BOBBY WHITE, members of the Plaintiff Class and/or their physicians, hospitals, healthcare providers, and/or the FDA the aforementioned as it pertains to Digitek® and Bertek®.

147. Defendants had sole access to material facts concerning the defective nature of the products and their propensity to cause damage and injury to users of Digitek® and Bertek®, including the Plaintiff, BOBBY WHITE, and members of the Plaintiff Class.

148. Defendants' concealment and omissions of material facts concerning, inter alia the safety and or proper efficacy of Digitek® and Bertek® were made purposefully, willfully, wantonly, and/or recklessly, to mislead Plaintiff BOBBY WHITE, members of the Plaintiff Class and/or their physicians, hospitals and/or healthcare providers into reliance, continued use of Digitek® and Bertek® and actions thereon, and to cause them to purchase, recommend, dispense and/or use Digitek® and Bertek®.

149. Defendants concealment and omissions of material facts concerning, inter alia the safety and/or proper efficacy of Digitek® and Bertek® were made purposefully,

willfully, wantonly, and/or recklessly, to mislead Plaintiff, BOBBY WHITE, members of the Plaintiff Class and/or their physicians, hospitals and/or healthcare providers into reliance, continued use of Digitek® and Bertek® and actions thereon, and to cause them to purchase, recommend, dispense and/or use Digitek® and Bertek®, solely for their financial gain and without regard for the safety of their customers, the Plaintiffs herein and the Plaintiff class action members.

150.    Defendants knew that Plaintiff, BOBBY WHITE, members of the Plaintiff Class and/or their physicians, hospitals, healthcare providers, and/or the FDA had no way to determine the truth behind Defendants' concealment and omissions, and that these included material omissions of facts surrounding Digitek® and Bertek®, as set forth herein.

151.    Plaintiff, as well as his doctors, healthcare providers, and/or hospitals reasonably relied on facts revealed which negligently, fraudulently and/or purposefully did not include facts that were concealed and/or omitted by Defendant.

152.    By reason of the foregoing Plaintiff and Plaintiff Class experienced and/or are at risk of experiencing serious and dangerous side effects, as well as have incurred financial damage and injury.

153.    As a result of the foregoing acts and omissions the Plaintiff and Plaintiff Class requires and/or will require more health care and services and did incur medical, health, incidental and related expenses. Plaintiff and Plaintiff Class are informed and believe and further allege that the Plaintiff will in the future be required to obtain further medical and/or hospital care, attention, and services.

154.    By reason of the foregoing, Plaintiff and Plaintiff Class have been damaged as against the Defendants in an amount in excess of ONE HUNDRED MILLION

33

DOLLARS ($100,000,000.00).

## SEVENTH CAUSE OF ACTION
## (VIOLATION OF CONSUMER PROTECTION STATUTES)

155. Plaintiff, on behalf of himself and all others similarly situated, repeats, reiterates, realleges each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

156. Defendants engaged in commercial conduct by selling Digitek® and Bertek®.

157. Defendants misrepresented and omitted material information regarding Digitek® and Bertek® by failing to disclose known risks.

158. Defendants' misrepresentations and concealment of material facts constitute unconscionable commercial practices, deception, fraud, false pretenses, misrepresentation, and/or the knowing concealment, suppression, or omission of materials facts with the intent that others rely on such concealment, suppression, or omission in connection with the sale and advertisement Digitek® and Bertek® in violation of Missouri Merchandising Practices Act, RSMo. §407.010, et seq. and other similar statutes.

159. Missouri and all other states and the District of Columbia have enacted statutes to protect consumers from deceptive, fraudulent, and unconscionable trade and business practices. Defendants violated these statutes by knowingly and falsely representing that Digitek® and Bertek® was fit to be used for the purpose for which they were intended, when Defendants knew it was defective, dangerous, ineffective, unsafe and by other acts alleged herein.

34

160. Defendants engaged in the deceptive acts and practices alleged herein in order to sell Digitek® and Bertek® to the public, including Plaintiff and the Class members.

161. As a direct and proximate result of the Defendants' violations of Missouri Merchandising Practices Act, RSMo. §407.010, et seq. and other various consumer protection statutes enacted in other states and the District of Columbia, Plaintiff and the Class members have suffered damages. Plaintiff and the Class members are entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs and reasonable attorneys' fees.

162. By reason of the foregoing, Plaintiff and Plaintiff Class have been damaged as against the Defendants in an amount in excess of ONE HUNDRED MILLION DOLLARS ($100,000,000.00).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff and members of Class demand judgment against Actavis Totowa, LLC, Mylan Laboratories, Inc., Mylan Pharmaceuticals, Inc. and UDL Laboratories, Inc. as follows:

  i.    An order certifying the Class, appointing Plaintiff as class representatives, and appointing PETERSON & ASSOCIATES, INC. as counsel to the Class;

  ii.   Equitable, injunctive and declaratory relief, including enjoining Defendants from distributing Digitek® and Bertek®;

  iii.  Damages in an amount to be determined at trial;

  iv.   Prejudgment and post judgment interest at the maximum rate allowable at law;

  v.    Treble, exemplary, and/or punitive damages in an amount to be determined at trial;

  vi.   The costs and disbursements incurred by Plaintiff and Class members in connection with this action, including reasonable attorneys' fees;

35

vii.     All statutory damages;

viii.     Disgorgement of Defendants' profits from the sale Digitek® and Bertek®;

ix.     Such other and further relief under all applicable state of federal law and any relief the Court deems just and appropriate.

**PETERSON & ASSOCIATES, P.C.**

| | |
|---|---|
| David M. Peterson | #32229 |
| D. Todd Mathews | #52502 |
| Nicholas S. Clevenger | #57171 |
| Christine C. Howard | #37003 |

Park Plaza Building
801 W. 47th Street, Suite 107
Kansas City, Missouri 64112
(816) 531-4440
(816) 531-0660 FAX
**ATTORNEYS FOR PLAINTIFF**

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI

# Civil Cover Sheet

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use only in the Western District of Missouri.

### This cover sheet should be sent to ONE of the following addresses:

| Kansas City | kcgen@mow.uscourts.gov |
|---|---|
| Jefferson City | jcgen@mow.uscourts.gov |
| Springfield | spfdgen@mow.uscourts.gov |

**Plaintiff (s):** Bobby White

**Defendant (s):** Actavis Totowa, LLC ; Mylan Laboratories, Inc. ; Mylan Pharmacuticals, Inc. ; UDL Laboratories, Inc.

County of Residence: Jackson

County Where Claim For Relief Arose: Jackson

County of Residence: Outside State of Missouri

Plaintiff's Atty(s):

Defendant's Atty(s):

**David T Mathews**
**Peterson & Associates, PC**
**801 W. 47th St, Suite 107**
**Kansas City, Missouri 64112**
**816-531-4440**

**David M Peterson**
**Peterson & Associates, PC**
**801 W. 47th St, Suite 107**
**Kansas City, Missouri 64112**
**816-531-4440**

**Nicholas S. Clevenger**
**Peterson & Associates, PC**
**801 W. 47th St., Suite 107**
**Kansas City, Missouri 64112**
**816-531-4440**

**Christine C. Howard**

Peterson & Associates, PC
801 W. 47th St., Suite 107
Kansas City, Missouri 64112
816-531-4440

II. Basis of Jurisdiction:        **4. Diversity (complete item III)**

III. Citizenship of Principal
Parties (Diversity Cases Only)
                Plaintiff:- **1 Citizen of This State**
                Defendant:- **5 Non MO corp and Principal place of Business outside MO**

IV. Origin :                      **1. Original Proceeding**

V. Nature of Suit:                **245 Tort Product Liability**

VI.Cause of Action:               **Consumer Product Liability action arising out of the recall of Digitek® and Bertek®**

VII. Requested in Complaint
                Class Action:
                Dollar Demand:> **100,000,000.00**
                Jury Demand: **Yes**

**Signature:  David M. Peterson**

**Date:  05/02/2008**

If any of this information is incorrect, please go back to the Civil Cover Sheet Input form using the *Back* button in your browser and change it. Once correct, print this form, sign and date it and submit it with your new civil action. Note: You may need to adjust the font size in your browser display to make the form print properly.                    Revised: 05/09/06

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

---

**JOSEPH J. NOVAK**

Plaintiff,

   vs.

**ACTAVIS TOTOWA LLC;
ACTAVIS GROUP; MYLAN, INC.;
MYLAN PHARMACEUTICALS,
INC.; and UDL LABORATORIES,
INC.**

Defendants.

---

Docket No.:

Civil Action

**COMPLAINT
AND DEMAND FOR JURY TRIAL**

---

## COMPLAINT

Plaintiff, by and through his attorneys, for the Complaint and Jury Demand against Defendants, states, avers and alleges as follows:

### BACKGROUND

1.    This is an action for damages suffered by Plaintiff as a direct and proximate result of the Defendants' negligent and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, distribution, labeling, and/or sale of their drug Digitek®.

## PARTIES, VENUE AND JURISDICTION

2.      This is an action for damages that exceeds the jurisdictional minimum of this Court.

3.      Venue is appropriate because Defendants Actavis Totowa LLC, Actavis Group, Mylan Inc., Mylan Pharmaceuticals, Inc. and UDL Laboratories, Inc. do business in the state of Ohio and at all times relevant hereto, Plaintiff resided in the state of Ohio.

4.      This suit is brought under the United States Constitution and the common law of the State of Ohio to recover damages and other relief, including the costs of suit and reasonable attorneys' and expert fees, for the injuries Plaintiff sustained as a result of the Defendants' negligent and wrongful conduct in connection with the design, development, formulation, manufacturing, testing, packaging, promoting, marketing, distributing, labeling and/or sale of Digitek®.

5.      Plaintiff **JOSEPH J. NOVAK** at all times relevant hereto, was a resident of Medina, Ohio.

6.      Defendant **ACTAVIS GROUP** (hereinafter "Defendants" or "Actavis Group"), is a foreign corporation, organized and existing under the laws of Iceland, and having a principal place of business at Dalshraun 1, 220 Hafnarfjordur, Iceland.

7.      Defendant **ACTAVIS TOTOWA, LLC**, (hereinafter "Defendants" or "Actavis") is a corporation, incorporated and existing under the laws of the State of Delaware,  with its principal place of business located at 990 Riverview Drive, Totowa, New Jersey 07512. Defendant is thus a resident and citizen of Delaware and New Jersey.

8.      Upon information and belief, Actavis Totowa is a subsidiary, affiliate or division of Actavis Group.

9.    Defendant **MYLAN, INC.,** (hereinafter "Defendants" or "Mylan") is a corporation, incorporated and existing under the laws of the State of Pennsylvania, with its principal place of business located at 1500 Corporate Drive, Canonsburg, PA 15317.

10.    Defendant, **MYLAN PHARMACEUTICALS, INC.,** (hereinafter "Defendants" or "Mylan Pharmaceuticals") is a corporation, incorporated and existing under the laws of the State of West Virginia, with its principal place of business located at 781 Chestnut Ridge Road, Morgantown, West Virginia, 26505.

11.    Defendant, **UDL LABORATORIES, INC.,** (hereinafter "Defendants" or "UDL") is a corporation, incorporated and existing under the laws of the State of Illinois, with its principal place of business located at 1718 Northrock Court, Rockford, Illinois, 61103.

12.    Upon information and belief, Mylan Pharmaceuticals and UDL are subsidiaries, affiliates or divisions of Mylan, Inc.

13.    At all times relevant, Defendants were engaged in the business of designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing into interstate commerce, either directly or indirectly through third parties or related entities, the drug Digitek®. Plaintiff alleges on information and belief that Defendants do business in Ohio and this country.

14.    Plaintiff hereby incorporate by reference as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows:

## FACTUAL ALLEGATIONS

15.    Digitek® is one of the brand name preparations of the generic drug digoxin (also known as Digitalis). Digoxin is a purified cardiac glycoside extracted from the foxglove plant, *Digitalis lanata.*

3

16.   Digoxin is used to increase the strength and vigor of the heart muscle contractions and is useful in the treatment of congestive heart failure.

17.   Digoxin also slows the electrical conduction between the atria and ventricles and is useful in treating abnormally rapid atrial rhythms such as atrial fibrillation, atrial flutter and atrial tachycardia.

18.   There is very little cushion between a therapeutically beneficial level of digoxin and a toxic level of digoxin.

19.   Digoxin toxicity can occur from a single exposure or chronic overmedication.

20.   Digoxin toxicity can cause potentially life-threatening heart rhythm disturbances, as well as nausea, vomiting, diarrhea, dizziness, confusion, loss of appetite, visual disturbances, low blood pressure, cardiac instability, irregular pulse, heart palpitations and bradycardia. At its most severe, death can result from excessive digoxin intake.

21.   The first commercially available digoxin product approved by the Food and Drug Administration ("FDA") went on the market in 1952.

22.   On April 25, 2008, the FDA announced that Actavis Totowa, manufacturer of Digitek® brand digoxin tablets, had initiated a Class 1 nationwide recall of all strengths of Digitek® tablets.

23.   The Digitek® tablets were commercially released with twice the appropriate thickness, and hence, twice the approved level of active ingredient than is appropriate.

24.   Several reports of illness and injury related to Digitek® have been reported to the FDA.

25.   The Digitek® tablets were manufactured by Actavis Totowa, LLC, the United States manufacturing division of the international Actavis Group.

4

26.     The Digitek® tablets were distributed by Mylan Pharmaceuticals, Inc., under a "Bertek" label and by UDL Laboratories, Inc., under a "UDL" label.

27.     With no contributory negligence on his part, Plaintiff Joseph J. Novak ingested Digitek®, a pharmaceutical product designed, manufactured, promoted, distributed and/or sold by Defendants.

28.     As a direct, proximate and legal result of the negligence, carelessness and other wrongdoing of the Defendants as described herein, Plaintiff suffered injury from the use of Digitek®.

29.     As a direct, proximate and legal result of the negligence, carelessness, and other wrongdoing of the Defendants, as described herein, Plaintiff required reasonable and necessary health care, attention and services, and incurred medical, incidental, and service expenses thereupon.

## FIRST CAUSE OF ACTION
### Products Liability
### Defective Manufacturing

30.     Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows:

31.     At all times material to this action, the Defendants were responsible for designing, developing, manufacturing, testing, packaging, promoting, marketing, distributing, labeling, and/or selling Digitek®.

32.     At all times material to this action, Defendants' Digitek® was expected to reach, and did reach, consumers in the State of Ohio and throughout the United States without substantial change in the condition in which it was sold.

5

33.    At all times material to this action, Digitek® was designed, developed, manufactured, tested, packaged, promoted, marketed, distributed, labeled, and/or sold by Defendants in a defective and unreasonably dangerous condition at the time it was placed in the stream of commerce in ways which include, but are not limited to, one or more of the following particulars:

      a.    When placed in the stream of commerce, Digitek® contained manufacturing defects, which rendered the product unreasonably dangerous;

      b.    Digitek®'s manufacturing defects occurred while the product was in the possession and control of the Defendants;

      c.    Digitek® was not made in accordance with the Defendants' specifications or performance standards;

      d.    Digitek®'s manufacturing defects existed before it left the control of the Defendants.

34.    As a direct and proximate result of the subject product's manufacturing defects, Plaintiff suffered severe and permanent physical injuries. As a further direct and proximate result of the manufacturing Defendants' wrongdoing and actions Plaintiff Joseph J. Novak will continue to suffer harm, and economic loss.

## SECOND CAUSE OF ACTION
### Products Liability
### Design Defect

35.    Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows:

36.    At all times material to this action, the Defendants were responsible for designing, developing, manufacturing, testing, packaging, promoting, marketing, distributing, labeling, and/or selling Digitek®.

37.    Digitek® is defective and unreasonably dangerous to consumers.

38.    Digitek® is defective in its design or formulation in that it is not reasonably fit, suitable, or safe for its intended purpose and/or its foreseeable risks exceed the benefits associated with its design and formulation.

39.    At all times material to this action, Digitek® was expected to reach, and did reach, consumers throughout the United States and Ohio without substantial change in the condition in which it was sold.

40.    At all times material to this action, the subject product was designed, developed, manufactured, tested, packaged, promoted, marketed, distributed, labeled, and/or sold by Defendants, and/or their corporate predecessors in a defective and unreasonably dangerous condition at the time it was placed in the stream of commerce in ways which include, but are not limited to, one or more of the following particulars:

   a.    When placed in the stream of commerce, Digitek® contained unreasonably dangerous design defects and was not reasonably safe as intended to be used, subjecting Plaintiff, to risks that exceeded the benefits of the subject product, including but not limited to, the development of renal failure and death;

   b.    When placed in the stream of commerce, Digitek® was defective in design and formulation, making the use of the product more dangerous

7

than an ordinary consumer would expect, and more dangerous than the risks associated with the other products on the market;

c.    Digitek®'s design defects existed before it left the control of the Defendants, and/or their corporate predecessors;

d.    Defendants' product was insufficiently tested;

e.    Defendants' product caused harmful side effects that outweighed any potential utility; and

f.    Defendants' product was not accompanied by adequate instructions and/or warnings to fully apprise consumers of the full nature and extent of the risks and side effects associated with its use, thereby rendering Defendants liable to Plaintiff.

41.    In addition, at the time the subject products left the control of the Defendants, there were practical and feasible alternative designs that would have prevented and/or significantly reduced the risk of Plaintiff' injuries without impairing the reasonably anticipated or intended function of the product. These safer alternative designs were economically and technologically feasible, and would have prevented or significantly reduced the risk of Plaintiff' injuries without substantially impairing the product's utility.

42.    As a direct and proximate result of the subject product's design defects, Plaintiff suffered severe physical injuries. As a further direct and proximate result of the design defects wrongdoing and actions of Defendants, Plaintiff will continue to suffer loss, harm, and economic loss.

8

## THIRD CAUSE OF ACTION
### Products Liability
### Failure to Warn

43.   Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows:

44.   Defendants' product Digitek® was defective and unreasonably dangerous when the product left the possession of the Defendants in that it contained warnings insufficient to alert consumers, including Plaintiff, of the dangerous risks of over-dosage from defective Digitek® tablets and reactions associated with over-dosage of Digitek®, notwithstanding that the Defendants knew or should have known that the product was highly dangerous and created significant risks of serious bodily harm, including death to humans, if an over-dosage occurred.

45.   Plaintiff ingested Digitek® and used the subject product for its intended purpose.

46.   Neither Plaintiff, nor his physicians could have discovered any defect in the subject product through the exercise of reasonable care.

47.   The Defendants, as manufacturers and/or distributors of the subject product, are held to the level of knowledge of an expert in the field.

48.   The warnings that were given by the Defendants were not accurate, clear and/or were ambiguous.

49.   The warnings that were given by the Defendants failed to properly warn physicians and patients of the increased risks associated with Digitek®.

50.   The warnings that were given by the Defendants failed to properly warn consumers/persons ingesting the subject product of the increased risks of injury and death from over-dosage.

9

51.    Plaintiff reasonably relied upon the skill, superior knowledge and judgment of the Defendants.

52.    The Defendants had a continuing duty to warn Plaintiff of the dangers associated with Digitek® manufactured and supplied by Defendants.  Digitek® was further defective due to inadequate post-marketing warning, labeling, or instruction because, after Defendants knew or should have known of the risk of serious bodily harm and death from the ingestion of defective Digitek®, Defendants failed to provide an adequate warning to persons such as Plaintiff and/or their health care providers of the product, knowing the product could cause serious injury and death.

53.    Had Plaintiff and/or her physicians received adequate warnings regarding the risks of over-dosage of Digitek®, the subject product would not have been ingested by Plaintiff.

54.    As a direct and proximate result of the subject product's defective and inappropriate warnings, Plaintiff suffered severe and permanent physical injuries.  As a further direct and proximate result of the product's defective and inappropriate warnings, wrongdoing and actions of Defendants described herein, Plaintiff will continue to suffer loss, harm, and economic loss.

## FOURTH CAUSE OF ACTION
### Breach of Express Warranty

55.    Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows:

56.    Defendants expressly warranted that Digitek® was a safe and effective drug.

57.    The Digitek® manufactured and sold by Defendants did not conform to these express representations because it caused serious injury and/or death to persons when administered in recommended dosages.

10

58. As a direct and proximate result of Defendants' breach of warranty, Plaintiff suffered severe and permanent physical injuries. As a further direct and proximate result of Defendants' breach of warranty, wrongdoing and other actions of Defendants described herein, Plaintiff will continue to suffer harm, and economic loss.

## FIFTH CAUSE OF ACTION
### Negligence

59. Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows:

60. Defendants had a duty to exercise reasonable care in the design, development, formulation, manufacture, marketing, promotion, sale, labeling and/or distribution of Digitek® into the stream of commerce, including a duty to assure that the product did not pose significant risk of injury or death.

61. Defendants breached their duty of reasonable care to Plaintiff.

62. As a direct and proximate result of Defendants negligence, Plaintiff suffered injury and will continue to suffer harm.

## SIXTH CAUSE OF ACTION
### Punitive Damages Act

63. Plaintiff incorporates by reference as if fully set forth herein, every allegation set forth in the preceding paragraphs, and alleges as follows:

64. At all times material hereto, Defendants knew or should have known that their product was highly and unreasonably dangerous if over-dosage should occur.

65. Defendants' intentional and/or reckless failure to disclose information regarding Digitek® deprived Plaintiff of necessary information to enable him to weigh the true risks of using Defendant's Digitek® against its benefits.

11

66.    At all times material hereto, Defendants knew and recklessly disregarded the fact that Digitek® was potentially capable of causing debilitating and potentially lethal side effects in patients and possibly death.

67.    Defendants knew of Digitek®'s defective and unreasonably dangerous nature, as set forth herein, but continued to design, develop, manufacture, market, distribute and sell it so as to maximize sales and profits at the expense of the health and safety of the public, including Plaintiff, in conscious and/or reckless disregard of the foreseeable harm caused by their product.

68.    As a direct and proximate result of Defendants' conscious and deliberate disregard for the rights and safety of the public such as Plaintiff, as alleged above, Plaintiff suffered severe and permanent physical injuries. As a further direct and proximate result of Defendants' conscious and deliberate disregard for the rights and safety of the public such as Plaintiff, as alleged above, wrongdoing and other actions of Defendants described herein, Plaintiff will continue to suffer injury, harm, and economic loss.

69.    The aforesaid conduct of Defendants was committed with knowing, conscious, and deliberate disregard for the rights and safety of the public, including Decedent, thereby entitling Plaintiff to punitive damages in an amount appropriate to punish Defendants and deter them from similar conduct in the future.

WHEREFORE, the Plaintiff demands compensatory damages against Defendants in an amount in excess of the statutory limit for arbitration together with attorneys' fees and costs.

## RELIEF REQUESTED

WHEREFORE, Plaintiff prays for judgment against Defendants and relief as follows in amounts to be determined at trial:

12

1.    Compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial of this action;

2.    Compensatory damages in excess of the jurisdictional amount, including, but not limited to medical expenses, lost future income, loss of earning capacity, out of pocket expenses, and other economic damages in an amount to be determined at trial of this action;

3.    Pre- and post-judgment interest;

4.    Attorneys' fees, expenses, and costs of this action as allowed by law;

5.    Treble damages;

6.    Punitive/Exemplary damages; and

7.    Such further relief as this Court deems necessary, just, and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all issues.

Dated: May 2, 2008

Respectfully submitted:


_____/s/_____

John R. Climaco (Ohio #0011456)
jrclim@climacolaw.com
Scott D. Simpkins (Ohio #0066775)
sdsimp@climacolaw.com
Dawn M. Chmielewski (Ohio #0077723)
dxchmi@climacolaw.com
**CLIMACO, LEFKOWITZ, PECA, WILCOX &
GAROFOLI CO., LPA**
55 Public Square, Suite 1950
Cleveland, OH 44113
Telephone: (216) 621-8484


_____

Frank Piscitelli, Esq. (Ohio #0062128)
frank@piscitellilaw.com
**FRANK PISCITELLI CO., LPA**
55 Public Square
Suite 1950
Cleveland, Ohio 44113
Telephone: (216) 931-7000


_____

D. Scott Kalish (0063002)
Scottkalishcollc@cs.com
405 Western Reserve Bldg.
1468 West Ninth Street
Cleveland, OH 44113
216-502-0570
Fax: 216-502-0569


*Attorneys for the Plaintiff*


14

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

RUBY I. THRASHER, individually and on
behalf of all others similarly situated

            Plaintiffs,

versus

ACTAVIS GROUP, ACTAVIS TOTOWA, LLC,
MYLAN PHARMACEUTICALS, INC., MYLAN
BERTEK PHARMACEUTICALS, INC. AND
UDL LABORATORIES, INC.,

            Defendants.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2008 MAY -5  PM 4: 28

LORETTA G. WHYTE
CLERK

Civil Action No.:

Section:

JURY DEMAND

**08-3167**

**SECT. C  MAG. 5**

## CLASS ACTION COMPLAINT

Plaintiffs, Ruby I. Thrasher, by and through their undersigned counsel of record,

Lambert & Nelson, PLC, Becnel Law Firm, LLC, The Law Offices of Ronnie G. Penton,

and Parker Waichman Alonso, LLP, hereby commence this action individually, and on

behalf of the Class identified below, and seeks Class status on behalf of herself and the

Class as described below.

## NATURE OF THE CASE/ OVERVIEW

1.    Plaintiff brings this action on behalf of all persons residing in the United States

who purchased Digitek ® (Digoxin) manufactured by Actavis Group through Actavis

Totowa, LLC and distributed by Mylan Pharmaceuticals, Inc. under the "Bertek" label

and by UDL Laboratories, Inc. under a "UDL" label.  Plaintiff brings this action pursuant

to Rule 23 of the Federal Rules of Civil Procedure (hereinafter "F.R.C.P.") to recover

compensatory, equitable, and actual and punitive damages, injunctive relief, and

Fee $350        -1-
✓ Process_____
X Dktd_____
___ CtRmDep_____
___ Doc. No._____

attorneys' fees.

2. Plaintiff seeks to represent the following class:

**Digitek ® (Digoxin) Class:** All citizens, residents, or domiciliaries of the United States who have purchased Digitek ® (Digoxin) manufactured by Actavis Group through Actavis Totowa, LLC and distributed by Mylan Pharmaceuticals, Inc. through Mylan's affiliates under the "Bertek" label and by UDL Laboratories, Inc. under a "UDL" label and such citizens', residents' and domiciliaries' estates, representatives, administrators, spouses, children, relatives, and "significant others" as their heirs or survivors.

3. Defendants, Actavis Group through Actavis Totowa, LLC, designed, researched, manufactured, tested, sought approval by the United States Food and Drug Administration (hereinafter "FDA") and advertised, promoted, marketed, sold and/or distributed Digitek ® (Digoxin) through Defendant, Mylan Pharmaceuticals, Inc., through its affiliates Defendant, Mylan Bertek Pharmaceuticals, Inc. under the "Bertek" label and by Defendant, UDL Laboratories, Inc., under a "UDL" label for the treatment of heart problems including heart failure and abnormal heart rhythms.

4. As a result of the negligence of Defendants and the defective nature of Digitek ® (Digoxin), the drug contains twice the approved level of active ingredient than is appropriate.

5. As a result of the defective nature of Digitek ® (Digoxin), the drug increases the risk of digitalis toxicity.

6. Digitalis toxicity can cause nausea, vomiting, dizziness, low blood pressure, cardiac instability, bradycardia, death, and other health concerns.

-2-

7.     At all times relevant hereto, Defendants misrepresented the safety of Digitek ®
(Digoxin) and negligently designed, manufactured, marketed, advertised, promoted,
sold and/or distributed Digitek ® (Digoxin) as a safe and effective medication to treat
heart problems including heart failure and abnormal heart rhythms.

8.     At all times relevant hereto, Defendants failed to warn of the dangers of Digitek
® (Digoxin) including, but not limited to, the fact that Digitek ® (Digoxin) contains twice
the approved level of active ingredient than is appropriate.

9.     At all times relevant hereto, Defendants knew, and had reason to know, or
should have known, that Digitek ® (Digoxin) was defective thereby defrauding Plaintiff,
members of the Plaintiff Class, physicians, patients and the population-at-large while
accelerating the risk of Digitalis toxicity leading to, in some patients, nausea, vomiting,
dizziness, low blood pressure, cardiac instability, bradycardia, death, and other health
concerns.

10.     At all times relevant hereto, Defendants knew, and had reason to know, or
should have known, that its representations that Digitek ® (Digoxin) was safe and
effective were materially false and misleading.

11.     As a result of the defective nature of Defendants' product, Digitek ® (Digoxin)
fails to properly treat heart problems including heart failure and abnormal heart rhythms
thereby placing patients at an increased risk of accelerating or worsening an adverse
cardiovascular event. Defendants knew, had reason to know, or should have known of
the defective nature of their product and the resulting risk of injuries and deaths, but
failed to warn Plaintiff and all other Plaintiff Class members, and/or their physicians,
preventing Plaintiff and Plaintiff Class members, and/or their physicians, and/or the

-3-

medical community from making informed choices about the selection of cardiovascular medications.

12.    As a result of the defective nature of Defendants' product, Digitek ® (Digoxin) increases the risk of Digitalis toxicity thereby increasing the risk injuries and death. Defendants knew, had reason to know, or should have known of the defective nature of their product and the resulting risk of injuries and deaths, but failed to warn Plaintiff and all other Plaintiff Class members, and/or their physicians, preventing Plaintiff and Plaintiff Class members, and/or their physicians, and/or the medical community from making informed choices about the selection of cardiovascular medications.

13.    Upon information and belief, Defendants concealed their knowledge of the defects in their products from the Plaintiff, Plaintiff Class members, and/or their physicians, hospitals, pharmacists and/or the FDA.

14.    Consequently, Plaintiffs and all Plaintiff Class members seek compensatory damages as a result of their use of Digitek ® (Digoxin) which causes, may cause and/or continue to cause Plaintiff and the Plaintiff Class members to suffer economic loss, physical pain, mental anguish, medical and other expenses.

15.    Further, Plaintiff and all Plaintiff Class members seek equitable and other relief for themselves, and all others similarly situated, to compensate them, in whole or in part, for the following economic issues which confront them as a result of their reliance upon the safety of Digitek ® (Digoxin):

> a.    the increased cost of medical expenses including, but not limited to, those un-reimbursed by insurance policies, those uninsured, and/or the payment of higher insurance rates due to their use of Digitek ® (Digoxin);

-4-

      b.     medical monitoring;

      c.     Return of any purchase price paid, including, but not
               limited to, insurance co-payments, interest on these amounts from
               the date of purchase, attorneys' fees and costs, non-pecuniary
               damages, as well as any other legal or equitable relief to which
               Plaintiffs may be entitled;

      d.     whatever further relief the Court deems just and proper under the
               circumstances.

### JURISDICTION AND VENUE

16.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 and the

Class Action Fairness Act. Venue is proper in this Court because Plaintiff resides within

this judicial district.

17.    At all times relevant hereto, Actavis Group was engaged in the business of

manufacturing, marketing, promoting, selling, and/or distributing Digitek ® (Digoxin).

18.    At all times relevant hereto, Actavis Totowa, LLC was engaged in the business of

manufacturing, marketing, promoting, selling, and/or distributing Digitek ® (Digoxin).

19.    At all times relevant hereto, Mylan Pharmaceuticals, Inc. was engaged in the

business of marketing, promoting, selling and/or distributing Digitek ® (Digoxin).

20.    At all times relevant hereto, Mylan Bertek Pharmaceuticals, Inc. was engaged in

the business of marketing, promoting, selling and/or distributing Digitek ® (Digoxin).

21.    At all times relevant hereto, UDL Laboratories, Inc. was engaged in

the business of marketing, promoting, selling and/or distributing Digitek ® (Digoxin).

22.    Actavis Group placed defective Digitek ® (Digoxin) into the stream of interstate

and worldwide commerce.

23.    Actavis Totowa, LLC placed defective Digitek ® (Digoxin) into the stream of

-5-

interstate and worldwide commerce.

24.    Mylan Pharmaceuticals, Inc. placed defective Digitek ® (Digoxin) into the stream of interstate and worldwide commerce.

25.    Mylan Bertek Pharmaceuticals, Inc. placed defective Digitek ® (Digoxin) into the stream of interstate and worldwide commerce.

26.    UDL Laboratories, Inc. placed defective Digitek ® (Digoxin) into the stream of interstate and worldwide commerce.

27.    As a direct and proximate result of Actavis Group placing defective Digitek ® (Digoxin) into the stream of commerce, Plaintiff and the Class Members have suffered and continue to suffer monetary damages, and will continue to suffer such damages indefinitely.

28.    As a direct and proximate result of Actavis Totowa, LLC placing defective Digitek ® (Digoxin) into the stream of commerce, Plaintiff and the Class Members have suffered and continue to suffer monetary damages, and will continue to suffer such damages indefinitely.

29.    As a direct and proximate result of Mylan Pharmaceuticals, Inc. placing defective Digitek ® (Digoxin) into the stream of commerce, Plaintiff and the Class Members have suffered and continue to suffer monetary damages, and will continue to suffer such damages indefinitely.

30.    As a direct and proximate result of Mylan Bertek Pharmaceuticals, Inc. placing defective Digitek ® (Digoxin) into the stream of commerce, Plaintiff and the Class Members have suffered and continue to suffer monetary damages, and will continue to suffer such damages indefinitely.

31.    As a direct and proximate result of UDL Laboratories, Inc. placing defective Digitek ® (Digoxin) into the stream of commerce, Plaintiff and the Class Members have suffered and continue to suffer monetary damages, and will continue to suffer such damages indefinitely.

32.    Plaintiff and Class Members have incurred and will continue to incur significant financial damages.

33.    Upon information and belief, at all times relevant hereto, Actavis Group was present and doing business in the State of Louisiana and in the Eastern District of Louisiana. At all relevant times, Actavis Group transacted, solicited, and conducted business in the State of Louisiana and derived substantial revenue from such business.

34.    Upon information and belief, at all times relevant hereto, Actavis Totowa, LLC was present and doing business in the State of Louisiana and in the Eastern District of Louisiana. At all relevant times, Actavis Totowa, LLC transacted, solicited, and conducted business in the State of Louisiana and derived substantial revenue from such business.

35.    Upon information and belief, at all times relevant hereto, Mylan Pharmaceuticals, Inc. was present and doing business in the State of Louisiana and in the Eastern District of Louisiana. At all relevant times, Mylan Pharmaceuticals, Inc. transacted, solicited, and conducted business in the State of Louisiana and derived substantial revenue from such business.

36.    Upon information and belief, at all times relevant hereto, Mylan Bertek Pharmaceuticals, Inc. was present and doing business in the State of Louisiana and in the Eastern District of Louisiana. At all relevant times, Mylan Bertek Pharmaceuticals,

Inc. transacted, solicited, and conducted business in the State of Louisiana and derived substantial revenue from such business.

37.     Upon information and belief, at all times relevant hereto, UDL Laboratories, Inc. was present and doing business in the State of Louisiana and in the Eastern District of Louisiana. At all relevant times, UDL Laboratories, Inc. transacted, solicited, and conducted business in the State of Louisiana and derived substantial revenue from such business.

38.     At all relevant times, Actavis Group expected or should have expected that its acts would have consequences within the United States of America, and the Eastern District of Louisiana, in particular.

39.     At all relevant times, Actavis Totowa, LLC expected or should have expected that its acts would have consequences within the United States of America, and the Eastern District of Louisiana, in particular.

40.     At all relevant times, Mylan Pharmaceuticals, Inc. expected or should have expected that its acts would have consequences within the United States of America, and the Eastern District of Louisiana, in particular.

41.     At all relevant times, Mylan Bertek Pharmaceuticals, Inc. expected or should have expected that its acts would have consequences within the United States of America, and the Eastern District of Louisiana, in particular.

42.     At all relevant times, UDL Laboratories, Inc. expected or should have expected that its acts would have consequences within the United States of America, and the Eastern District of Louisiana, in particular.

-8-

## **PARTIES**

43.    Plaintiff, Ruby I. Thrasher, is a resident of the United States of America, State of Louisiana, Parish of Jefferson.

44.    Plaintiff, Ruby I. Thrasher, purchased, used, and suffered adverse effects from Digitek ® (Digoxin) and, as such, Plaintiff, Ruby I. Thrasher, is a member of the proposed Class herein.

45.    Defendant, Actavis Group, is a foreign corporation incorporated under the laws of the State of New Jersey.

46.    Defendant, Actavis Totowa, LLC, is a foreign corporation incorporated under the laws of the State of New Jersey.

47.    Defendant, Mylan Pharmaceuticals, Inc., is a foreign corporation incorporated under the laws of the State of West Virginia.

48.    Defendant, Mylan Bertek Pharmaceuticals, Inc., is a foreign corporation, incorporated under the laws of the State of California.

49.    Defendant, UDL Laboratories, Inc., is a foreign corporation, incorporated under the laws of the State of Illinois.

## **GENERAL ALLEGATIONS**

50.    Upon information and belief, Actavis has approximately 50% of the Digoxin market.

51.    On April 25, 2008, the FDA announced that Actavis Totowa was recalling all lots of  Digitek ® (Digoxin) due to the possibility that tablets of double the appropriate thickness may have been commercially released.

52.    Upon information and belief, the FDA and Actavis received eleven (11)

complaints about side effects from Digitek ® (Digoxin) since 2006. At this time, neither

the FDA nor Actavis knows how long the defective pills were sold.

53.    Defendants negligently designed, manufactured, marketed, advertised,

promoted, sold and/or distributed Digitek ® (Digoxin) which was unreasonably

dangerous in normal use in that the defective drug has twice the approved level of

active ingredient than is appropriate.

54.    Defendants failed to adequately warn users of the defective drug of its

unreasonably dangerous characteristics.

55.    Defendants owed a legal duty to Plaintiff and Plaintiff Class Members to

manufacture and sell Digitek ® (Digoxin) without hidden and concealed defects.

56.    Defendants breached such duty which proximately caused Plaintiff's and Plaintiff

Class Members' damages.

57.    Defendants knew or, in the exercise of reasonable care, should have known that

its drug was defective and that Plaintiff and Plaintiff Class Members might have

reasonably been expected to use the drug and be affected by its defective condition.

58.    This defective condition is a direct and proximate cause of Plaintiff's and Plaintiff

Class Members' injuries.

## STATE AND NATIONAL CLASS DEFINITIONS

59.  Plaintiff brings this action pursuant to F.R.C.P. 23 on behalf of herself and all

others similarly situated including the class as follows:

a.    **Digitek ® (Digoxin) Purchaser Refund National Class:** All citizens,
residents, or domiciliaries of the United States who have purchased
Digitek ® (Digoxin) manufactured by Actavis Group through Actavis

-10-

Totowa, LLC and distributed by Mylan Pharmaceuticals, Inc. through Mylan's affiliates under the "Bertek" label and by UDL Laboratories, Inc. under a "UDL" label and such citizens', residents' and domiciliaries' estates, representatives, administrators, spouses, children, relatives, and "significant others" as their heirs or survivors.

b.    **Digitek ® (Digoxin) Personal Injury National Class:**  All citizens, residents, or domiciliaries of the United States who have purchased Digitek ® (Digoxin) manufactured by Actavis Group through Actavis Totowa, LLC and distributed by Mylan Pharmaceuticals, Inc. through Mylan's affiliates under the "Bertek" label and by UDL Laboratories, Inc. under a "UDL" label and suffered adverse effects from the ingestion of the drug and such citizens', residents' and domiciliaries' estates, representatives, administrators, spouses, children, relatives, and "significant others" as their heirs or survivors.

c.    **Digitek ® (Digoxin) Medical Monitoring National Class:**  All citizens, residents, or domiciliaries of the United States who have purchased Digitek ® (Digoxin) manufactured by Actavis Group through Actavis Totowa, LLC and distributed by Mylan Pharmaceuticals, Inc. through Mylan's affiliates under the "Bertek" label and by UDL Laboratories, Inc. under a "UDL" label and suffered adverse effects from the ingestion of the drug and seek the creation of a Court-supervised program funded by the Defendants to provide medical screening, medical services, medical research and education, and a medical/legal registry to assure that the patients who ingested the aforesaid Digitek ® (Digoxin) receive prompt and proper medical treatment to mitigate the risk of a life-threatening condition and appropriate compensatory damages.

60.    Excluded from the Class are:

a.    Defendants' officers and directors;

b.    any judge or judicial officer assigned to this matter and his or her

immediate family; and

c.    any legal representative, successor, or assign of any excluded

person or entities.

61.    Plaintiff and Plaintiff Class Members contemplate sub-classes so as to

ameliorate any choice of law concerns and/or be compliant with F.R.C.P. 23(a) and

-11-

23(b); more specifically, such sub-classes are contemplated based upon the 50 states

and the Common Wealth of Puerto Rico and the District of Columbia.

62.    While Plaintiffs and the Plaintiff Class may seek sub-classes as set forth above,

this will be the subject of the Class Certification briefing which will be filed and prepared

as soon as practical. To this end, Plaintiff and the Plaintiff Class additionally and/or

alternatively propose the following proposed Class and/or initial subclass herein as:

a.    **Digitek ® (Digoxin) Purchaser Refund Louisiana Class:** All
citizens of Louisiana state or residents of the State of Louisiana
who have purchased Digitek ® (Digoxin) manufactured by Actavis
Group through Actavis Totowa, LLC and distributed by Mylan
Pharmaceuticals, Inc. through Mylan's affiliates under the "Bertek"
label and by UDL Laboratories, Inc. under a "UDL" label and such
citizens', residents' and domiciliaries' estates, representatives,
administrators, spouses, children, relatives, and "significant others"
as their heirs or survivors.

b.    **Digitek ® (Digoxin) Personal Injury Louisiana Class:** All citizens
of Louisiana state or residents of the State of Louisiana who have
purchased Digitek ® (Digoxin) manufactured by Actavis Group
through Actavis Totowa, LLC and distributed by Mylan
Pharmaceuticals, Inc. through Mylan's affiliates under the "Bertek"
label and by UDL Laboratories, Inc. under a "UDL" label and
suffered adverse effects from the ingestion of the drug and such
citizens', residents' and domiciliaries' estates, representatives,
administrators, spouses, children, relatives, and "significant others"
as their heirs or survivors.

c.    **Digitek ® (Digoxin) Medical Monitoring Louisiana Class:** All
citizens of Louisiana state or residents of the State of Louisiana
who have purchased Digitek ® (Digoxin) manufactured by Actavis
Group through Actavis Totowa, LLC and distributed by Mylan
Pharmaceuticals, Inc. through Mylan's affiliates under the "Bertek"
label and by UDL Laboratories, Inc. under a "UDL" label and
suffered adverse effects from the ingestion of the drug and seek
the creation of a Court-supervised program funded by the
Defendants to provide medical screening, medical services,
medical research and education, and a medical/legal registry to
assure that the patients who ingested the aforesaid Digitek ®
(Digoxin) receive prompt and proper medical treatment to mitigate

-12-

the risk of a life-threatening condition and appropriate
compensatory damages.

## CLASS ACTION ALLEGATIONS

63.    Numerosity of the Class: The proposed Class is so numerous that joinder is

impractical. The disposition of these claims through this class action will be more

efficient and will benefit the parties and the Court. The identities of the individual

members of the class are ascertainable through, *inter alia*, medical and pharmaceutical

records. Further, Class Members may be informed of the pendency of the class action

by direct mail, internet, or other means.

64.    Predominance of the Common Questions of Fact and Law: A well-defined

community of interest in the questions of law and fact common to the Digitek ®

(Digoxin) Class predominate over questions affecting only individual Class Members

including, but not limited to:

      a.    Whether Defendants manufactured and/or marketed and sold a defective

          product;

      b.    Whether Defendants' failed to give adequate and timely warning of the

          dangers of Digitek ® (Digoxin);

      c.    Whether Defendants concealed adverse information from Plaintiff and the

          Digitek ® (Digoxin) Class regarding Digitek ® (Digoxin);

      d.    Whether Defendants violated applicable state consumer protection laws;

      e.    Whether Plaintiff and the Class Members are entitled to recover

          compensatory, exemplary, punitive, and/or other damages as a result of

          Defendants' negligent and unlawful conduct;

-13-

f.      What is the proper mechanism for assessing and awarding damages and administering relief to Class Members, including the relief to reduce the threat of future harm to Class Members;

g.      Whether Defendants' conduct in manufacturing, failing to warn, selling and/or promoting and/or marketing and/or distributing Digitek ® (Digoxin) fell below the duty of care owed by Defendants to Plaintiff and members of the Plaintiff Class;

h.      whether Defendants negligently, recklessly, or intentionally concealed information about the safety of Digitek ® (Digoxin) from the Plaintiff and Plaintiff Class, as well as their physicians, hospitals, healthcare professionals, and the FDA;

i.      Whether Defendants under-reported the adverse events associated with Digitek ® (Digoxin);

j.      Whether Defendants are strictly liable in tort for selling a defective product;

k.      Whether Defendants' conduct constitutes fraudulent concealment;

l.      Whether Defendants' conduct constitutes fraudulent misrepresentation;

m.      Whether Defendants' conduct constitutes negligent misrepresentation;

n.      Whether Defendants' conduct constitutes negligence;

o.      Whether Defendants are liable for intentional and/or negligent infliction of emotional distress;

p.      Whether Defendants breached express warranties;

q.      Whether Defendants breached implied warranties of merchantability;

-14-

r.  Whether Plaintiff Class Members have sustained irreparable harm and whether they are entitled to equitable relief including restitution and/or refund and, if so, the nature and extent of such damages;

s.  Whether the Plaintiff Class is entitled to compensatory damages and, if so, the nature and extent of such damages;

t.  Whether Defendants are liable for punitive damages and, if so, how much is necessary and appropriate to punish them for their conduct, deter others and fulfill the policies and purposes of punitive and/or exemplary damages;

u.  How any and all punitive and/or exemplary damages awarded to Plaintiffs should be equitable allocated among the Plaintiff and the Plaintiff Class;

v.  Whether Defendants acted to defraud, misrepresent, and deceive the Plaintiff and/or the Plaintiff Class;

w.  Whether Defendants failed to adequately test their products;

x.  Whether Defendants failed to adequately reveal the results, if any, that were yielded by the testing of their product to the Plaintiff, Plaintiff Class, their physicians, hospitals, the FDA and other healthcare professionals;

y.  Whether Defendants failed to adequately warn of the adverse effects of Digitek ® (Digoxin); and

z.  Whether the safety defects in the Defendants' Digitek ® (Digoxin) constitute a design defect for purposes of strict products liability.

65.  Typicality: Having been a victim of Defendants' unlawful and negligent conduct, Plaintiff is a member of the Digitek ® (Digoxin) Class. Plaintiff purchased and ingested

-15-

Digitek ® (Digoxin). All members of the Class have purchased and ingested Digitek ®

(Digoxin). Plaintiff and members of the Digitek ® (Digoxin) Class have similarly

suffered harm arising from Defendants' violations of law and negligent conduct as

alleged herein.

66.    Adequacy of Representation: Plaintiff is an adequate representative of the

Plaintiff Class because she is a member of the Plaintiff Class and her interests do not

conflict with the interests of the members of the Plaintiff Class she seeks to represent.

Further, Plaintiff is represented by experienced and able counsel who have litigated

numerous other mass torts and products liability class actions, and they intend to

prosecute this action vigorously for the benefit of the entire Plaintiff Class. Plaintiffs and

their counsel will fairly and adequately protect the interests of the members of the

Plaintiff Class.

67.    Superiority: A class action is superior to other available methods for the efficient

adjudication of this litigation since individual litigation of each Class Members' claim is

impracticable. It would be unduly burdensome to the courts in which individual

litigations would proceed. Further, individual litigations present a potential for

inconsistent and/or contradictory judgments and further increases the delay and

expense to all parties and the courts. By contrast, the class action device presents far

fewer management difficulties and provides the benefit of a single adjudication,

economies of scale, and comprehensive supervision by a single court. Additionally,

notice of the pendency and/or resolution of this class action can be provided to Class

Members by direct mail, as upon information and belief, Defendants herein have kept

detailed records as to their sale of Digitek ® (Digoxin).

-16-

68.    This action is also properly certified under the provisions of F.R.C.P. 23 because:

      a.    the prosecution of separate actions by individual members of the
            Class would create a risk of inconsistency of varying adjudications
            with respect to individual Class Members, thus establishing
            incompatible standards of conduct for Defendants; and

      b.    due to the nature of the relief sought, the prosecution of separate
            actions by the individual members of the Class would create a risk
            of adjudications with respect to them that would, as a practical
            matter, be dispositive of the interests of the other members of the
            Class not parties to such adjudications or would substantially impair
            or impede the ability of such members of the Class to protect their
            interests.

## EQUITABLE TOLLING OF APPLICABLE STATUTES OF LIMITATIONS

69.    The running of any statute of limitations has been tolled by reason of

Defendants' fraudulent concealment. Defendants, through failing to disclose a known

defect to physicians or Class Members, and misrepresenting their product as safe for

its intended use, actively concealed from Plaintiff, the Class, Plaintiff's and the Class'

prescribing physicians the true risks associated with Digitek ® (Digoxin).

70.    As a result of Defendants' actions, Plaintiff, the Class, and their prescribing

physicians were unaware, and could not reasonably know or have learned through

reasonable diligence of the manufacturing defect and that Plaintiff and Class Members

had been exposed to the risks alleged herein and that those risks were a direct and

proximate result of Defendants' acts and omissions.

71.    Furthermore, Defendants are estopped from relying on any statute of limitations

because of their fraudulent concealment of the defective nature of Digitek ® (Digoxin).

Defendants were under a duty to disclose the true character, quality, and nature of

Digitek ® (Digoxin) because this was non-public information over which the Defendants

had, and continues to have, exclusive control, and because Defendants knew that this information was not available to the Plaintiff and Class Members, medical providers and/or to their facilities. In addition, the Defendants are estopped from relying on any statute of limitations because of their concealment of these facts.

72. Plaintiff and the Class had no knowledge that Defendants were engaged in the wrongdoing alleged herein. Because of the fraudulent acts of concealment of wrongdoing by the Defendants, the Plaintiff and the Class could not have reasonably discovered the wrongdoing at any time prior to April 25, 2008. Plaintiff, the Class and medical professionals could not have possibly conducted studies to determine the nature, extent and identity of related health risks dealing with the manufacturing defect of Defendants' drug and were forced to rely only on Defendants' representations.

## FIRST CAUSE OF ACTION AS AGAINST THE DEFENDANTS
## NEGLIGENCE AND NEGLIGENCE PER SE

73. Plaintiff, Ruby I. Thrasher, individually and on behalf of all others similarly situated, repeats, reiterates and realleges each and every allegation of this Complaint in each of the foregoing paragraphs inclusive, with the same force and effect as if fully set forth herein.

74. Defendants had a duty to exercise reasonable care in manufacturing, marketing, supplying, promoting, packaging, sale, and/or distribution of Digitek ® (Digoxin) into the stream of commerce, including a duty to assure that the product would work as intended, marketed, promoted, and/or advertised and/or did not cause users to suffer unreasonable, dangerous side effects.

75. Defendants failed to exercise ordinary care in the manufacturing, marketing,

-18-

supplying, promoting, packing, sale, testing, quality assurance, quality control and/or

distribution of Digitek ® (Digoxin) into interstate commerce in that Defendants knew or

should have know that the product was defective, did not function as intended and/or

created a high risk of unreasonable, dangerous side effects, including, but not limited

to, nausea, vomiting, dizziness, low blood pressure, cardiac instability, bradycardia, and

death, as well as other severe and permanent health consequences.

76.     The negligence of the Defendants, their agents, servants, and/or employees,

included, but was not limited to, the following acts and/or omissions:

> a.     manufacturing, producing, promoting, formulating, creating and/or designing Digitek ® (Digoxin) without thoroughly testing it;
>
> b.     manufacturing, producing, promoting, formulating, creating and/or designing Digitek ® (Digoxin) without adequately testing it;
>
> c.     not conducting sufficient testing programs to determine whether or not the aforesaid product was safe for use in that Defendants knew or should have known that Digitek ® (Digoxin) was unsafe and unfit for use by reason of the dangers to its users and/or because of the negligent manufacturing of the product;
>
> d.     selling Digitek ® (Digoxin) without making proper and sufficient tests to determine the dangers to its users;
>
> e.     negligently failing to adequately and correctly warn the Plaintiffs and Plaintiff Class Members, the public, the medical and healthcare profession, and/or the FDA of the dangers and negligent manufacture of Digitek ® (Digoxin);
>
> f.     negligently failing to recall or otherwise notify users at the earliest date that it became known that said product was, in fact, dangerous and defective;
>
> g.     failing to test Digitek ® (Digoxin) and/or failing to adequately, sufficiently and properly test Digitek ® (Digoxin);
>
> h.     negligently advertising and recommending the use of the aforesaid drug without sufficient knowledge as to its manufacturing defect

and dangerous propensities;

i.    negligently representing that Digitek ® (Digoxin) was safe for its intended purpose when, in fact, its safety is questionable;

j.    negligently manufacturing Digitek ® (Digoxin) in a manner which was dangerous to its users;

k.    negligently designing Digitek ® (Digoxin) in a manner which was dangerous to its users;

l.    negligently producing Digitek ® (Digoxin) in a manner which was dangerous to its users;

m.    negligently assembling Digitek ® (Digoxin) in a manner which was dangerous to its users;

n.    concealing information concerning reports of adverse effects from the Plaintiff and Plaintiff Class Members in knowing that Digitek ® (Digoxin) was unsafe, dangerous and non-conforming with accepted industry standards; and

o.    improperly concealing and/or misrepresenting information from the Plaintiff and Plaintiff Class Members, healthcare professionals and/or the public, concerning the severity of risks and dangers of Digitek ® (Digoxin) and/or the manufacturing defect.

77.    Defendants under-reported, underestimated and/or downplayed the serious dangers and the defective nature of Digitek ® (Digoxin).

78.    Defendants were negligent in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing and sale of Digitek ® (Digoxin) in that they:

a.    failed to use due care in designing and manufacturing Digitek ® (Digoxin) so as to avoid the aforementioned risks when Digitek ® (Digoxin) was used for its intended purpose;

b.    failed to accompany their product with proper warnings regarding all possible adverse side effects concerning the failure and/or defective nature of Digitek ® (Digoxin);

-20-

c. failed to accompany their product with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of Digitek ® (Digoxin) given its defective nature;

d. failed to warn Plaintiff and Plaintiff Class Members of the severity and duration of such adverse side effects, as the warnings given did not accurately reflect the defective nature of the product;

e. failing to conduct testing, including clinical testing and post-marketing surveillance to determine the safety of Digitek ® (Digoxin);

f. failing to warn Plaintiff and Plaintiff Class Members, prior to actively encouraging the sale of Digitek ® (Digoxin), either directly or indirectly, orally or in writing, about the defective nature of the product; and

g. were otherwise negligent.

79. Upon information and belief, despite the fact that Defendants knew or should have known that Digitek ® (Digoxin) caused unreasonably dangerous side effects due to its manufacturing defect, Defendants continued to market, manufacture, distribute and/or sell Digitek ® (Digoxin) to consumers, including the Plaintiffs and Plaintiff Class Members.

80. Defendants knew or should have known that consumers such as Plaintiff and Plaintiff Class Members would foreseeably suffer injury, both physical and economic, and/or be at an increased risk of suffering injury as a result of Defendants' failure to exercise ordinary care, as well as Defendants' negligent manufacturing process, as set forth above.

81. Defendants' actions and/or inactions, as set forth herein, by virtue of violating statutes, ordinances and/or rules and/or regulations, constitutes negligence per se.

82. Defendants knew or should have known that consumers such as the Plaintiffs

would foreseeably suffer injury, and/or be at increased risk of suffering injury, including personal injuries and financial harm, as a result of Defendants' failure to exercise ordinary care, as well as Defendants' negligent manufacturing process, as set forth above.

83.    Defendants' negligence was the proximate cause of Plaintiff's and Plaintiff Class Members' injuries, harm and economic loss which they suffered and will continue to suffer.

84.    By reason of the foregoing, Plaintiff and Plaintiff Class Members experienced and/or are at risk of experiencing serious and dangerous side effects, as well as have incurred financial damage and injury.

85.    As a result of the foregoing acts and omissions, the Plaintiff and Plaintiff Class Members require and/or will require more health care and services and did incur medical, health, incidental, and related expenses.  Plaintiff and Plaintiff Class are informed and believe and further allege that Plaintiffs will in the future be required to obtain further medical and/or hospital care, attention, and services.

86.    By reason of the foregoing, Plaintiff and Plaintiff Class have been damaged as against the Defendants in excess of the sum of One Billion Dollars ($1,000,000,000.00).

## SECOND CAUSE OF ACTION AGAINST THE DEFENDANTS
## STRICT LIABILITY

87.    Plaintiff, Ruby I. Thrasher, individually, and on behalf of all others similarly situated, repeats, reiterates, and realleges each and every allegation of this Complaint in each of the foregoing paragraphs inclusive, with the same force and effect as if fully

-22-

set forth herein.

88.    At all times herein mentioned, Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed Digitek ® (Digoxin) used by Plaintiff, Ruby I. Thrasher, and the Plaintiff Class Members.

89.    Digitek ® (Digoxin) was expected to, and did, reach the usual consumers, handlers, and persons coming into contact with said product without substantial change in the condition which it was produced, manufactured, sold, distributed, and marketed by the Defendants.

90.    At those times, the Digitek ® (Digoxin) was in an unsafe, defective, and inherently dangerous condition which was unreasonably dangerous to its users and, in particular, Plaintiff, Ruby I. Thrasher, and members of the Plaintiff Class.

91.    Digitek ® (Digoxin) was so defective in design or formulation or manufacture that when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design, formulation or manufacture of Digitek ® (Digoxin).

92.    At all times herein mentioned, Digitek ® (Digoxin) was in a defective condition and unsafe, and Defendants knew, had reason to know, or should have known that said product was defective and unsafe, especially when used in the form and manner as provided by Defendants.

93.    Defendants knew, or should have known, that at all times herein mentioned Digitek ® (Digoxin) was in a defective condition and was/is inherently dangerous and unsafe.

94.    At the time of use of Digitek ® (Digoxin) by Plaintiff, Ruby I. Thrasher, Plaintiffs

-23-

consequences.

100. Digitek ® (Digoxin) as designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants is defective due to inadequate warnings and/or inadequate testing.

101. Digitek ® (Digoxin) as designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants is defective due to inadequate post-marketing surveillance and/or warnings because, upon information and belief, sales continued after Defendants knew, or should have known, of the manufacturing defect and risk of serious side effects including, but not limited to, nausea, vomiting, dizziness, low blood pressure, cardiac instability, bradycardia, and death, as well as other severe and permanent health consequences.

102. By reason of the foregoing, the Defendants are strictly liable in tort to the Plaintiff, Ruby I. Thrasher, and members of the Plaintiff Class for the manufacturing, promoting, distribution, and selling of a defective product, Digitek ® (Digoxin).

103. Defendants' defective design, manufacturing defect, and inadequate warnings of the dangers associated with Digitek ® (Digoxin) were acts that amount to willful, wanton, and/or reckless conduct by Defendants.

104. Said defects in Defendants' Digitek ® (Digoxin) were a substantial factor in causing Plaintiff's and Plaintiff Class Members' injuries and/or placing Plaintiff and members of the Plaintiff Class at increased risk of serious injury and/or harm.

105. As a direct and proximate result of the defective condition of Digitek ® (Digoxin) as manufactured and sold by Defendants, Plaintiff and members of the Class suffered, and will continue to suffer, damages.

and members of the Plaintiff Class utilized the drug for the purposes and manner normally intended, namely for treatment of heart problems including heart failure and abnormal heart rhythms.

95.    Defendants had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

96.    Defendants' Digitek ® (Digoxin) product was designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed in a defective condition by Defendants and was unreasonably dangerous to its intended users, including Plaintiff, Ruby I. Thrasher, and members of the Plaintiff Class.

97.    Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product which created an unreasonable risk to the health of consumers thereof and to Plaintiff, Ruby I. Thrasher, and members of the Plaintiff Class.  Defendants are, therefore, strictly liable for the injuries sustained by the Plaintiff and Plaintiff Class Members.

98.    Neither the Plaintiff, Ruby I. Thrasher, nor the members of the Plaintiff Class, acting as a reasonably prudent person, could discover that Digitek ® (Digoxin) was defective as herein mentioned or perceive its danger.

99.    Digitek ® (Digoxin) designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was defective due to inadequate warnings or instructions as the Defendants knew, or should have known, that the defective product created a risk of serious and dangerous side effects including, but not limited to, nausea, vomiting, dizziness, low blood pressure, cardiac instability, bradycardia, and death, as well as other severe and permanent health

-24-

106.   By reason of the foregoing, Plaintiff and Plaintiff Class Members experienced, and/or are at risk of experiencing, serious and dangerous side effects, as well as have incurred financial damage and injury.

107.   As a result of the foregoing acts and omissions, the Plaintiff and Plaintiff Class Members require, and/or will require, more health care and services and did incur medical, health and incidental and related expenses. Plaintiff and Plaintiff Class Members are informed and believe, and further allege, that Plaintiff and Plaintiff Class Members will in the future be required to obtain further medical and/or hospital care, attention, and services.

108.   By reason of the foregoing, Plaintiff and Plaintiff Class Members have been damaged as against Defendants in excess of One Billion Dollars ($1,000,000,000.00).

## THIRD CAUSE OF ACTION AGAINST DEFENDANTS
## BREACH OF EXPRESS WARRANTY

109.   Plaintiff, Ruby I. Thrasher, individually, and on behalf of all others similarly situated, repeats, reiterates, and realleges each and every allegation of this Complaint in each of the foregoing paragraphs inclusive, with the same force and effect as if fully set forth herein.

110.   Defendants expressly warranted that Digitek ® (Digoxin) was safe and well accepted by users.

111.   Digitek ® (Digoxin) does not conform to these express representations because the prescription drug is not safe and it is associated with numerous side effects not accurately warned about by Defendants. As a direct and proximate result of the breach of said warranties, Plaintiff, Ruby I. Thrasher, and Plaintiff Class Members suffered,

-26-

and/or will continue to suffer, and/or are at an increased risk to suffer, severe and permanent personal injuries, harm, and/or economic loss.

112.    Plaintiff, Ruby I. Thrasher, and Plaintiff Class Members did rely on the express warranties of the Defendants herein.

113.    Members of the medical community, including physicians and/or other healthcare professionals, relied upon the representations and warranties of the Defendants in recommending and/or prescribing Digitek ® (Digoxin).

114.    The Defendants herein breached the aforesaid express warranties, as Digitek ® (Digoxin) was defective.

115.    Defendants expressly represented to Plaintiff, the Plaintiff Class and/or their physicians, healthcare providers, and/or the FDA that Digitek ® (Digoxin) is safe, efficacious, and fit for use for the purposes intended, that the prescription drug is of merchantable quality, that Digitek ® (Digoxin) did not produce any dangerous side effects in excess of those risks associated with other non-defective drugs of the same class, that the side effects the prescription drug did produce were accurately reflected in the warnings, and that Digitek ® (Digoxin) was adequately tested and fit for its intended use.

116.    Defendants knew or should have known that the aforesaid representations and warranties are false, misleading and untrue in that Digitek ® (Digoxin) is not fit for the use intended and, in fact, produced serious injuries to the users that are not accurately identified and represented by the Defendants because Digitek ® (Digoxin) was negligently manufactured.

117.    By reason of the foregoing, Plaintiff and Plaintiff Class Members experienced,

-27-

and/or are at risk of experiencing, serious and dangerous side effects, as well as have incurred financial damage and injury.

118.   As a result of the foregoing acts and omissions, the Plaintiff and Plaintiff Class Members require, and/or will require, more health care and services and did incur medical, health, incidental, and related expenses. Plaintiff and Plaintiff Class Members are informed, and believe, and further allege, that Plaintiff and Plaintiff Class Members will in the future be required to obtain further medical and/or hospital care, attention, and services.

119.   By reason of the foregoing, Plaintiff and Plaintiff Class Members have been damaged as against Defendants in excess of One Billion Dollars ($1,000,000,000.00).

## FOURTH CAUSE OF ACTION AGAINST DEFENDANTS
## BREACH OF IMPLIED WARRANTY

120.   Plaintiff, Ruby I. Thrasher, individually, and on behalf of all others similarly situated, repeats, reiterates, and realleges each and every allegation of this Complaint in each of the foregoing paragraphs inclusive, with the same force and effect as if fully set forth herein.

121.   At all times herein, Defendants manufactured, compounded, portrayed, distributed, recommended, merchandised, advertised, promoted, and sold Digitek ® (Digoxin) for the treatment of heart problems including heart failure and abnormal heart rhythms.

122.   At the times Defendants marked, sold, and distributed Digitek ® (Digoxin) for use by Plaintiff, Ruby I. Thrasher, and Plaintiff Class Members, Defendants knew of the use for which Digitek ® (Digoxin) was intended and impliedly warranted the product to be of

-28-

merchantable quality and safe and fit for such use.

123.    The Defendants impliedly represented and warranted to Plaintiff, Ruby I.
Thrasher, and Plaintiff Class Members and/or their physicians, healthcare providers
and/or the FDA that Digitek ® (Digoxin) was safe and of merchantable quality and fit for
the ordinary use for which said product was to be used.

124.    Said representations and warranties aforementioned are false, misleading, and
inaccurate in that Digitek ® (Digoxin) is unsafe, unreasonably dangerous, improper, not
merchantable quality, and defective.

125.    Plaintiff, Ruby I. Thrasher, and Plaintiff Class Members and/or members of the
medical community and/or healthcare professionals relied on said implied warranty of
merchantability of fitness for a particular use and purpose.

126.    Plaintiff, Ruby I. Thrasher, and Plaintiff Class Members and/or their physicians
and/or healthcare professionals reasonably relied upon the skill and judgment of
Defendants as to whether Digitek ® (Digoxin) is of merchantable quality and safe and fit
for its intended use.

127.    Digitek ® (Digoxin) was placed into the stream of commerce by Defendants in a
defective, unsafe, and inherently dangerous condition and the products and materials
were expected to, and did, reach users, handlers, and persons coming into contact with
said product without substantial change in the condition in which they were sold.

128.    The Defendants herein breached the aforesaid implied warranties, as Digitek ®
(Digoxin) was not fit for its intended purposes and uses.

129.    By reason of the foregoing, Plaintiff and Plaintiff Class Members experienced,
and/or are at risk of experiencing, serious and dangerous side effects, as well as have

-29-

incurred financial damage and injury.

130.   As a result of the foregoing acts and omissions, the Plaintiff and Plaintiff Class Members require, and/or will require, more health care and services and did incur medical, health, incidental, and related expenses. Plaintiff and Plaintiff Class Members are informed and believe, and further allege, that Plaintiff and Plaintiff Class Members will in the future be required to obtain further medical and/or hospital care, attention, and services.

131.   By reason of the foregoing, Plaintiff and Plaintiff Class Members have been damaged as against Defendants in excess of One Billion Dollars ($1,000,000,000.00).

## FIFTH COUNT AS AGAINST DEFENDANTS
## FRAUDULENT MISREPRESENTATION

132.   Plaintiff, Ruby I. Thrasher, individually, and on behalf of all others similarly situated, repeats, reiterates, and realleges each and every allegation of this Complaint in each of the foregoing paragraphs inclusive, with the same force and effect as if fully set forth herein.

133.   The Defendants falsely and fraudulent represented to the medical and healthcare community and/or to the Plaintiff and/or Plaintiff Class Members and/or the FDA and/or the public in general that said product, Digitek ® (Digoxin), had been tested and was found to be safe and/or effective for use.

134.   That representation made by Defendants was, in fact, false.

135.   When said representations were made by Defendants, upon information and belief, they knew those representations to be false and they willfully, wantonly, and recklessly disregarded whether the representations were true.

136. These representations were made by Defendants with the intent of defrauding and deceiving the Plaintiff and Plaintiff Class Members, the public in general, and the medical and healthcare community in particular, and were made with the intent of inducing the public in general, and the medical and healthcare community in particular, to recommend, dispense and/or purchase said product Digitek ® (Digoxin) for the treatment of heart problems including heart failure and abnormal heart rhythms all of which evinced a callous, reckless, willful, depraved indifference to the health, safety and welfare of the Plaintiff and Plaintiff Class Members herein.

137. At the time the aforesaid representations were made by the Defendants and, at the time the Plaintiff and Plaintiff Class Members used Digitek ® (Digoxin), the Plaintiff and Plaintiff Class Members were unaware of the falsity of said representations and reasonably believed them to be true.

138. In reliance upon said representations, the Plaintiff and Plaintiff Class Members were induced to, and did, purchase and use Digitek ® (Digoxin), thereby sustaining damage and injury and/or being at an increased risk of sustaining severe and permanent personal injuries in the future.

139. Said Defendants knew, and were aware, or should have been aware, that Digitek ® (Digoxin) had not been sufficiently tested, was defectively manufactured and/or lacked adequate and/or sufficient warnings.

140. Defendants knew, or should have known, that Digitek ® (Digoxin) had a potential to, could, and would cause severe and grievous injury to the users of said product.

141. Defendants brought Digitek ® (Digoxin) to the market and acted fraudulently, wantonly, and maliciously to the detriment of the Plaintiff and Plaintiff Class Members.

-31-

142.    By reason of the foregoing, Plaintiff and Plaintiff Class Members experienced, and/or are at risk of experiencing, serious and dangerous side effects, as well as have incurred financial damage and injury.

143.    As a result of the foregoing acts and omissions, the Plaintiff and Plaintiff Class Members require, and/or will require, more health care and services and did incur medical, health, incidental, and related expenses.  Plaintiff and Plaintiff Class Members are informed and believe, and further allege, that Plaintiff and Plaintiff Class Members will in the future be required to obtain further medical and/or hospital care, attention, and services.

144.    By reason of the foregoing, Plaintiff and Plaintiff Class Members have been damaged as against Defendants in excess of One Billion Dollars ($1,000,000,000.00).

### SIXTH CAUSE OF ACTION AGAINST DEFENDANTS
### FRAUDULENT CONCEALMENT

145.    Plaintiff, Ruby I. Thrasher, individually, and on behalf of all others similarly situated, repeats, reiterates, and realleges each and every allegation of this Complaint in each of the foregoing paragraphs inclusive, with the same force and effect as if fully set forth herein.

146.    At all times during the course of dealing between Defendants and Plaintiff, Plaintiff Class Members and/or Plaintiff's and Plaintiff Class Members' healthcare providers and/or the FDA, Defendants misrepresented the safety of Digitek ® (Digoxin).

147.    At all times during the course of dealing between Defendants and Plaintiff, Ruby I. Thrasher, and Plaintiff Class Members and/or Plaintiffs' healthcare providers and/or the FDA, Defendants misrepresented the safety of Digitek ® (Digoxin) in that the drug

-32-

contains twice the approved level of active ingredient than is appropriate and was negligently manufactured in this regard.

148.    Defendants knew, or were reckless in not knowing, that its representations were false.

149.    Defendants fraudulently concealed, and/or intentionally omitted, the fact that Digitek ® (Digoxin) contains twice the approved level of active ingredient than is appropriate and was negligently manufactured in this regard.

150.    Defendants fraudulently concealed, and/or intentionally omitted, the fact that the risk of adverse events with the negligently manufactured Digitek ® (Digoxin) were not adequately tested for and/or known by Defendants.

151.    Defendants fraudulently concealed, and/or intentionally omitted, the fact that Defendants were aware of complaints regarding adverse side effects since 2006 and did nothing.

152.    Defendants fraudulently concealed, and/or intentionally omitted, the fact that Digitek ® (Digoxin) was negligently manufactured.

153.    Defendants were under a duty to disclose to Plaintiff, Ruby I. Thrasher, and Plaintiff Class Members and/or their physicians, hospitals, healthcare providers, and/or the FDA, the aforementioned as it pertains to Digitek ® (Digoxin).

154.    Defendants' concealment and omissions of material facts concerning, *inter alia*, the negligent manufacture of Digitek ® (Digoxin) was made purposefully, willfully, wantonly, and/or recklessly to mislead Plaintiff and Plaintiff Class Members and/or their physicians, hospitals and/or healthcare providers into reliance, continued use of Digitek ® (Digoxin) and actions thereon, and to cause them to purchase, recommend, dispense

-33-

and/or use Digitek ® (Digoxin).

155.   Defendants' concealment and omissions of material facts concerning, *inter alia*, the negligent manufacture of Digitek ® (Digoxin) was made purposefully, willfully, wantonly, and/or recklessly to mislead Plaintiff, Ruby I. Thrasher, and Plaintiff Class Members and/or their physicians, hospitals, and healthcare providers into reliance, continued use of Digitek ® (Digoxin) and actions thereon, and to cause them to purchase, recommend, dispense and/or use Digitek ® (Digoxin) solely for Defendants' financial gain and without regard for the safety of their customers, the Plaintiff herein and the Plaintiff Class Members.

156.   Defendants knew that Plaintiff, Ruby I. Thrasher, Plaintiff Class Members, and/or their physicians, hospitals, healthcare providers, and/or the FDA had no way to determine the truth behind Defendants' concealment and omissions and that these included material omissions of facts surrounding Digitek ® (Digoxin) as alleged herein.

157.   Plaintiff, Plaintiff Class Members, as well as their doctors, healthcare providers and/or hospitals reasonably relied on facts revealed which negligently, fraudulently and/or purposefully did not include facts that were concealed and/or omitted by Defendants.

158.   By reason of the foregoing, Plaintiff and Plaintiff Class Members experienced, and/or are at risk of experiencing, serious and dangerous side effects, as well as have incurred financial damage and injury.

159.   As a result of the foregoing acts and omissions, the Plaintiff and Plaintiff Class Members require, and/or will require, more health care and services and did incur medical, health, incidental, and related expenses. Plaintiff and Plaintiff Class Members

are informed and believe, and further allege, that Plaintiff and Plaintiff Class Members

will in the future be required to obtain further medical and/or hospital care, attention,

and services.

160. By reason of the foregoing, Plaintiff and Plaintiff Class Members have been

damaged as against Defendants in excess of One Billion Dollars ($1,000,000,000.00).

## SEVENTH CAUSE OF ACTION AGAINST DEFENDANTS
## VIOLATION OF CONSUMER PROTECTION STATUTES

161. Plaintiff, Ruby I. Thrasher, individually, and on behalf of all others similarly

situated, repeats, reiterates, and realleges each and every allegation of this Complaint

in each of the foregoing paragraphs inclusive, with the same force and effect as if fully

set forth herein.

162. Defendants engaged in commercial conduct by selling Digitek ® (Digoxin).

163. Defendants misrepresented and omitted material information regarding Digitek ®

(Digoxin) by failing to disclose known risks and had Plaintiffs known of such risks, they

would not have purchased the drug.

164. Defendants' misrepresentations and concealment of material facts constitute

unconscionable commercial practices, deception, fraud, false pretenses,

misrepresentation and/or the knowing concealment, suppression, or omission of

material facts with the intent that others rely on such concealment, suppression, or

omission in connection with the sale and advertisement of Digitek ® (Digoxin) in

violation of state law statutes.

165. Louisiana, all other states, the Commonwealth of Puerto Rico, and the District of

Columbia have enacted statutes to protect consumers from deceptive, fraudulent, and

unconscionable trade and business practices. Defendants violated these statutes by

knowingly and falsely representing that Digitek ® (Digoxin) was fit to be used for the

purpose for which it was intended, when Defendants knew it was defective, dangerous,

ineffective, unsafe and by other acts alleged herein.

166.   Defendants engaged in the deceptive acts and practices alleged herein in order

to sell Digitek ® (Digoxin) to the public, including Plaintiff and Plaintiff Class Members.

167.   As a direct and proximate result of Defendants' violations of consumer protection

statutes enacted in Louisiana, other states, the Commonwealth of Puerto Rico, and the

District of Columbia, Plaintiff and the Plaintiff Class Members have suffered damages.

Plaintiff and the Plaintiff Class Members are entitled to compensatory damages,

equitable and declaratory relief, refund of prescription costs, punitive damages, costs

and reasonable attorneys' fees.

168.   By reason of the foregoing, Plaintiff and Plaintiff Class Members have been

damaged as against Defendants in excess of One Billion Dollars ($1,000,000,000.00).

## EIGHTH CAUSE OF ACTION AGAINST DEFENDANTS
### REDHIBITION

169.   Defendants are liable to Plaintiffs under the theory of redhibition.

170.   Plaintiffs are entitled to a return or refund of any purchase price paid, including,

but not limited to, insurance co-payments, interest on these amounts from the date of

purchase, attorneys' fees and costs, non-pecuniary damages, as well as any other legal

or equitable relief to which Plaintiffs may be entitled.

171.   Defendants have breached the implied warranty of merchantability in that

Digitek ® (Digoxin) was not reasonably fit for the purposes for which it was sold,

intended, or reasonably foreseen to be used. Moreover, the Digitek ® (Digoxin) manufactured and sold by Defendants was defective on the date of its delivery to Plaintiffs.

172.   Defendants have also breached the implied warranty of fitness for a particular purpose. Digitek ® (Digoxin) is not reasonably fit for the specific purposes for which Defendants knowingly sold it and for which the Plaintiffs purchased Digitek ® (Digoxin) in reliance on Defendants.

173.   Plaintiffs have suffered damages as a result of Defendants' breach of warranty.

174.   Defendants have knowingly received a substantial benefit at the expense of Plaintiffs.

175.   It would be unjust to permit Defendants to enrich themselves at the expense of Plaintiffs and to retain the funds that Defendants wrongfully obtained from Plaintiffs. Therefore, Plaintiffs invoke the Louisiana Doctrine of Unjust Enrichment.

176.   Defendants have a duty to exercise the necessary degree of care expected and required of manufacturers of healthcare products. Defendants deviated from that duty by negligently manufacturing Digitek ® (Digoxin) and subsequently failing to warn of the attendant risks of the uses of the negligently manufactured Digitek ® (Digoxin).

177.   As a result of Defendants' negligence, Plaintiffs have been injured and sustained damages. These damages are the actual and proximate result of Defendants' breach of the applicable duty of care.

178.   Defendants had control over the design, assembly, packaging, marketing, advertising, manufacturing, labeling, testing, promotion, distribution and/or sale of the drug Digitek ® (Digoxin) and did so in a negligent fashion.

-37-

179. At all times material hereto, Defendants either knew, or should have known, that the negligently manufactured drug Digitek ® (Digoxin) was causally related to and associated with severe and life threatening complications and side effects.

180. Although Defendants knew, or should have known, that dangerous risks were associated with the use of the negligently manufactured Digitek ® (Digoxin), Defendants permitted the drug to be advertised, promoted, and/or sold without adequate warnings.

181. Defendants failed to adequately warn Plaintiffs of the hazards of Digitek ® (Digoxin) and concealed this knowledge from Plaintiffs and others. As a result of this failure, Plaintiffs were caused to suffer the injury and damages as set forth herein.

182. Upon information and belief, Defendants falsely misrepresented and concealed pertinent facts regarding the drug Digitek ® (Digoxin) including, without limitation, its negligent manufacture, the absence of adequate testing, the severity of its side effects and adverse medical conditions caused by the negligently manufactured drug.

183. Defendants failed to take measures to ensure that the end user of the drug was notified fully and completely of the risks of Digitek ® (Digoxin) and/or that physicians, pharmacists and healthcare providers were notified of these risks.

184. Digitek ® (Digoxin) contains a vice or defect which renders it either absolutely useless or renders its use so inconvenient and imperfect that buyers would not have purchased it had they known of this vice or defect.

185. Defendants impliedly or expressly warranted that the drug Digitek ® (Digoxin) that they manufactured, distributed and/or sold was safe for use. Presence of the unsafe characteristics of Digitek ® (Digoxin) is an absolute vice as provided by

-38-

Louisiana Civil Code articles 2520 *et seq.*, rendering Defendants liable in redhibition.

186.    Whereas Defendants, while knowing of the vice as described herein, failed to describe it to Purchaser, Defendants are liable for all damages, including reasonable attorneys" fees, as provided by Louisiana Civil Code articles 2545 and 1953 *et seq.*

187.    The damages in question arose from a reasonably anticipated use of the product in question.

188.    The product in question is unreasonably dangerous for the following reasons:

        a.    it is unreasonably dangerous in construction or composition as provided in R.S. 9:2800.55;

        b.    It is unreasonably dangerous in design as provided in R.S. 9:2800.56;

        c.    It is unreasonably dangerous because an adequate warning about the product was not provided as required by R.S. 9:2800.57; and

        d.    it is unreasonably dangerous because it does not conform to an express warranty of the manufacturer about the product as provided in R.S. 9:2800.58.

189.    The characteristics of the product that render it unreasonably dangerous under R.S. 9:2800.55, *et seq.*, existed at the time the product left the control of the manufacturer or resulted from a reasonably anticipated alteration or modification of the product.

190.    Defendants failed to adequately warn consumers of the negligent manufacture and potential adverse health effects of Digitek ® (Digoxin). Defendants marketed Digitek ® (Digoxin) which was in a dangerous and defective condition and was defective

-39-

in design and formulation by reason of which said drug was unreasonably dangerous to the user thereof. Digitek ® (Digoxin) was dangerous and defective at the time it was marketed by Defendants and at the time it was ingested by Plaintiffs.

191.   Said dangerous and defective condition proximately caused the injuries alleged herein to Plaintiffs while the product was used for its ordinary intended purpose and in the ordinary intended manner. The injuries alleged herein to Plaintiffs, and damages suffered were the direct and proximate result of the marketing and sale by Defendants of the defective and unreasonably dangerous product, Digitek ® (Digoxin).

192.   Defendants failed to properly and adequately test Digitek ® (Digoxin).

193.   Plaintiffs were prescribed and took Digitek ® (Digoxin) and suffered severe and debilitating injuries and damages as a result.

194.   Defendants failed to adequately warn consumers of the manufacturing defect and attendant potential adverse health effects of Digitek ® (Digoxin).

## NINTH CAUSE OF ACTION AGAINST DEFENDANTS
## MEDICAL MONITORING

195.   Plaintiff, Ruby I. Thrasher, individually, and on behalf of all others similarly situated, repeats, reiterates, and realleges each and every allegation of this Complaint in each of the foregoing paragraphs inclusive, with the same force and effect as if fully set forth herein.

196.   As a direct result of Defendants' actions, omissions, and negligence, Plaintiff and Plaintiff Class Members have been put at a heightened risk of very serious health complications. This risk of death and serious health complications requires diagnostic medical examinations. By monitoring and testing the affected Plaintiff and members of

-40-

the Class, it can be determined whether they are prone to death and serious health

complications as a result of the damages caused by Defendants. Through such testing

and monitoring, lives can be saved.

197. Because the ingestion of this defectively manufactured drug poses significant

health risks to Plaintiff and Plaintiff Class Members, medical monitoring is the most

appropriate method by which it can be determined whether a particular Plaintiff should

be promptly treated.

198. Accordingly, Defendants should be required to establish a medical monitoring

program that includes, *inter alia*:

> a. establish a trust fund, in an amount to be determined to pay for the medical monitoring of all recipients of the defectively manufactured drug, as frequently as determined to be medically necessary, as well as to pay development and/or research for other methods by which the risk of the negligent manufacture of this drug can be reduced;

> b. notifying all members of the Class in writing, not just notices to Doctors, that they have been prescribed a defectively manufactured drug that requires medical monitoring; and

> c. providing information and/or educational training to treating physicians to aid them in detecting patients who may be suffering the adverse consequence of having ingested the negligently manufactured drug.

199. Plaintiff and the Plaintiff Class Members have no adequate remedy at law in that

monetary damages alone cannot compensate them for the risk of a fatal cardiac event.

Without a Court-approved medical monitoring program, as described above, Plaintiff

and the Plaintiff Class Members will continue to face an unreasonable risk of death.

## DEMAND FOR JURY TRIAL

200. Plaintiff, Ruby I. Thrasher, individually and on behalf of the Plaintiff Class

-41-

Members, hereby demands a trial by jury as to all issues so triable.

## **PRAYER FOR RELIEF**

201.   WHEREFORE, Plaintiff and Plaintiff Class Members demand judgment against

Actavis Group, Actavis Totowa, LLC, Mylan Pharmaceuticals, Inc., Mylan Bertek

Pharmaceuticals, Inc., and UDL Laboratories, Inc. as follows:

a.   An order certifying the Class, appointing Plaintiff as Class Representative, and appointing Lambert & Nelson, PLC, Becnel Law Firm, LLC, The Law Offices of Ronnie G. Penton, and Parker Waichman Alonso, LLP as counsel to the Class;

b.   Equitable, injunctive, and declaratory relief;

c.   Damages in an amount to be determined at trial;

d.   Pre-judgment and post-judgment interest at the maximum rate allowable at law;

e.   Treble, exemplary, and/or punitive damages in an amount to be determined at trial;

f.   The costs and disbursements incurred by Plaintiff and Plaintiff Class Members in connection with this action, including reasonable attorneys' fees;

g.   All statutory damages;

h.   Disgorgement of Defendants' profits from the sale of Digitek ® (Digoxin);

i.   Return or refund of any purchase price paid, including, but not limited to, insurance co-payments, interest on these amounts from the date of purchase, attorneys' fees and costs, non-pecuniary damages, as well as any other legal or equitable relief to which Plaintiffs may be entitled;

j.   Medical monitoring;

k.   Such other and further relief under all applicable state and federal law and any other relief the Court deems just and appropriate.

-42-

Respectfully submitted,

HUGH P. LAMBERT, T.A. (7933)
LINDA J. NELSON (9938)
E. ALEXIS BEVIS (29091)
Lambert & Nelson, PLC
701 Magazine Street
New Orleans, LA 70130
Telephone: 504-581-1750
Facsimile: 504-529-2931

DANIEL E. BECNEL, JR. (2926)
MATTHEW B. MORELAND (24567)
Becnel Law Firm, LLC
106 West 7th Street
P.O. Drawer H
Reserve, LA 70084
Telephone: (985) 536-1186
Facsimile: (985) 536-6445

RONNIE G. PENTON (10462)
Law Offices of Ronnie G. Penton
209 Hoppen Place
Bogalusa, LA 70427
Telephone: (985) 732-5681
Facsimile: (985) 735-5579

JERROLD S. PARKER (JP-6865)
Parker, Waichman, Alonso, LLP
111 Great Neck Road
Great Neck, NY 11021
Telephone: (516) 466-6500
Facsimile: (516) 466-6665

-43-

**<u>PLEASE SERVE:</u>**
Actavis Group
through its Corporate Headquarters
60 Columbia Road, Building B
Morristown, NJ 07960

Actavis Totowa, LLC
through its Corporate Headquarters
1 New England Avenue
Piscataway, NJ 08854

Mylan Pharmaceuticals, Inc.
through its Corporate Headquarters
781 Chestnut Ridge Road
Morgantown, WV 26505

Mylan Bertek Pharmaceuticals, Inc.
through its Corporate Headquarters
320 Lakeside Drive, Suite A
Foster City, CA 94404

UDL Laboratories, Inc.
through its Corporate Headquarters
1718 Northrock Court
Rockford, IL 61103